Slip Op. 17- 12

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **CHINA MANUFACTURERS ALLIANCE, LLC AND DOUBLE COIN HOLDINGS LTD.,** | |
| Plaintiffs, | |
| **TITAN TIRE CORPORATION, ET AL.,** | |
| Plaintiffs, | |
| and | **Before: Timothy C. Stanceu, Chief Judge** |
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,** | **Consol. Court No. 15-00124** |
| Plaintiffs, | |
| v. | |
| **UNITED STATES,** | |
| Defendant. | |

## OPINION AND ORDER

[Remanding to the issuing agency a determination in an antidumping duty proceeding]

Dated: February 6, 2017

*Daniel L. Porter*, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. With him on the brief were *James P. Durling*, *Matthew P. McCullough*, *Claudia Hartleben*, and *Tung Nguyen*.

*William F. Fennell*, Stewart and Stewart, of Washington, D.C., for plaintiffs and defendant-intervenors Titan Tire Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. With him on the brief were *Terence P. Stewart* and *Nicholas J. Birch*.

*Mark E. Pardo*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, and *Andrew T. Schutz*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Nanda Srikantaiah*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge:  In this consolidated action,[1] three groups of plaintiffs contest the final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the fifth periodic administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China ("China" or the "PRC").  Finding merit in certain of plaintiffs' claims, the court remands the determination to Commerce for reconsideration and redetermination.

## I. BACKGROUND

### A.  The Contested Determination

The determination contested in this litigation is *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) *("Amended Final Results")*; *see Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) *("Final Results")*.  Commerce issued the

---

[1] Consolidated under *China Manufacturers Alliance, LLC et al. v. United States*, Consol. Court No. 15-00124, are *Guizhou Tyre Co., Ltd. et al. v. United States*, Court No.15-00128, and *Titan Tire Corporation et al. v. United States*, Court No. 15-00136.

antidumping duty order (the "Order") on off-the-road tires from China (the "subject

merchandise") on September 4, 2008.  *Certain New Pneumatic Off-the-Road Tires From the*

*People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less*

*Than Fair Value and Antidumping Duty Order*, A-570-912, 73 Fed. Reg. 51,624 (Int'l Trade

Admin. Sept. 4, 2008).  The fifth administrative review pertained to import entries of subject

merchandise made during the period of review ("POR") of September 1, 2012 through

August 31, 2013.  *Final Results*, 80 Fed. Reg. at 20,197.

### B.  The Parties to this Consolidated Case

The three groups of plaintiffs in this consolidated case are (1) China Manufacturers

Alliance, LLC ("CMA") and Double Coin Holdings Ltd.; (2) Guizhou Tyre Co., Ltd. and

Guizhou Tyre Import and Export Co., Ltd.; and (3) Titan Tire Corporation ("Titan"), joined by

the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

Service Workers International Union, AFL-CIO CLC (the "USW").

Commerce considered Double Coin Holdings Ltd. and two Chinese tire producers

affiliated with it to be a single company for the purposes of the review, to which it referred as

"Double Coin."[2]  *Final Results*, 80 Fed. Reg. at 20,198.  CMA is a U.S. importer of Double

Coin's subject merchandise.  Corrected Br. of Resp. Pls. CMA and Double Coin in Supp. of Mot.

for J. on the Agency R. (Oct. 5, 2015) 1, ECF No. 49 ("Double Coin's Br.").  Commerce

---

[2] Commerce ruled that "Double Coin Group Jiangsu Tyre Co., Ltd., Double Coin Group
Shanghai Donghai Tyre Co., Ltd., and Double Coin Holdings, Ltd. are affiliated pursuant to
section 771(33)(E) of the Act [19 U.S.C. § 1677(33)(E)] and should be collapsed together and
treated as a single company (collectively, 'Double Coin'), pursuant to the criteria laid out in
19 CFR 351.401(f)."  *Certain New Pneumatic Off-the-Road Tires from the People's Republic of
China: Final Results of Antidumping Duty Administrative Review; 2012-2013, 80 Fed. Reg.
20,197, 20,198 (Int'l Trade Admin. Apr. 15 2015) ("Final Results").*

designated Double Coin, an exporter and producer of subject merchandise, as one of two

mandatory respondents in the fifth review. *Final Results*, 80 Fed. Reg. at 20,197.

Commerce designated Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co.,

Ltd. (collectively, "GTC" or "Guizhou"), another exporter and producer of subject merchandise,

as the other mandatory respondent in the review. *Id.*

Titan, a U.S. producer of off-the-road tires, and the USW were the petitioners in the

Department's investigation culminating in the issuance of the Order. *Certain New Pneumatic*

*Off-The-Road Tires From the People's Republic of China; Preliminary Determination of Sales at*

*Less than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 9,278 (Int'l Trade

Admin. Feb. 20, 2008). Titan and the USW participated in the fifth administrative review as

interested parties. Compl. ¶ 3 (May 6, 2015), ECF No. 6 (Court No. 15-00136).

C.  Proceedings before Commerce

Commerce initiated the fifth administrative review on November 8, 2013. *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in*

*Part*, 78 Fed. Reg. 67,104 (Int'l Trade Admin. Nov. 8, 2013). Commerce published the

preliminary results of the review ("Preliminary Results") on October 10, 2014. *Certain New*

*Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of*

*Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 61,291 (Int'l Trade Admin.

Oct. 10, 2014) ("*Preliminary Results*"), and accompanying *Decision Memorandum for*

*Preliminary Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-*

*the-Road Tires from the People's Republic of China; 2012-2013*, A-570-912 ARP 12-13 (Int'l

Trade Admin. Sept. 30, 2014) (Admin.R.Doc. No. 259), *available at*

http://enforcement.trade.gov/frn/summary/prc/2014-24275-1.pdf (last visited Jan. 25, 2017)

("*Prelim. I&D Mem.*").

In the Preliminary Results, Commerce preliminarily determined that Double Coin made

sales of subject merchandise at less than fair value and calculated for it a preliminary dumping

margin of 0.69%.  *Preliminary Results*, 79 Fed. Reg. at 61,293.  However, upon adopting a

rebuttable presumption that all Chinese exporters are subject to control by the government of the

PRC, Commerce preliminarily ruled Double Coin to have failed to rebut the Department's

presumption of government control and, therefore, to have failed to qualify for a "separate rate."

On that basis, Commerce considered Double Coin to be part of what it termed the "PRC-wide

entity."  *Id.*  In the Preliminary Results, Commerce preliminarily assigned the PRC-wide entity a

rate of 105.59%, which it obtained by taking a simple average of the individual rate Commerce

calculated for Double Coin (0.69%) and the rate Commerce assigned to the PRC-wide entity in

the original antidumping duty investigation, which was 210.48%.  *Id.*  Commerce also

preliminarily determined that GTC made sales of subject merchandise at less than fair value and

qualified for a separate rate, preliminarily assigning GTC an individually-determined margin of

16.18%.  *Id.* at 61,294.

On April 15, 2015, Commerce published the Final Results, incorporating by reference an

*Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative*

*Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2012-*

*2013*, A-570-912 ARP 12-13 (Int'l Trade Admin. Apr. 8, 2015) (Admin.R.Doc. No. 293),

*available at* http://enforcement.trade.gov/frn/summary/prc/2015-08673-1.pdf (last visited

Jan. 25, 2017) ("*Final I&D Mem.*").  Commerce assigned a margin of 11.34% to GTC and a

margin of 105.31% to the PRC-wide entity, which Commerce again determined to include

Double Coin based on a finding that Double Coin had not rebutted the Department's

presumption of government control.  *Final Results*, 80 Fed. Reg. at 20,199.  The PRC-wide rate

was the "simple average of the previously assigned PRC-wide rate (210.48 percent) and Double

Coin's calculated margin (0.14 percent)."  *Id.* (footnotes omitted).

Following a ministerial error allegation, Commerce published amended final results of

the review ("Amended Final Results") on May 7, 2015.  *See Amended Final Results*, 80 Fed.

Reg. at 26,230.  In the Amended Final Results, Commerce revised GTC's margin from 11.34%

to 11.41%.[3]  *Id.* at 26,231.[4]  The PRC-wide rate remained 105.31%.  *Id.*

D.  Proceedings before the Court of International Trade

CMA and Double Coin Holdings Ltd. commenced their action on April 28, 2015.

Summons, ECF No. 1; Compl., ECF No. 6.  Plaintiffs GTC, and Titan and the USW,

commenced their actions thereafter.  *See* Compl. (May 1, 2015), ECF No. 6 (Court No. 15-

00128); Compl. (May 6, 2015), ECF No. 6 (Court No. 15-00136).  Titan and the USW filed a

motion to intervene as defendant-intervenors in the cases brought by CMA/Double Coin

Holdings Ltd. and GTC.  *See* Titan and the USW Consent Mot. to Intervene as of Right

---

[3] The amended final results were issued following a ministerial error allegation asserting
that Commerce failed to include two of GTC's inputs in the total material cost buildup for
normal value.  *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of
China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013, 80 Fed.
Reg. 26,230, 26,231 (Int'l Trade Admin. May 7, 2015) ("Amended Final Results").*

[4] Commerce assigned GTC's margin as the "all-others" rate to the "separate rate"
respondents, i.e., those respondents that Commerce considered independent from the government
of China but that did not receive an individually-determined margin, which were Zhongce
Rubber Group Company Limited and Weihai Zhongwei Rubber Co., Ltd.  *See Certain New
Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Results of
Antidumping Duty Administrative Review; 2012-2013, 79 Fed. Reg. 61,291, 61,294 (Int'l Trade
Admin. Oct. 10, 2014) ("Preliminary Results")*; *Final Results*, 80 Fed. Reg. at 20,199; *Amended
Final Results*, 80 Fed. Reg. at 26,231.

(May 12, 2015), ECF No. 12; Titan and the USW Consent Mot. to Intervene as of Right

(May 12, 2015), ECF No. 12 (Court No. 15-00128).  CMA and Double Coin Holdings Ltd., and

GTC, filed motions to intervene as defendant-intervenors in the case brought by Titan and the

USW.  *See* Double Coin Consent Mot. to Intervene as of Right (May 15, 2015), ECF No. 13

(Court No. 15-00136); Guizhou Consent Mot. to Intervene as of Right (June 2, 2015), ECF

No. 18 (Court No. 15-00136).

Before the court are the three motions for judgment on the agency record, filed by each of

the three groups of plaintiffs according to USCIT Rule 56.2.  *See* Resp. Pls.' Mot. for J. on the

Agency R. (Sept. 24, 2015), ECF No. 38; GTC's Mot. for J. on the Agency R. and Br. in Supp.

(Sept. 24, 2015), ECF No. 36 ("GTC's Br."); Titan and the USW's Mot. for J. on the Agency R.

and Br. in Supp. (Sept. 24, 2015), ECF No. 35 ("Titan's Br.").  Defendant opposed all three

motions.  *See* Def.'s Response to Mots. for J. on the Agency R. (Dec. 7, 2015), ECF No. 60

(Def.'s Opp'n").[5]  The court held oral argument on April 27, 2016.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

---

[5] Double Coin and GTC each filed an opposition to Titan's and the USW's motion.  *See* Def.-intervenors' Response in Opp'n of Pls.' Titan and the USW's Mot. for J. on the Agency R. (Dec. 7, 2015), ECF No. 54; GTC's Response to Titan and the USW's Mot. for J. on the Agency R. (Dec. 7, 2015), ECF No. 59.  Titan filed an opposition to Double Coin's and GTC's motions. *See* Response Br. of Titan and the USW (Dec. 7, 2015), ECF No. 56.  Double Coin, GTC, and Titan and the USW filed reply briefs in response to the opposition briefs.  *See* Reply Br. of Resp. Pls.' CMA and Double Coin in Support of Mot. for J. on the Agency R. (Jan. 19, 2016), ECF No. 76; Reply Br. of Titan and the USW (Jan. 19, 2016), ECF No. 71; Consol. Pl. GTC's Reply Br. (Jan. 19, 2016), ECF No. 75.

section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended*, 19 U.S.C. § 1516a,

including an action contesting a final determination that Commerce issues to conclude an

antidumping administrative review.[6]  In reviewing a final determination, the court "shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

<u>B.  The Claims of the Three Groups of Plaintiffs</u>

CMA and Double Coin claim that Commerce acted unlawfully in determining a 105.31%

rate for the PRC-wide entity and assigning this rate to Double Coin.  Double Coin's Br. 8-51.

They advance several grounds for this claim, which the court addresses below.

GTC raises five claims.  First, it claims that Commerce unlawfully made downward

adjustments to account for Chinese value-added tax when determining the export prices and

constructed export prices at which GTC's subject merchandise was sold in the United States.

GTC's Br. 7-23.  Second, GTC challenges the Department's choice from among the record data

for determining surrogate financial ratios.  *Id.* at 23-31.  Third, GTC challenges the surrogate

value Commerce used to value steam coal inputs.  *Id.* at 31-45.  Fourth, GTC contends that

Commerce improperly double counted certain costs as domestic brokerage and handling and as

ocean freight.  *Id.* at 45-51.  Finally, GTC claims that the Department's surrogate value for

domestic warehouse costs should have been, but was not, adjusted for inflation.  *Id.* at 51-54.

Titan and the USW challenge, first, the 105.31% margin Commerce assigned to Double

Coin, arguing that Commerce instead should have assigned the 210.48% margin originally

---

[6] All citations to the United States Code herein are to the 2012 edition and all citations to
the Code of Federal Regulations are to the 2015 edition.

determined in the investigation for the PRC-wide entity and applied in reviews prior to the fifth

review.  Titan's Br. 17-24.  Second, they claim that Double Coin reported freight distances

incorrectly and that Commerce erred in accepting the misreported data.  *Id.* at 24-25.  Third,

Titan and the USW claim that Commerce erred in accepting Double Coin's reported inventory

carrying costs for subject merchandise.  *Id.* at 25-27.  Finally, they claim that Commerce

incorrectly limited ("capped") the distances used to determine GTC's surrogate freight costs for

material inputs.  *Id.* at 27-29.

### C.  CMA's and Double Coin's, and Titan's and the USW's, Claims Challenging Assignment of the 105.31% Rate to Double Coin

CMA and Double Coin Holdings Ltd. make four arguments in challenging the 105.31%

"PRC-wide" rate Commerce assigned to Double Coin.  They argue, first, that Commerce lacked

authority to determine a rate for the "PRC-wide entity" because the statute permitted it only to

determine a weighted average dumping margin for each individually examined exporter and

producer and an estimated "all others" rate for all exporters and producers not individually

examined.  Double Coin's Br. 8-16.  Second, they argue that Commerce had no authority to

apply the 105.31% rate to Double Coin because that rate rests on an outdated presumption that

that there is a single entity in China consisting of all Chinese exporters under the central control

of the PRC government.  *Id.* at 16-27.  They submit that the presumption, adopted in the early

1990s based on circumstances in China in the late 1980s, is now factually invalid and

contradicted by the Department's own determinations since that time, including its determination

that China's economy is now sufficiently market-oriented that Commerce now considers it

appropriate to subject Chinese exports to countervailing duties.  *Id.* at 20-25.  Third, they argue

that the Department's finding that the government of the PRC controls the export activities of

Double Coin is not supported by the evidence of record.  *Id.* at 27-51.  Fourth, and finally, they

argue that it was unlawful for Commerce to subject Double Coin to the 105.31% rate, rather than

a rate determined based on Double Coin's own data, because Commerce, in doing so, applied a

rate determined according to "facts otherwise available" and "adverse inferences."  *Id.* at 51-59.

According to their argument, this was impermissible, *inter alia*, "particularly since Commerce

found determined [*sic*] that Double Coin's actual AD [antidumping duty] rate was *de minimis*"

and because Commerce found that Double Coin fully cooperated with the review.  *Id.* at 51.

        CMA and Double Coin Holdings Ltd. have standing to challenge the PRC-wide rate of

105.31% because that rate was applied to Double Coin.  The court, therefore, construes their

various arguments as constituting a single claim—that Commerce unlawfully assigned this rate

to Double Coin—and construes all of its arguments as grounds in support of this claim.  For the

reasons discussed in this Opinion and Order, the court agrees with the fourth argument they put

forth.  Therefore, the court does not address the remaining arguments.

        Commerce stated in the fifth administrative review that "[t]he Department considers the

PRC to be a non-market economy country ["NME"] under section 771(18) of the Act,"[7] and

"[i]n antidumping proceedings involving NME countries, such as the PRC, the Department has a

rebuttable presumption that the export activities of all firms within the country are subject to

government control and influence."  *Final I&D Mem.* 10.  Commerce further stated that "[i]t is

the Department's policy to assign all exporters of the merchandise subject to review in NME

---

        [7] 19 U.S.C. § 1677(18)(A).  A "nonmarket economy country" ("NME") is defined therein
as "any foreign country that the administering authority determines does not operate on market
principles of cost or pricing structures, so that sales of merchandise in such country do not reflect
the fair value of the merchandise."

countries a single rate unless an exporter can affirmatively demonstrate an absence of

government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports." *Prelim.*

*I&D Mem* 7.

  In the fifth review, Commerce determined that Double Coin failed to rebut the

presumption of *de facto* state control and, therefore, found that Double Coin "is a part of the

PRC-wide entity." *Final I&D Mem.* 12.  From that finding, Commerce proceeded to a

conclusion that Double Coin had not established its entitlement to a "separate rate," i.e., a rate

separate from the rate Commerce would assign to the PRC-wide entity. *Id.* ("Double Coin is

ineligible for a separate rate due to its inability to establish independence from government

control.").  On this ground, Commerce declined to assign to Double Coin the *de minimis* margin

of 0.14%, to which it referred in the Final Results as Double Coin's "calculated margin."[8] *Final*

*Results*, 80 Fed. Reg. at 20,199; *see Final I&D Mem.* 12 (acknowledging that this was the

"calculated final margin for Double Coin").  Instead, Commerce assigned Double Coin a rate of

105.31%, a rate Commerce designated as a newly-established rate for "the PRC-wide entity."

*Final Results*, 80 Fed. Reg. at 20,199.

  Titan and the USW claim that Commerce erred in assigning the 105.31% rate to Double

Coin on the ground that on the record before it, Commerce should have left unchanged, and

applied to Double Coin, the PRC-wide rate of 210.48% determined upon conclusion of the

investigation and continued through previous reviews of the Order.

---

[8] For purposes of depositing and assessing antidumping duties, a margin of 0.14% is disregarded as a *de minimis* margin. *See* 19 C.F.R. § 351.106(c) (weighted-average dumping margins disregarded as *de minimis* if less than 0.5% *ad valorem*).

1.  Commerce Erred in Assigning Double Coin the 105.31% Rate Instead of the 0.14%
*De Minimis* Margin

The court begins its analysis with the statutory requirements for the conducting of an administrative review of an antidumping duty order.  Section 751(a)(1) of the Tariff Act requires Commerce, upon a proper request, to conduct a periodic administrative review at least once during each 12-month period beginning on the anniversary of the date of publication of an antidumping duty order.  19 U.S.C. § 1675(a)(1).  In a review, Commerce is directed generally to determine the normal value and U.S. price (i.e., export price or constructed export price) and resulting dumping margin, for "each entry" of the subject merchandise.  *See* 19 U.S.C. §§ 1675(a)(2)(A)(i), (ii).

Commerce designated Double Coin, as an exporter and producer of subject merchandise, to serve as one of the two "mandatory respondents" and maintained this designation throughout the fifth review.  Having made this designation, Commerce placed itself under a general obligation to assign Double Coin an "individual weighted average dumping margin."  That much is clear from Section 777A(c)(1) of the Tariff Act, 19 U.S.C. § 1677f-1(c)(1), which provides as a general rule that Commerce, in determining weighted average dumping margins under § 1675(a), "*shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.*"  *Id.* § 1677f-1(c)(1) (emphasis added).  There is a statutory exception to this general rule where "it is not practicable to make individual weighted average dumping margin determinations" because "of the large number of exporters or producers involved in the investigation or review."  *See id.* § 1677f-1(c)(2).  In that circumstance, Commerce

> may determine the weighted average dumping margins for a reasonable number
> of exporters or producers by limiting its examination to . . . a sample of exporters,

> producers, or types of products that is statistically valid . . . or . . . exporters and
> producers accounting for the largest volume of the subject merchandise from the
> exporting country that can be reasonably examined.

*Id.* § 1677f-1(c)(2).  In the fifth review, Commerce expressly invoked this statutory exception,

but it did so in deciding to *perform* an individual examination of Double Coin, not to *avoid* doing

one.  Commerce designated Double Coin and GTC (which Commerce determined was not part

of the PRC-wide entity) as its two "mandatory respondents," i.e., the two respondents to each of

which, according to § 1677f-1(c)(2), it would "limit[] its examination."  Citing 19 U.S.C.

§ 1677f-1(c)(2), Commerce chose Double Coin and GTC as the two "exporters and producers

accounting for the largest volume of the subject merchandise from the exporting country," *id.*

§ 1677f-1(c)(2)(B).  *Prelim. I&D Mem.* 3.

The *de minimis* margin of 0.14% that Commerce calculated for Double Coin qualifies as

an "individual weighted average dumping margin" within the meaning of 19 U.S.C.

§ 1677f-1(c)(1).  The rate of 105.31% that Commerce assigned to Double Coin, not having been

determined by an individual examination, does not.  The record evidence shows that Commerce

determined the *de minimis* margin according to the export prices and constructed export prices at

which Double Coin's subject merchandise was sold in the United States and the Department's

own determination of the normal value of that merchandise on the basis of Double Coin's factors

of production and surrogate values, according to the nonmarket economy country procedures of

19 U.S.C. § 1677b(c).  As Commerce acknowledged, it was able to calculate an individually-

determined margin for Double Coin "[b]ecause Double Coin provided the Department with its

verified sales and production data."  *Final Results*, 80 Fed. Reg. at 20,199.  Commerce

"calculated" the 105.31% rate as "a simple average of the previously assigned PRC-wide rate

(210.48 percent) and Double Coin's calculated margin (0.14 percent)."  *Id.* (footnotes omitted).

Even though it calculated the *de minimis* margin based on Double Coin's own data,

during the review Commerce rejected Double Coin's argument that "the statute requires the

Department to assign Double Coin a rate based on this information." *Final I&D Mem.* 12.

Commerce gave as its reason that "[i]t is the Department's policy to assign all exporters of the

merchandise subject to review in NME countries a single rate unless an exporter can

affirmatively demonstrate an absence of government control" and that "Double Coin is ineligible

for a separate rate due to its inability to demonstrate the absence of government control." *Id.*

This reason does not suffice. No "policy" can justify an agency's decision if that policy is

applied to conflict with a statutory requirement. Here, the policy Commerce cited cannot serve

to reconcile two inconsistent decisions: the Department's decision to subject Double Coin to

individual examination and its decision not to assign Double Coin an individual margin. The

plain language of 19 U.S.C. § 1677f-1(c) does not permit such a result. The Statement of

Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act ("URAA"),

which enacted § 1677f-1(c), underscores this point. The SAA clarifies that the provision was

intended in large part to reflect U.S. law and practice, which it described as follows:

> Under existing practice, Commerce attempts to calculate individual
> dumping margins for all producers and exporters of merchandise who are subject
> to an antidumping investigation or for whom an administrative review is
> requested. As a practical matter, however, Commerce may not be able to examine
> all exporters and producers, for example, when there is a large number of
> exporters and producers. In such situations, Commerce either limits its
> examination to those firms accounting for the largest volume of exports to the
> United States or employs sampling techniques. *Commerce will calculate*
> *individual dumping margins for those firms selected for examination and an "all*
> *others" rate to be applied to those firms not selected for examination.*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.

Rep. No. 103-316, Vol. 1 at 872 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200 (emphasis

added).  As the SAA makes clear, an exporter or producer that is "selected for examination" according to § 1677f-1(c) is one for which Commerce will calculate an individual dumping margin.  Therefore, whatever rate Commerce chose to apply to Double Coin—whether or not it also was the rate Commerce chose to apply to whatever it considered to be "the PRC-wide entity"—was required by statute to be an individual dumping margin for Double Coin, unless some statutory exception applied.  None did.

Commerce explained, further, that "[t]he Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity."  *Final I&D Mem.* 12; *see also Final Results*, 80 Fed. Reg. at 20,199.  This rationale also fails to justify the Department's decision not to assign an individually-determined margin to Double Coin. Commerce is permitted to base an individual weighted average dumping margin on substitute information by invoking its authority under 19 U.S.C. § 1677e(a), which directs the use of "facts otherwise available" where "necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).  Commerce expressly invoked this authority in using the 210.48% rate as a substitute for what it considered to be missing information pertaining to the "unspecified" portion of the PRC-wide entity that it did not consider to consist of Double Coin.  *Final Results*, 80 Fed. Reg. at 20,199.  However, in the fifth review Commerce was not in a position to use facts otherwise available in determining an individual dumping margin for Double Coin, and even had it been, it could not have used the 210.48% rate for that purpose.

As to Double Coin, Commerce did not make a valid finding, supported by record evidence, that "necessary information," within the meaning of 19 U.S.C. § 1677e(a), was unavailable on the record.  To the contrary, Commerce, by its own acknowledgment, had all the

information it needed to determine an individual weighted average dumping margin for Double Coin.

Under § 1677e(a), the information Commerce would use as a substitute for the missing information is information to be used "in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a).  In the Issues and Decision Memorandum for the Final Results, Commerce stated that "[i]n this review, we are seeking to establish a new rate for the [PRC-wide] entity, which is under review, and a *part of which* was selected as a mandatory respondent, but for which we do not have complete information."  *Final I&D Mem.* 13 (emphasis added).  In other words, Commerce decided to make an entity it described as the "PRC-wide entity" subject to the fifth review but intentionally declined to designate that entire entity as a mandatory respondent.[9]  By designating only GTC and Double Coin as mandatory respondents, Commerce decided that it would *not* perform an individual examination upon the PRC-wide entity as a whole.  Accordingly, for purposes of 19 U.S.C. § 1677f-1(c)(1), Commerce needed, and obtained, information with which to determine an individual dumping margin for Double Coin, which it designated for individual examination.

On the other hand, because Commerce intentionally declined to designate as a "mandatory," i.e., individually examined, producer or exporter the non-Double Coin portion of

---

[9] Commerce referred to what it considered the portion of the PRC-wide entity outside of Double Coin as "unspecified."  *Final I&D Mem.* 12.  The next sentence in the memorandum indicates that Commerce failed to define the entity it was subjecting to review: "Nor is there information on the record with respect to the composition of the PRC-wide entity."  *Id.*  In the Final Results and the accompanying Issues and Decision Memorandum, Commerce did not identify any exporter of subject merchandise other than Double Coin that it considered to be part of the PRC-wide entity.  Commerce was attempting to perform an administrative review, but not an individual examination, upon an entity it failed to define and, aside from Double Coin, about which it did not have record evidence allowing it to conclude that this entity was an exporter or producer of subject merchandise.

what it considered to be the PRC-wide entity, Commerce had no need for information with

which to calculate an individual weighted average dumping margin for that "portion."

Commerce determined that "we do not have the *necessary* information, *i.e.*, sales and production

data, from the remaining unspecified portion of the PRC-wide entity," *Final I&D Mem.* 12

(emphasis added), but this determination of necessity is incorrect.  The "sales and production

data" to which Commerce referred pertain to an individual weighted average dumping margin.

In short, the Department's review of that "remaining unspecified portion" of the PRC, i.e., the

non-Double Coin portion, was governed by an exception authorized by § 1677f-1(c)(2), under

which Commerce exercised its discretion not to perform an individual examination, not the

general rule of § 1677f-1(c)(1), under which it must perform one.  In summary, the finding that

Double Coin had failed to rebut the Department's presumption of government control did not

prevent Commerce from assigning Double Coin an individual margin.  Instead, Commerce relied

on that finding as its sole reason for choosing not to do so.

Even were the court to presume, for the sake of argument, that Commerce could have

invoked its authority under 19 U.S.C. § 1677e(a) to use facts otherwise available in determining

a margin for Double Coin, it would not have been permissible for it to use the 210.48% rate as

facts otherwise available on the record before it.  The factual information upon which that rate is

based bears no relationship to any sales or import entries—of any party—that are the subject of

the fifth review and, in any event, is not on the administrative record of the fifth review.[10]

---

[10] As to the theoretical question of "facts otherwise available" on the record for
determining a weighted average dumping margin for the PRC-wide entity, the court finds on the
record only one set of data that could be said to have qualified for that purpose: the record data
pertaining to an individual examination of the exports of Double Coin, which Commerce actually
          (continued . . .)

Moreover, the 210.48% rate was the result of the Department's invalid attempt to use not only

facts otherwise available but also an adverse inference drawn according to 19 U.S.C. § 1677e(b)

(to which Commerce refers as "adverse facts available," or "AFA").[11]  In the fifth review,

Commerce could not rely on its § 1677e(b) authority in applying the 105.31% rate to Double

Coin.  Commerce found Double Coin to be a cooperative respondent in the fifth review.  *Prelim.

I&D Mem.* 12.  It also found the data Double Coin submitted sufficient for the calculation of the

final *de minimis* margin.  *See Final Results*, 80 Fed. Reg. at 20,199.  Commerce did not find the

PRC-wide entity, or any portion of it, to be an uncooperative respondent in the fifth review.  Nor

did it assert that it submitted any requests for information to what it deemed the "PRC-wide

---

(. . . continued)
did examine when it calculated (but declined to apply) a *de minimis* margin for Double Coin.
The record contains no data pertaining to any Chinese exporter's subject merchandise, or even
data pertaining to the identity of such an exporter, other than that of Double Coin, that are
relevant to the fifth administrative review and that Commerce considered to be a part of the
PRC-wide entity.  As Commerce conceded, the record did not allow it to know the composition
of what it termed the "PRC-wide entity."  *Final I&D Mem.* 12.

[11] As the source for "the previously assigned PRC-wide rate (210.48 percent),"
Commerce cited the final less-than-fair-value determination it issued upon concluding the
original antidumping duty investigation.  *Final I&D Mem.* 12 n.44 (citing *Certain New
Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of
Critical Circumstances*, 73 Fed. Reg. 40,485, 40,489 (Int'l Trade Admin. July 15, 2008) (*"Final
LTFV Determination"*)).  The cited determination, of which the court takes judicial notice,
discloses that the 210.48% rate was the result of the use of facts otherwise available and an
adverse inference, *see* 19 U.S.C. § 1677e(b), based on the Department's finding that the PRC-
wide entity did not respond to the Department's request for information and thereby failed to
cooperate to the best of its ability.  *Final LTFV Determination*, 73 Fed. Reg. at 40,487-88.
Commerce found Double Coin to be a "Separate Rate Recipient," i.e., a respondent that
demonstrated *de jure* and *de facto* absence of government control.  *Id.* at 40,487, 40,489.  The
preliminary LTFV determination, of which the court also takes judicial notice, reveals that the
source of the 210.48% rate was "the highest calculated rate from the petition."  *Certain New
Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination
of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 9,278,
9,285 (Int'l Trade Admin. Feb. 20, 2008).

entity" (other than those it sent to Double Coin).  Instead, in using the 210.48% rate in

determining Double Coin's margin, Commerce impermissibly relied on matters not on the record

of the fifth review, pointing to a lack of cooperation in the original antidumping duty

investigation of what it then considered to be the PRC-wide entity (which at that time Commerce

found not to include Double Coin).  As Commerce explained:

> In this review, to the extent that the application of the pre-existing PRC-wide rate
> affects the antidumping duties assessed on Double Coin's entries as a result of
> this review, this rate is not an application of AFA to the entity in this review;
> rather, it reflects in part the rate applied to the entity based on the actions of the
> entity in the investigation of which Double Coin is now a part (and unchanged by
> any subsequent review).

*Final I&D Mem.* 13.  While Commerce attempts to characterize the 105.31% rate it applied to

Double Coin as something other than a rate determined according to "AFA," this

characterization is inaccurate.  The 105.31% rate was derived in substantial part from the AFA

rate assigned to the PRC-wide entity in the investigation.  The authority Congress provided in

19 U.S.C. § 1677e does not extend to the use of an adverse inference against Double Coin, a

fully cooperative interested party that Commerce examined individually in the review and for

which Commerce calculated (but declined to apply) an individual weighted average dumping

margin based on information it found to be sufficient for that purpose.

In the Final Issues and Decision Memorandum, Commerce cited various judicial

decisions in an attempt to justify its decision.  Commerce relied on a decision of the Court of

Appeals for the Federal Circuit ("Court of Appeals"), *Sigma Corp. v. United States*, 117 F.3d

1401, 1405-06 (Fed. Cir. 1997) in arguing that "[t]he Department's practice of assigning a PRC-

wide rate has been upheld by the Federal Circuit" and that in *Sigma Corp.* the Court of Appeals

"affirmed that it was within the Department's authority to employ a presumption for state control

in a NME country and place the burden on the exporters to demonstrate an absence of central

government control." *Final I&D Mem.* 10.  The issue of the current factual validity of the

presumption, although raised by Double Coin, is one the court need not resolve here.  The

opinion in *Sigma Corp.* did not address the question the court *does* need to resolve, i.e., whether

Commerce may refuse to assign an individual weighted average dumping margin to a

cooperative exporter or producer upon which it chose to perform an individual examination of

sales of subject merchandise.  *Sigma Corp.* involved antidumping duty reviews initiated before

the 1995 effective date of the Uruguay Round Agreements Act, which enacted 19 U.S.C.

§ 1677f-1(c).  *See* Pub. L. No. 103-465, § 229(a).  That previous version of the Tariff Act of

1930 had provided Commerce authority to use best information available ("BIA") rather than the

authority provided by the current 19 U.S.C. § 1677e, and it was under this "best information

available" authority that Commerce had imposed a single rate upon respondents who failed to

cooperate with the Department's investigation.

Commerce reasoned, further, that in *Transcom, Inc. v. United States*, 294 F.3d 1371,

1381-83 (Fed. Cir. 2002), the Court of Appeals affirmed "[t]he application of a PRC-wide rate to

all parties which were not eligible for a separate rate" and that "[i]n *Transcom*, the Federal

Circuit also found that a rate based on 'BIA' (the precursor to facts available and AFA under the

current statute) is not punitive." *Final I&D Mem.* 11.  *Transcom* also involved a review of an

antidumping duty order initiated prior to the effective date of the Uruguay Round Agreements

Act, which enacted 19 U.S.C. § 1677f-1(c).

Commerce concluded from *Sigma Corp.* and *Transcom*, and from decisions of this Court

that cite the opinions in those two cases, that "contrary to Double Coin's assertions, the courts

have consistently upheld the Department's authority to apply a presumption of state control in

NME countries and to apply a single rate to all exporters that fail to rebut that presumption."

*Final I&D Mem.* 11.  Neither case lends support to the decision challenged here, made under a

provision of the URAA, in which a cooperative exporter selected for individual examination was

not assigned a margin based on the sales of that exporter's own subject merchandise.  Commerce

took this action on the basis of a review of an entity—the portion of the "PRC-wide enterprise"

that did not include Double Coin—that Commerce did not select for individual examination.

Nothing in the Tariff Act authorizes Commerce to do this simply upon a Departmental finding

that the entity Commerce *did* select for individual examination, i.e., Double Coin, did not rebut

its presumption of government control.  This is quite different from the Department's established

practice of subjecting to a "PRC-wide" rate all Chinese exporters that Commerce found to have

failed to demonstrate independence from an uncooperative governmental entity and that

Commerce, for that reason, considered not to be entitled to individual examination or to a

"separate rate."   While the statute does not specify how Commerce is to determine a rate for

respondents that, pursuant to 19 U.S.C. § 1677f-1(c)(2), Commerce does not examine

individually in an administrative review of an antidumping duty order, it is explicit in directing

Commerce to "determine the individual weighted average dumping margin for each known

exporter and producer of the subject merchandise" that Commerce selects for individual

examination in such a review.  19 U.S.C. § 1677f-1(c)(1).  The statute makes no exception to this

requirement for exporters or producers Commerce considers controlled by the government of a

non-market economy country.

     As did Commerce in the Final Issues and Decisions Memorandum, defendant submits

that the Department's decision to apply a country-wide rate to Double Coin in the fifth review is

consistent with the decision of the Court of International Trade in *Advanced Technology &*

*Materials Co. v. United States*, 37 CIT __, __, 938 F. Supp. 2d 1342, 1350-51 (2013), which,

defendant points out, was affirmed by the Court of Appeals pursuant to Fed. Cir. R. 36 in

*Advanced Technology & Materials Co. v. United States*, 541 F. App'x. 1002 (Fed. Cir. 2013).

The case is neither precedential nor on point.  The segment of the opinion of this Court on which

Commerce and defendant relied concerned a plaintiff, Advanced Technology & Materials Co.,

Ltd., that was not selected as a mandatory respondent in the antidumping duty investigation that

gave rise to that case.  *See Advanced Tech. & Materials Co.*, 37 CIT __ at __, 938 F. Supp. 2d at

1350-51; *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative*

*Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof From the*

*People's Republic of China*, 71 Fed. Reg. 29,303 (May 22, 2006).  As a result, the case did not

involve the issue presented by this case, in which Commerce disregarded its obligation under

19 U.S.C. § 1677f-1(c) to assign Double Coin, a respondent Commerce selected for individual

examination, an individual weighted average dumping margin.

 In the Final Issues and Decision Memorandum, Commerce also relied on its regulation,

19 C.F.R. § 351.107(d), which provides that "[i]n an antidumping proceeding involving imports

from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable

to all exporters and producers."  *Final I&D Mem.* 10.  This reliance is misplaced.  Double Coin's

claim, properly construed, is that Commerce unlawfully assigned Double Coin the 105.31% rate

in the particular circumstances of the fifth review.  Whether or not another circumstance could

allow Commerce to apply a single rate to all exporters and producers of merchandise from a

nonmarket economy country is not the issue before the court.  Commerce may not exercise the

discretion inherent in this regulation, which states that rates "may" consist of a single margin, to

apply a single antidumping duty margin to all exporters and producers in a nonmarket economy

country in a way that fails to heed the statutory requirement to assign an individual weighted

average dumping margin to a fully cooperative exporter or producer it designated for individual

examination pursuant to 19 U.S.C. § 1677f-1(c).  The court presumes the validity of the

regulation, which Double Coin does not challenge.  While a court owes deference to an agency's

reasonable construction of its own regulation, a regulation that may be valid on its face is

interpreted unreasonably if it is applied contrary to the requirements of the authorizing statute.

*See Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, __, 132 S. Ct. 2156, 2166-67

(2012).

Similarly, the court will grant the deference to an agency's reasonable interpretation of a

statutory provision in appropriate circumstances.  *See Chevron U.S.A., Inc. v. Nat. Res. Def.*

*Council, Inc.*, 467 U.S. 837 (1984).  Here, however, Commerce has offered no interpretations of

the statutory provision chiefly at issue, 19 U.S.C. § 1677f-1(c), for the court's consideration; nor

did it analyze 19 U.S.C. § 1677e beyond invoking its authority thereunder to use the 210.48%

rate as facts otherwise available.  Instead, Commerce has attempted to justify its decision to

apply the 105.31% rate to Double Coin according to its inapplicable past practices, a regulation

(19 C.F.R. § 351.107(d)) it attempts to apply contrary to a statutory provision, and inapposite

judicial decisions.

2.  The Court Denies Relief on Titan's and the USW's Claim that as to Double Coin, Commerce
Unlawfully Departed from the Previous 210.48% PRC-Wide Rate

Titan and the USW claim that the Department's decision to assign the 105.31% rate to

Double Coin, instead of the previous PRC-wide rate of 210.48%, was unreasonable and

unsupported by substantial record evidence.  They base this claim on the state of the record and

their interpretations of past Commerce practice and various judicial decisions.  Titan's Br. 17-24.

The court denies relief on this claim.

As grounds in support of its claim, Titan and the USW argue that this Court has

recognized that under Department practice involving nonmarket economy cases, the separate

sales behavior of a single member of the PRC-wide entity is not meaningful and no individual

inquiry into that behavior is warranted.  Titan's Br. 18-19 (citing *Watanabe Grp. v. United*

*States*, 34 CIT 1545, 1551 (2010), *Jiangsu Changbao Steel Tube Co. v. United States*, 36 CIT__,

__, 884 F. Supp. 2d 1295, 1312 (2012)).  This argument fails because in this case, Commerce

decided to designate Double Coin under 19 U.S.C. § 1677f-1(c) for individual examination and,

thereby, for assignment of an individual weighted average dumping margin.  In light of that

decision, an individual inquiry into Double Coin's selling behavior is not only meaningful but

also necessary.

Titan and the USW next argue that "[f]or Commerce to be able to calculate a new margin

for the PRC-wide entity," i.e., a revision of the previous 210.48% rate, "it needed data on factors

of production and sales for the entity as a whole" and that where such information is not on the

record, the Department's standard practice when reviewing a member of the NME-wide entity,

as upheld by the courts, "is to apply an AFA rate to the whole entity."  Titan's Br. 20-21.  As to

the lack of record evidence on the PRC-wide entity as a whole, and alluding to the apparent fact

that Commerce did not seek information from the PRC-wide entity as a whole, Titan and the

USW argue that "[i]n this review, the onus was on the [PRC-wide] entity, including Double

Coin, to submit complete data on the record."  Titan's Br. 20 (citing *Chia Far Indus. Factory Co.*

*v. United States,* 28 CIT 1337, 1354, 343 F. Supp. 2d 1344, 1362 (2004)).  In support of this

argument, Titan and the USW contend that "Double Coin was aware of the government control it

was under, and on notice it was likely to be held to be part of the PRC-wide entity" but that

"Double Coin and that entity chose not to submit a complete set of information for Commerce to

review the activities of the entire PRC-wide entity." Titan's Br. 20-21. These arguments ignore

the record fact that Commerce, although naming Double Coin for individual examination as a

mandatory respondent, specifically declined to so designate the PRC-wide entity as a whole.

Notably, Titan and the USW do not claim that the Department's decision to designate

only Double Coin, and not the PRC-wide entity as a whole, as a mandatory respondent was

unlawful. Instead, they claim that Commerce was required on the record before it to assign the

whole entity, including Double Coin, the 210.48% rate in the fifth review. In support of its

argument, these plaintiffs cite *Transcom*, 294 F.3d at 1382, and *Advanced Technology &*

*Materials Co.*, 37 CIT at __, 938 F. Supp. 2d at 1351, but these cases are inapposite for the

reasons the court discussed previously. They also cite *Shandong Huanri (Group) General Co. v.*

*United States*, 31 CIT 1029, 1040, 493 F. Supp. 2d 1353, 1364 (2007), but this decision does not

address the issue posed by this case. The discussion in the opinion relates to the Department's

finding of control of the plaintiffs by the PRC government. There is no discussion in the opinion

of designation of plaintiffs as mandatory respondents and, accordingly, no discussion of the issue

this case presents as to 19 U.S.C. § 1677f-1(c). The decision challenged in the case, *Brake*

*Rotors From the People's Republic of China: Final Results and Partial Rescission of the Seventh*

*Administrative Review; Final Results of the Eleventh New Shipper Review*, 70 Fed. Reg. 69,937

(Int'l Trade Admin. Nov. 18, 2005), does not discuss the process of selection of mandatory

respondents.

Finally, Titan and the USW argue that the 210.48% rate permissibly could be used as

facts otherwise available in the application of a rate to the PRC-wide entity, and that the

105.31% rate could not, because only the former, being based on the petition, and not the latter,

was relevant to the PRC-wide entity as a whole.  Titan's Br. 22-24.  According to Titan and the

USW, the rate Commerce selected "was not based on any fact, available or otherwise, but was

only an assumption."  *Id.* at 22.  They maintain that "[i]n selection among facts otherwise

available, 19 U.S.C. § 1677e(b)(2) allows Commerce to select from among (1) the petition, (2)

the final determination, (3) any prior review, and (4) any other information on the record" and

that "[t]he new PRC-wide margin calculated was based on none of these permissible choices for

facts available."  *Id.*  Here again, Titan and the USW overlook the point that Commerce

designated Double Coin for individual examination and did not so designate the PRC-wide

entity.  As the court discussed previously, it was not permissible for Commerce to use facts

otherwise available in determining a weighted average dumping margin for Double Coin.

    3.  Commerce Must Assign Double Coin the *De Minimis* Margin Because This Is the
Appropriate Remedy for Double Coin's Claim Contesting the Assignment of the 105.31% Rate

       In conclusion, Commerce acted contrary to law in applying the rate of 105.31% to entries

of the subject merchandise exported by Double Coin.  As a remedy, Double Coin argues that the

decision to impose this rate must be set aside, Double Coin's Br. 59, and the court agrees.

Double Coin seeks that the court remand the Department's decision with instructions for

reissuance "consistent with the court's decision."  *Id.*  Double Coin thus leaves to the court the

specific instructions to be issued in remanding the Department's decision.

       Whether or not it was lawful for Commerce to deem Double Coin to be part of what it

deemed "the PRC-wide entity," Commerce was required by 19 U.S.C. § 1677f-1(c)(1) to apply

to Double Coin's subject merchandise an individual weighted average dumping margin

calculated according to the statutory requirements.  The only information available on the record

of the fifth administrative review that can be used for this purpose is the information provided by

Double Coin.  This was the information Commerce used to determine the *de minimis* margin that

Commerce described as a "calculated" and a "final" margin.  Commerce found the information

sufficient for that purpose.  The court is remanding the contested decision with the directive to

assign this 0.14% *de minimis* margin to the subject merchandise of Double Coin because that is

the appropriate remedy under the statute.

It might be argued that the court should issue a more general order that does not direct

Commerce to assign Double Coin the *de minimis* margin but leaves to Commerce the

determination of what margin to assign, so long as that margin is, as the statute requires, an

individual weighted average dumping margin.  According to such an argument, the court should

not foreclose the possibility that Commerce might choose to conduct the review anew as to the

PRC-wide entity, reopening the record as necessary to remedy what it acknowledged, *see Final

I&D Mem.* 12, as a lack of record evidence on the composition of this entity and on sales and

production data pertaining to it.  The court decides against this course of action.

As the court discussed previously, Commerce designated Double Coin as a mandatory,

i.e., individually examined, respondent, but it expressly avoided this designation for what it

considered to be the remainder of the PRC-wide entity, thereby deciding that it would *not*

perform an individual examination upon the PRC-wide entity as a whole.  Upon judicial review,

it is axiomatic that a court may adjudicate only claims that are properly before it.  In actions

contesting an agency determination, such as this one, the court may adjudicate only claims

challenging findings, determinations, and conclusions Commerce reached in the Final Results.

The court's remand order, therefore, may include only those directives that are needed to correct

the *contested* findings, determinations, and conclusions the court determines to be contrary to

law.  The court's procedures reflect this limitation on judicial review; *see, e.g.*, USCIT

R. 56.2(c).

In this litigation, no party contested the Department's designation of GTC and Double

Coin as mandatory respondents.  Moreover, no party contested the Department's decision in the

Final Results not to also designate as a "mandatory," i.e., individually examined, producer or

exporter the entire PRC-wide entity or, precisely, what Commerce considered to be the

"unspecified" portion of the PRC-wide entity beyond Double Coin.[12]  However illogical it might

seem that Commerce found the PRC-wide entity to be a single entity yet also reached a decision

to examine individually only what it deemed a portion of it, i.e., Double Coin, that decision is

unchallenged in this litigation and, therefore, final and conclusive.[13]  As a result, any prospect of

the Department's calculating, in a remand proceeding, an individual weighted average dumping

margin for the PRC-wide entity is foreclosed as beyond the scope of this litigation.  Accordingly,

the court refrains from issuing an order under which Commerce may revisit its final decision and

---

[12] Although CMA and Double Coin Holdings Ltd. argue that Commerce lacked the authority to issue a "PRC-wide" rate in the fifth review, *see* Double Coin's Br. 8-16, the court may not construe this argument as objecting to the Department's selection or non-selection of mandatory respondents.  As the court noted earlier, their standing results from the Department's applying the 105.31% margin to Double Coin.  Therefore, their claim is properly construed as limited by their standing, under which they may challenge the Department's assignment of the 105.31% rate to Double Coin, and not to any other respondent, real or hypothetical.  As a result, CMA and Double Coin Holdings Ltd. are not entitled to a remedy under which the court would order Commerce not to assign an antidumping duty rate to the PRC-wide entity.  Under the court's construction of, and adjudication of, their claim, such a rate could have no effect on CMA and Double Coin Holdings Ltd.

[13] In contrast, the Department's finding that Double Coin is part of the PRC-wide entity *is* challenged in this litigation.  Commerce, therefore, is free to alter that finding in complying with the court's order, should it choose to do so, even though a decision to do so or not to do so can have no effect on the margin Double Coin must be assigned in the redetermination.  Because the court's adjudication of the claim of CMA and Double Coin Holdings Ltd. does not require review of the validity of that finding, the court is not ordering that the finding be reconsidered.

reopen the record with the objective of obtaining information that might be used for that purpose.

The court is ordering Commerce to assign the 0.14% *de minimis* margin to Double Coin because

it is the only possible result that, on the record of the fifth administrative review, could comply

with all statutory requirements, in particular 19 U.S.C. § 1677f-1(c).[14]

D.  GTC's Claims

1.  The Department's Deductions for Value-Added Tax Were Contrary to the Statute

Section 772(c)(2)(B) of the Tariff Act directs Commerce to reduce "[t]he price used to

establish export price and constructed export price" by "the amount, if included in such price, of

any export tax, duty, or other charge imposed by the exporting country on the exportation of the

subject merchandise to the United States."[15]  19 U.S.C. § 1677a(c)(2)(B).  GTC claims that

Commerce exceeded its authority under section 772(c)(2)(B) when it made certain deductions

from the starting prices Commerce used to establish the export price ("EP") and constructed

export price ("CEP") for GTC's subject merchandise.[16]  Commerce made the deductions for

what it considered to be Chinese unrefunded value-added tax ("VAT") incurred on the subject

tires that GTC exported to the United States.  GTC argues that the Department's deductions were

unauthorized by the plain language of the statute, GTC's Br. 13-17, and that, even had they been

---

[14] Titan and the USW direct two claims to the Department's calculation of the 0.14% margin.  As discussed later in this Opinion and Order, the court does not find merit in either of these claims.

[15] According to 19 U.S.C. 1677a(c)(2)(B), no deduction is made if the export tax, duty or other charge is one described in 19 U.S.C. § 1677(6)(c), which is an export tax, duty, or other charge "levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received."  GTC does not contend that this exception applies.

[16] Commerce refers to the unadjusted sales price used to establish export price or constructed export price as the "starting price."  *See* 19 C.F.R. § 351.402(a).

authorized, the methodology Commerce used to calculate them was unreasonable and contrary to record evidence, *id.* at 17-23.

For the Final Results, Commerce described the Chinese VAT system as one in which "some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded." *Final I&D Mem.* 28 (footnote omitted). According to Commerce, "[t]his amounts to a tax, duty, or other charge on exports that is not imposed on domestic sales"; Commerce referred to this portion as "irrecoverable VAT." *Id.* Commerce explained that "[i]rrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports" and "is VAT paid on inputs and raw materials (used in the production of exports) that is nonrefundable and, therefore, a cost." *Id.* (footnote omitted). Commerce concluded that, for purposes of 19 U.S.C. § 1677a(c)(2)(B), "[i]rrecoverable VAT is, therefore, an 'export tax, duty, or other charge imposed' on exportation of the subject merchandise to the United States." *Id.* (footnote omitted).

In the Final Issues and Decisions Memorandum, Commerce defined "irrecoverable VAT" as follows: "Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods." *Id.* at 30 (footnote omitted). Commerce stated therein that "[i]nformation placed on the record of this review by both GTC and Double Coin," which consisted of GTC's and Double Coin's responses to the Department's questionnaire on VAT, "indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and the rebate rate for subject merchandise is nine percent." *Final I&D Mem.* 28 (footnote omitted). To apply 19 U.S.C. § 1677a(c)(2)(B), Commerce "removed from U.S. price the difference between the rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and

regulation." *Id.* at 29.  Because GTC had both EP and CEP sales, *see Prelim. I&D Mem.* 19,

22-23, Commerce made the 8% downward adjustments to the starting prices used to calculate

both EP and CEP.  GTC argues that § 1677a(c)(2)(B) did not allow Commerce to make these

deductions from its starting prices for irrecoverable VAT because, under Chinese law, GTC pays

no VAT on its exports of subject merchandise and instead pays VAT only on its domestic

purchases of inputs used to produce its tires.  GTC's Br. 14-15.

GTC relies on regulations of the PRC, which it placed on the record, as providing that

"'for taxpayers that export goods, *the tax rate shall be zero.*'"  *Id.* at 14 (quoting Article 2.3 of

the *Interim Regulations of the People's Republic of China on Value-Added Taxes* (2008) and

citing GTC's Section C Response. at 49-50 and Exhibit C-15 (emphasis in GTC's Br.)).

According to GTC, "[t]his is an *internal tax* related to the cost of acquiring inputs within China,

and it is obviously not a tax that is 'imposed on the exportation of the subject merchandise.'"  *Id.*

at 15.  GTC argues, further, that "since the record plainly shows that the VAT rate for export

sales is zero, there is no support for any assumption that VAT is 'included in the price' of the

export sale as required before Commerce can make any adjustment pursuant to 19 U.S.C.

§ 1677a(c)(2)(B)."  *Id.* at 15 n.16.

GTC maintains that even were Commerce, as a general matter, permitted to make a

deduction for irrecoverable VAT, its deduction in this instance was impermissible because

"[c]omputing an adjustment based upon the difference between the VAT *rates* paid and refunded

is obviously not the same as computing the actual *amount* paid if the applicable input VAT rate

and refund rate are applied to a different value basis."  *Id.* at 18 (emphasis in original).  Asserting

that "the 17% VAT input rate being used by Commerce is only applied to the value of inputs

purchased by GTC for the production of its tires, while the 9% refund rate is being applied to the

much higher basis of the FOB [free-on-board] value of the finished merchandise," GTC adds that

"it is obvious that 9% of the FOB value of the finished tires could equal or exceed the 17% VAT

amount paid on the cost of material inputs (as GTC showed in its VAT supplemental response)."

*Id.* (footnote omitted).

      For the Final Results, Commerce included in the Final Issues and Decision Memorandum

an interpretation of § 1677a(c)(2)(B) that the court reviews according to the analysis outlined by

the U.S. Supreme Court in *Chevron*, 467 U.S. at 842-43.  The first step in the court's review is to

determine whether Congress has spoken to the precise question presented, because if so, then the

answer Congress gave is binding on the agency and on the court.  *Id.*  If the statutory language is

ambiguous or silent on the precise question presented, then a court, upon reviewing an

interpretation of a statute made by the agency charged by Congress with its administration, is to

give deference to a reasonable interpretation of the statute, even if the interpretation is not the

one the court would have preferred.  *Id.* at 843-44.

      Neither the Final Results nor the incorporated Final Issues and Decision Memorandum

includes a specific finding that the PRC government imposed a tax, duty, or other charge in an

amount equaling 8% of the free-on-board ("FOB") value of GTC's subject merchandise.

Therefore, the statutory language presents two questions of interpretation.  One question is

whether, in the absence of a finding that any sort of "tax, duty or other charge" equivalent to 8%

of the FOB value of the exported merchandise actually was "imposed by the exporting country,"

it was permissible for Commerce to construe the statute to authorize it to make that deduction

from the starting price for EP or CEP.  If, and only if, the answer to the first question is yes, does

the second question arise.  That question is whether a VAT tax imposed on a producer's

domestic manufacturing inputs but not refunded upon the exportation of the finished good can be

construed to be an "*export* tax, duty, or other charge" that was "*on the exportation* of the subject

merchandise." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added).

The answer to the court's first question of interpretation is found in the unambiguous

language of the statute.  Under that language, the deduction from the EP or CEP starting price

must be in the actual "amount" of the tax, duty, or other charge that was "imposed" by the

government of the country of export.  *Id.* (requiring that the price used to establish EP and CEP

be reduced by "the *amount* . . . of any . . . tax, duty, or other charge *imposed* by the exporting

country . . .") (emphasis added).  If Commerce finds that a tax, duty, or other charge was so

imposed in relation to the subject merchandise, it then would make a finding as to whether the

tax, duty, or other charge was "included in such price," i.e., the starting price.  If a charge was

*not* found to have been so imposed, then under the statute, and as a matter of logic, it cannot be

found to have been "included" in that price.  Commerce never made either of these two specific

findings.  Under step one of the *Chevron* analysis, the court must give effect to the unambiguous

language of the statute.  Because the answer to the court's first question of statutory

interpretation is no, the court need not reach the second question.

Instead of finding as a fact that the PRC imposed a tax, duty, or charge—of whatever

character—in an amount equivalent to 8% of the FOB value of GTC's subject merchandise,

Commerce applied a presumption that goods exported from China are subject to "irrecoverable

VAT" in the amount of 8% of the FOB value of the exported good.  *Final I&D Mem.* 30

("Irrecoverable VAT is (1) the free-on-board value of the exported good, applied to the

difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to

exported goods.").  A presumption is, of course, different than a finding of fact.  Commerce

neither found that China imposed a tax, duty, or other charge on GTC's subject merchandise in

an amount equivalent to 8% of the FOB value nor found that China had imposed on that

merchandise a charge in any other specific amount.  Instead, it stated in the Final Issues and

Decisions Memorandum a general finding that "under the PRC's VAT regime, . . . *some portion*

of the input VAT that a company pays on purchases of inputs used in the production of exports is

not refunded." *Id.* at 28 (emphasis added) (footnote omitted).  Later in the memorandum,

Commerce further found that "[i]nformation placed on the record by both GTC and Double Coin

indicates that according to the Chinese VAT schedule, the standard VAT levy is 17 percent and

the rebate rate for subject merchandise is nine percent." *Final I&D Mem.* 29 (footnote omitted).

Under the plain language of 19 U.S.C. § 1677a(c)(2)(B), these findings do not suffice.  They are

not findings of an "amount" of a tax, duty, or other charge that was imposed by the exporting

government in relation to GTC's exported merchandise.  Commerce next stated that "[f]or

purposes of these final results, therefore, we removed from U.S. price the difference between the

rates (*i.e.*, eight percent), which is the irrecoverable VAT as defined under PRC tax law and

regulations." *Id.* (footnote omitted).  This also was insufficient as it is not a finding of any

specific amount of a tax, duty, or other charge imposed in relation to GTC's subject exports.

Having failed to reach a finding that § 1677a(c)(2)(B) required, Commerce had no statutory

authority to make a deduction from GTC's EP and CEP starting prices.  Those deductions,

therefore, were contrary to law and must be set aside.  Defendant, and Titan and the USW, put

forth arguments to the contrary, but the court finds their arguments unpersuasive.  The court

addresses their principal arguments below.

     After discussing record evidence consisting of GTC's responses to the Department's

questionnaires on VAT, defendant argues that "Commerce properly relied on the information on

the record, which demonstrated that the irrecoverable VAT for the subject merchandise was eight

percent." Def.'s Opp'n. 60.  This argument is erroneous.  Having failed to state the finding the

statute required as to GTC's subject merchandise, Commerce cannot be said to have relied on

record information "which demonstrated that the irrecoverable VAT *for the subject merchandise*

was eight percent." *Id.* (emphasis added).  In the absence of the statutorily-required finding, the

decision to make the deductions from the EP and CEP starting prices cannot be sustained.  The

court, therefore, need not reach the question of whether Commerce *could* have made such a

finding on the record before it.  Without deciding that question, the court notes that Commerce

refused to consider certain record evidence probative on the question and, overall, failed to

provide an adequate explanation of the reasoning underlying its decision to make the 8%

deductions from the EP and CEP starting prices.

 Commerce concluded that under Chinese law irrecoverable VAT "is VAT paid on inputs

and raw materials (used in the production of exports) . . . ." *Final I&D Mem.* 28 (footnote

omitted).  Commerce also concluded that under Chinese law "the standard VAT levy is

17 percent and the rebate rate for subject merchandise is nine percent." *Id.* at 29 (footnote

omitted).  Commerce fails to explain how, in light of these two conclusions, a presumption of

GTC's having incurred an "irrecoverable VAT" charge in the amount of 8% of the value of the

subject exports could have been plausible.  A simplified example illustrates this point.  Based on

the Department's two conclusions about Chinese VAT, as stated above, a subject off-the-road

tire exported from China to the United States with an FOB export value of $100 (to take a round

number) would contain "inputs and raw materials" that were subject to VAT at the rate of 17%

applicable to those inputs and raw materials, and the exportation of the tire would have qualified

GTC for a VAT rebate of $9.00.  In order for GTC to have incurred a "tax, duty, or other

charge," based on unrefunded VAT, of $8.00 (in accordance with the Department's presumption

that the irrecoverable VAT was 8% of export value), the actual VAT imposed on the "inputs and

raw materials" used in the production of the tire would have had to have been $17.00, i.e., the

$9.00 in refunded VAT plus the $8.00 in unrefunded VAT.  But for the VAT on the inputs and

raw materials to have been $17.00, those VAT-subject inputs and raw materials would have had

to have been valued at $100, which was the *entire FOB value of the exported tire*.  The FOB

export values could have included no other costs (for example, no cost of labor, no factory

overhead, no selling, general, administrative, or any other expenses), and no profit.  In other

words, the implication of the Department's presumption that GTC incurred a net VAT charge of

8% on the value of its subject exported tires is that the 17% standard VAT levy was applied to

the entire FOB export value of the tire, with 9% subsequently rebated (for a net VAT charge of

8% of the export value), and not merely to the VAT-subject inputs and raw materials used in

production.  This appears to be in contradiction with the Department's own conclusion that the

VAT was "paid on inputs and raw materials (used in the production of exports)."  *Id.* at 28.  The

Issues and Decision Memorandum offers no explanation to resolve this apparent contradiction.

    Moreover, the record contains evidence consisting of GTC's responses to the

Department's VAT questionnaires that is probative on the issue of whether GTC possibly could

have incurred a net charge for VAT that was in an amount equivalent to 8% of the FOB value of

its subject merchandise.  This evidence included twelve monthly VAT tax returns (copies of

which GTC submitted to Commerce for the record), a calculation of the total VAT incurred on

production inputs, and an allocation of that amount to export sales on the basis of sales value.

*GTC's Supplemental VAT Questionnaire Response* 1-3 & Exhibits 2-3 (May 28, 2014), ECF

No. 45-1.  In the review, GTC informed Commerce that " . . . during the POR GTC's VAT

refund based upon the 9% refund rate for export sales exceeded the amount of VAT paid for

inputs attributable to exported merchandise." *Id.* at 3; *see* GTC's Br. 18.  Commerce refused to

consider this evidence because it concluded that GTC "did not provide the reconciliation" the

Department requested, that the reconciliation it did provide "would result in an adjustment to

irrecoverable VAT based on non-product specific data" and that "[f]or the calculation of

irrecoverable VAT we will not consider allocations across all company sales or across products

with different VAT schedules." *Final I&D Mem.* 30 (footnote omitted).

        The record evidence indicates that the Department's refusal to consider GTC's submitted

evidence was, at least in part, the result of the way that GTC maintained its VAT-related

business records in the company's SAP accounting system.[17]  In this regard, GTC points out that

VAT was owed on domestic sales, not export sales, on which the VAT rate was zero.  GTC's

Reply 4-5.  It argues that, consequently, its monthly VAT tax returns necessarily reflect VAT

payments on domestic sales made each month and, as a result, "a reconciliation limited to subject

---

[17] Commerce stated as follows:

In our questionnaires to Double Coin and GTC we asked that if the irrecoverable
VAT amount reported is not directly derived as the difference between the VAT
tax rate applicable to domestic purchases and inputs and the refund rate for export
sales of subject merchandise, then they need to: 1) explain in detail why and
provide worksheets demonstrating how to calculate the irrecoverable VAT;
2) reconcile the worksheets to the translated VAT tax returns provided and
provide a detailed narrative explanation that describes the calculations shown in
the worksheets; and 3) for each reconciling item reported in the worksheets,
provide documentation and a citation to Chinese laws and regulations to fully
support the reason for the reconciling item.  However, the respondents did not
provide this information, and the limited information they did provide would
result in an adjustment to irrecoverable VAT based on non-product specific data.
For the calculation of irrecoverable VAT we will not consider allocations across
all company sales or across products with different VAT schedules.

*Final I&D Mem.* 30 (footnote omitted).  Commerce rejected "GTC's assertion that it provided
the exact type of reconciliation to its VAT tax returns that the Department requested" on the
ground that the reconciliation was to GTC's tax returns and not its VAT tax returns.  *Id.*

merchandise would not be possible"; it also argues that Commerce did not request such.  *Id.* at 8.

GTC disputes the Department's finding that GTC's allocation was over multiple products with

different VAT rates and asserts that, with the exception of certain natural rubber (for which GTC

alleges there was a lower VAT rate) the VAT rate for its domestic input purchases was 17%.

*Id.* at 7.  Also, GTC argues that the Department's refusal to consider GTC's VAT reconciliation

conflicted with 19 C.F.R. 351.401(g)(4) ("The Secretary will not reject an allocation method

solely because the method includes expenses incurred . . . with respect to sales of merchandise

that does not constitute subject merchandise.").  *Id.* at 8.

It is not necessary that the court accept or reject each of these various arguments as to

GTC's VAT reconciliation.  As the court concluded above, Commerce, contrary to the premise

of defendant's argument, relied on a presumption rather than an actual finding of fact that GTC

incurred a net VAT charge equivalent to 8% of the FOB value of its subject exports.  Had

Commerce made an actual finding, such a finding would have been subjected to judicial review

based on the record evidence viewed as a whole, including the evidence Commerce refused to

consider.

Defendant also argues that the Department's construction of 19 U.S.C. § 1677a(c)(2)(B)

warrants *Chevron* deference, Def.'s Opp'n. 53-57, and that "[n]either the statute nor the statute's

legislative history defines 'export tax, duty or other charge imposed' for purposes of this

provision," *id.* at 54.  This argument does not address the flaw the court has identified, i.e., the

absence of a finding that a charge, of any character, in an amount equal to 8% of export value

was imposed and was specific to GTC's subject merchandise.  That is why the court need not

reach the question of whether any unrefunded VAT charge that Commerce might have found to

have been incurred would have qualified as an "export" tax, duty, or other charge within the

meaning of the statute.  The statute is not reasonably construed to allow Commerce to substitute

a presumption for a finding required by the plain statutory language.

Titan and the USW argue that the statute is silent on how Commerce is to adjust EP and

CEP prices for export duties, taxes, and other charges and, in particular, "is silent on how this

adjustment should be applied to exports from a non-market economy."  Resp. Br. of Titan and

the USW (Dec. 7, 2015) 38, ECF No. 55 ("Titan's Opp'n").  According to Titan and the USW,

having "examined the Chinese VAT system to determine how best to implement the statute and

[having] reviewed GTC's VAT payments and refunds in this case," Commerce "has made a

reasonable determination to apply a rate-based adjustment to U.S. prices for the Chinese

government's imposition of irrecoverable VAT specifically to GTC's exports of subject

merchandise."  *Id.*  This argument, too, is unpersuasive.

The presumptive "rate-based adjustment" to which Titan and the USW refer was contrary

to the statute, under which a reduction from the starting price for EP or CEP must be in the

*amount* of a tax, duty, or other charge imposed by the exporting country in relation to the subject

merchandise.  Their argument that the statute is silent on how the adjustment is applied to

exports from a nonmarket economy country is unavailing because 19 U.S.C. § 1677a(c)(2)(B)

makes no mention of nonmarket economy countries.  Although the statute has an exception

allowing normal value to be determined differently when the exports are from a nonmarket

economy country, *see* 19 U.S.C. § 1677b(c), there is no parallel exception for export price or

constructed export price, *see* 19 U.S.C. § 1677a(c)(2)(B).  In other words, § 1677a(c)(2)(B)

applies to a "tax, duty, or other charge imposed by the exporting country" without regard to

whether or not that country is a nonmarket economy country.  In either event, Commerce must

base any deduction from the EP or CEP starting price on a finding of an amount of a tax, duty, or

other charge that is specific to the subject exported merchandise.  Rather than do so, Commerce

employed a general presumption based on a formula it gleaned from Chinese regulations.

Nor can the court conclude that Commerce has made, in Titan's and the USW's words, a

"reasonable determination."  The court has discussed certain flaws in the Final Issues and

Decision Memorandum, including the lack of an essential finding of fact, but another flaw is the

inconsistency in describing the effect of the Department's presumption.  At certain points, the

memorandum appears to treat the presumption as irrebuttable for any Chinese exporter, as is

demonstrated by the following blanket statement:

> Irrecoverable VAT is (1) the free-on-board value of the exported good,
> applied to the difference between (2) the standard VAT levy rate and (3) the VAT
> rebate rate applicable to exported goods.  The first variable, export value, is
> unique to each respondent and sale while the rates in (2) and (3), as well the
> formula for determining irrecoverable VAT, are each explicitly set forth in
> Chinese law and regulations.

*Final I&D Mem.* 30.  This "formula for determining irrecoverable VAT" appears to leave no

possibility for a Chinese exporter to rebut the presumption that it has incurred a net VAT cost

equal to 8% of the value of the exported goods.[18]  The Final Issues and Decision Memorandum

also cites a 2012 issuance, *Methodological Change for Implementation of Section 772(c)(2)(B) of*

---

[18] As a source for the presumption and the formula, Commerce cited its own decision in
*Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Issues and
Decision Memorandum for the Final Determination of Sales at Less Than Fair Value*, A-570-
990, POI 12-13, 5, 9 n.35 (Apr. 28, 2014), *available at*
http://enforcement.trade.gov/frn/summary/prc/2014-10240-1.pdf) (last visited Jan. 25, 2017).
The decision cites a "Circular," Article III.3.4 of Circular 7, as setting forth the formula for
calculating irrecoverable VAT on export sales as follows: "irrecoverable VAT = (FOB export
value – bonded imports) * (standard VAT levy rate – VAT rebate applicable to exported
goods)."  The decision memorandum in the cited antidumping duty investigation is not
substantial evidence establishing that China imposed a tax, duty, or fee *on GTC's exported
merchandise* that amounted to 8% of the value of that merchandise.

*the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*,

77 Fed. Reg. 36,481, 36,482-83 (June 19, 2012), in which Commerce announced a methodology

by which it would begin making section 772(c)(2)(B) deductions from export price or

constructed export price for goods exported from nonmarket economy countries, including

China.  In citing this issuance, the Final Issues and Decision Memorandum states that "[w]here

the irrecoverable VAT is a fixed percentage of U.S. price, the Department explained [in the 2012

issuance] that the final step in arriving at a tax-neutral dumping comparison is to reduce the U.S.

price downward by this same percentage." *Final I&D Mem.* 28.  Elsewhere, the Issues and

Decision Memorandum describes imposition of an 8% irrecoverable VAT tax as a presumption

that a respondent can rebut.  *Id.* at 29 (explaining that Commerce will "use the difference

between the [17%] VAT rate and the [9%] refund rate, consistent with PRC regulations, unless

the company can show otherwise for the subject merchandise").

In summary, Commerce substituted a presumption—whether rebuttable or irrebutable—

for an actual finding.  The Department's decision violated 19 U.S.C. § 1677a(c)(2)(B), which

reduces an EP or CEP starting price by the amount of the tax, duty, or other charge that is found

to have been imposed by the exporting country in relation to the subject exported merchandise, if

included in that price.  Any deduction made under § 1677a(c)(2)(B) is specific to the EP or CEP

starting price.  Generalized conclusions about China's VAT scheme do not suffice.  Commerce

may not reduce the starting price by a fixed percentage—no matter how derived—that is not the

actual amount of a tax, duty, or other charge that the exporting country is found in fact to have

imposed.  Because Commerce, based on an impermissible construction of 19 U.S.C.

§ 1677a(c)(2)(B), did exactly that, the court rejects the arguments of defendant and of Titan and

the USW and cannot sustain upon judicial review the VAT deductions Commerce made from the

starting prices for GTC's subject merchandise.

### 2.  The Department's Selection of Financial Statements for Calculating Surrogate Financial Ratios Was Supported by Substantial Evidence

According to section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), Commerce, as

a general matter, is to determine the normal value of subject merchandise from a nonmarket

economy country "on the basis of the value of the factors of production utilized in producing the

merchandise," plus "an amount for general expenses and profit plus the cost of containers,

coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  To implement the statutory directive

to add amounts for "general expenses and profit," Commerce typically calculates surrogate

values for factory overhead expenses, for selling, general & administrative ("SG&A") and

interest expenses, and for profit, by calculating and applying "financial ratios" derived from the

financial statements of one or more producers of comparable merchandise in the primary

surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).

In selecting financial statements to calculate the surrogate financial ratios, the

Department's policy is to use audited and complete statements, which are contemporaneous with

the period of review, from one or more market economy producers of identical merchandise.  *See*

*Final I&D Mem.* 36; *Prelim. I&D Mem.* 17-18.  In the fifth review, the petitioners placed on the

record financial statements for two producers in Indonesia, the Department's chosen surrogate

country, of merchandise identical to the subject merchandise: PT Gajah Tunggal Tbk ("Gajah

Tunggal") and PT Goodyear Indonesia Tbk ("Goodyear").  *See Petitioners' 4th Surrogate Value*

*Comments*, Attachments 3, 4 (Sept. 2, 2014), ECF Nos. 89-19, 89-20, 89-21.  In the Preliminary

Results, Commerce used both of these financial statements to calculate the surrogate financial

ratios.[19]  *Preliminary Results Surrogate Value Mem.*, A-570-912, ARP 13-14 (Sept. 30, 2014),

(Admin.R.Doc. No. 265) ECF No. 108-1 ("*Prelim. Surrogate Value Mem.*").

In the Final Results, Commerce decided to calculate the surrogate financial ratios using

only the statements of Goodyear, concluding that "its audited financial statements are complete,

contemporaneous with the POR, and include detailed expense lines for raw materials,

manufacturing labor, manufacturing energy, and manufacturing overhead."  *Final I&D Mem.* 36.

Commerce decided not to use the Gajah Tunggal statements "because Gajah Tunggal's audited

financial statements do not contain a line for manufacturing energy."  *Id.*  In the Preliminary

Results, Commerce computed a cost of energy for Gajah Tunggal using the company's 2013

annual report, which was also on the record and which provided the company's cost of energy as

a percentage of the total cost of production.  *Id.*  However, in the Final Results, Commerce

determined that "there may be some inconsistency between Gajah Tunggal's annual report and

its audited financial statements."  *Id.*  Accordingly, Commerce decided against using the Gajah

Tunggal statements and calculated the surrogate financial ratios "only using Goodyear's

complete, audited financial statements which break out all relevant manufacturing costs."  *Id.*

GTC argues that Commerce erred in rejecting the Gajah Tunggal statements.  *See* GTC's

Br. 26.  Specifically, GTC argues that "Commerce has a well-established preference for using

multiple financial statements in its surrogate ratio calculations so that the resulting ratios provide

a more accurate representation of the industry as a whole rather than a single company."  *Id.*

GTC also argues that there was record evidence that could be used to calculate Gajah Tunggal's

---

[19] From these two financial statements, Commerce calculated separate factory overhead
expenses, SG&A and interest, and profit ratios for each company and then averaged those ratios
to derive a single set of financial ratios.

energy costs, namely the company's 2013 annual report, and the Department's determination that

the annual report was unreliable is unsupported by substantial evidence.  *Id.* at 27.  Finally, GTC

argues that Commerce could have taken notice of Gajah Tunggal's revised 2013 financial

statements, which do contain a line item for energy costs.  *Id.* at 28-30.  The revised 2013

financial statements were not on the record in this review but were on the record in another

antidumping proceeding.  *Id.*

    The court rejects GTC's arguments.  The Department has a statutory obligation to

calculate surrogate values using the best available information, *see* 19 U.S.C. § 1677b(c)(1), but

the statute also "accords Commerce wide discretion in the valuation of factors of production."

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001)

(quoting *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  The

Department exercised its discretion in deciding that the Goodyear financial statements were the

best available information on the record for calculating surrogate financial ratios.

    Commerce acted within its discretion in deciding against the Gajah Tunggal financial

statements because of the lack of a breakdown for energy costs.  While Commerce adjusted for

this deficiency in the Preliminary Results using information from the company's annual report, it

was under no obligation to do so in the Final Results.  Nor was Commerce under an obligation to

take steps allowing it to use Gajah Tunggal's revised 2013 financial statements, which were not

on the record in this review, when it had a complete, audited, and contemporaneous set of

financial statements from Goodyear on the record.  As to the use of only the Goodyear

statements, Commerce permissibly balanced the advantage of using financial statements of two

companies with the advantage of ensuring consistent reporting of the various costs.  Upon

judicial review, it is not the role of the court to disturb the valid exercise of an agency's

discretion where it discerns no error in fact or law.  Therefore, the court sustains the

Department's determination to reject the Gajah Tunggal statements and calculate the surrogate

financial ratios using only the Goodyear financial statements.

3.  The Department's Choice of Surrogate Data for Coal Was Supported by Substantial Evidence

Commerce applied a surrogate value of $0.15/kg. for steam coal, which GTC used to

manufacture the subject merchandise, which value Commerce calculated from Global Trade

Atlas ("GTA") import data for "Bituminous Coal, Not Agglomerated" from Indonesia,

Harmonized System subheading 2701.12.  *Prelim. Surrogate Value Mem.* 12.  In making this

calculation, Commerce excluded imports of coal originating in nonmarket economy countries,

unspecified countries, and the countries Commerce considered to maintain non-specific export

subsidies, which were India, Indonesia, South Korea, and Thailand.  *Id.*  GTC claims that the

Department's finding that the Indonesian import data were the best available data on the record

for valuing steam coal was not supported by substantial evidence.  Based on its review of the

record evidence available to support that finding, the court declines to grant relief on this claim.

"Congress has vested Commerce with considerable discretion in selecting the 'best

available information' for use in valuing factors of production."  *Allied Pacific Food (Dalian)*

*Co. Ltd. v. United States*, 32 CIT 1328, 1342, 587 F. Supp. 2d 1330, 1339 (2008) (citing *Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  Commerce stated for

the Final Results that "[w]hen selecting SVs [i.e., surrogate values] for use in an NME

proceeding, the Department's preference is to use, where possible, a range of publicly available,

non-export, tax-exclusive, and product-specific prices for the POR, with each of these factors

applied non-hierarchically to the case-specific facts and with preference to data from a single

surrogate country."  *Final I&D Mem.* 38 (footnote omitted).

Commerce chose Indonesia as the surrogate country for valuation of factors of production, a decision GTC does not contest. The record contained two possible sources of Indonesian data for valuing coal: the Global Trade Atlas import data and the price indices published by Argus Coalindo, a source of information on prices for Indonesian coal. *See Final I&D Mem.* 37-39. Commerce determined the Global Trade Atlas data superior to the Argus Coalindo data, concluding that "the GTA data represent actual prices of coal purchases in Indonesia" whereas the Argus Coalindo data represent prices on the international spot market "and thus do not accurately represent the price of coal bought or sold in Indonesia." *Id.* at 38. Commerce added that "[b]ecause the Argus Coalindo data is for export prices paid for Indonesian coal, GTA data is a better, more specific, source to value coal inputs and fulfills the Department's standard SV criteria (non-export, broad-market, *etc.*)." *Id.*

GTC makes three arguments in claiming that the Department's selection of the Global Trade Atlas import data as the best available information was unlawful. GTC argues, first, that the Department's finding that the Argus Coalindo data reflect only export prices is unsupported by record evidence. GTC's Br. 39. Second, GTC argues that Commerce should have found that the Argus Coalindo data are more specific to the input than are the import data and that Commerce "did not have a valid basis for rejecting the Argus/Coalindo price data" when it found insufficient certain "testing slips" for coal samples that GTC submitted for the record to show the heat values of the coal it used. *Id.* at 42. Finally, GTC argues that Commerce incorrectly rejected the Argus Coalindo data on the ground that GTC did not "corroborate the ash and sulfur levels with those specified in the Argus Coalindo or Platts Coal Pricing Methodologies sources." *Id.* at 43 (citing *Final I&D Mem.* 38-39).

GTC bases its first argument, i.e., that Commerce incorrectly found the Argus Coalindo data to be based solely on export data, on record evidence that the Argus Coalindo data are derived from two separate services, Argus and Coalindo.  According to GTC, the Department's conclusion regarding prices for Indonesian coal traded on the international spot market "refers only to the Argus data collection methodology; it has nothing to do with the Coalindo data collection methodology," which GTC describes as having been founded to develop specialist pricing services for the Indonesian coal markets and as deriving prices using panels comprised of Indonesian coal producers, consumers and traders.  *Id.* at 39-40.  GTC also argues that according to the record information on Argus Coalindo, the prices are for deliveries on an FOB Kalimantan basis, apply as much "to a coal buyer (or trader) located in Indonesia as one located elsewhere," and, therefore, should not be considered prices for export only.  *Id.* at 40.

It is possible to interpret the Department's finding that "the Argus Coalindo data is for export prices paid for Indonesian coal," as GTC does, to mean that the data are derived *entirely* from export prices.  However, it also is possible to interpret the finding as meaning that the data are derived only partly from export prices.  But even if the court were to interpret the statement of the finding as GTC does, the court would not conclude that the choice of the Global Trade Atlas import data was not based on substantial evidence.  Regarding export prices, the Department's criterion is that surrogate values be "non-export average values," *Prelim. Surrogate Value Mem.*, i.e., averages that are exclusive of export prices.  *See also Final I&D Mem.* 38 ("non-export . . . prices").  Regardless of how the finding is interpreted, the Argus Coalindo data, according to record evidence, did not satisfy the criterion.  Commerce cited the "Argus Coalindo Methodology and Specifications Guide," which describes the Argus data collection team as consisting of "specialist market reporters/analysts in Singapore, Beijing,

Tokyo, Sydney, London, Moscow, Washington, Johannesburg and Bogota, drawing on Argus'

global network of energy correspondents." *Final I&D Mem.* 38 n.135 (citing *GTC's Second*

*Surrogate Value Submission*, Exhibit 5 (Sept. 2, 2014), ECF No. 89-29).  The guide goes on to

state:

> The market reporters/analysts ask market participants in the survey whether they
> have bought or sold any Indonesian coal, whether they have heard of any trade in
> Indonesian coal, and whether they have received or made any bids or offers for
> Indonesian coal.  The participants are asked where they see the level of prices for
> Indonesian coal traded on the international spot market.

*GTC's Second Surrogate Value Submission*, Exhibit 5 (Sept. 2, 2014), ECF No. 89-29.  The

record evidence supports a finding that the Argus Coalindo database is at least derived in some

way from prices on the international spot market.  Commerce validly could conclude on the basis

of this evidence that export prices influenced the prices in that database.  Commerce also

determined that Indonesia maintains non-specific export subsidies, *Prelim. Surrogate Value*

*Mem.* 12, a determination GTC does not contest.  Seeking to use price data derived solely from

the Indonesian market and avoid data on prices of coal exported from Indonesia to other markets,

the Department permissibly concluded that its "non-export" criterion had not been satisfied.

For its second argument, GTC maintains that Commerce should have found that the

Argus Coalindo data to be more specific to the input it consumed in producing the subject

merchandise.  *See* GTC's Br. 35-38.  Specifically, GTC argues that "Commerce has *repeatedly*

*recognized* a preference for published sources that provide values specific to the coal input used

by respondents (particularly with respect to useful heat values ('UHV')), and it has repeatedly

relied on such sources instead of the less-specific import price data."  *Id.* at 36 (emphasis in

original; citations omitted).  GTC argues, further, that it "provided the Department with ample

evidence of the specific UHV ranges for the coal it uses in the production of subject

merchandise, including a summary of characteristics (including UHV) for 48 of GTC's coal

testing reports." *Id.* at 38.  According to GTC, "[u]sing this information in conjunction with the

Argus/Coalindo pricing data, Commerce had the ability to assign a surrogate value for coal

specific to the heat value of the actual coal input used by GTC." *Id.*

　　　　The court does not agree with GTC that Commerce was *required* by the record data or its

past decisions to choose the Argus Coalindo data based on specificity to the input.  Commerce

concluded that "there is insufficient record data to establish consistent heat values for GTC's

coal during the POR (*i.e.*, GTC provided only a handful of coal testing slips with heat values that

vary quite widely)." *Final I&D Mem.* 38.  The finding that the submitted testing results vary

widely is supported by the record evidence, which shows, for both the minimum and the

maximum heat values in the samples, that the highest value is considerably higher than the

lowest value.  *See GTC's Supplemental Section C&D Responses*, Exhibit SD-8 (Conf.)

(June 17, 2014), ECF No. 45-3.  Referring to a simple average of the minimum and maximum

heat values in its coal testing slips, respectively, GTC states that "[u]sing the summary sheet [i.e.,

for its testing reports] and underlying coal test reports to calculate a simple average, it is evident

that the UHV for GTC's coal is in the 4748-4996 Kcal/Kg range."  GTC's Br. 41.  But the two

simple averages do not demonstrate that the heat values consistently were in a narrow range, and

according to the record data, they were not.

　　　　Further to its argument on useful heat values, GTC argues that Commerce had an

obligation under 19 U.S.C. § 1677m(d) to inform GTC that its heat value data were deficient and

provide GTC the opportunity to remedy or explain the deficiency.  GTC's Br. 41-42.  This

argument is unconvincing.  Commerce never found the heat value data "deficient" for purposes

of § 1677m(d).  Had it done so, it would have been required to give GTC the opportunity to

remedy or explain before using substitute information, i.e., "facts otherwise available," or an

"adverse inference," according to 19 U.S.C. § 1677e; here, Commerce did not invoke that

authority and simply used other available record evidence to make its determination.  Commerce

was not obligated by § 1677m(d) to inform GTC that ultimately it would consider the GTC's

submitted heat value data insufficiently probative on the issue for which GTC offered it and, on

that ground, disagree with GTC's argument that the Argus Coalindo data should be preferred to

the import data.

GTC's third argument takes issue with the Department's statement in the Final Issues and

Decision Memorandum that "[t]hough GTC did provide a limited selection of coal testing slips

with heat values, GTC made no effort to corroborate its ash and sulfur levels with those specified

in the Argus Coalindo or Platts Coal Pricing Methodologies sources."  *Id.* at 43 (citing *Final*

*I&D Mem.* 38-39).  GTC argues that "[t]his reasoning must be rejected" because Commerce, in

past cases in which it valued coal, did not raise the same objection as to ash and sulfur levels and

in this case "fails to cite a *single instance* in which it rejected coal prices specific by heat value

because the record lacked information regarding sulfur or ash content."  *Id.* at 43.  GTC adds that

"to say that UHV is not a key component for categorizing GTC's coal runs counter to the

Department's own practice."  *Id.*  It also asserts that Platts Coal Pricing Methodologies is another

information service unrelated to Argus Coalindo and that the importance of heat values is shown

by the Argus Coalindo data because "while Argus/Coalindo does reference sulfur and ash

content in its specifications, the pricing data is provided by grade with specific reference to heat

value alone."  *Id.* at 44.  GTC then reasserts, as to the ash and sulfur issue it raises, its

unconvincing argument that "if Commerce believed that there was a deficiency with respect to

this information, it had an obligation to notify GTC and provide GTC with an opportunity to

provide such information." *Id.* GTC adds that "[i]t is undisputed that GTA import data fails to provide prices specific to heat values, *or* sulfur and ash content, whereas it is clear that the Argus/Coalindo prices are specific to heat values." *Id.* (emphasis in original),

The court is unconvinced by GTC's third argument. Neither the record data on sulfur and ash content, nor the Department's comments on those data, are sufficient to cause the court to disallow as unsupported by record evidence the finding that the Global Trade Atlas import data were the best available information for valuing GTC's coal input. Commerce did not conclude that heat value information was unimportant as to the issue of specificity. Nevertheless, given the limitation posed by the significant variation in the heat value test data GTC submitted, Commerce was justified by the record evidence in rejecting GTC's argument, as made during the review, that the Argus Coalindo must be preferred to the Global Trade Atlas import data because of specificity to the input. GTC summarizes its arguments by asserting that "the record demonstrates that the Argus/Coalindo data satisfy the Department's surrogate value criteria and are more product specific than any other source available on the record," *id.* at 45, but this argument ignores that the Argus Coalindo data, according to record data, did not meet the Department's criterion that the data it uses be based on averages that are exclusive of export prices. Commerce was justified in finding the heat value data GTC submitted insufficiently probative on the question of specificity to the input when weighed against the record data showing that the Argus Coalindo data were not exclusive of data derived from prices for coal exported from Indonesia.

For the foregoing reasons, the court does not grant relief on GTC's claim challenging the steam coal surrogate value.

4.  The Department's Finding that its Calculations of GTC's Brokerage & Handling and Ocean
    Freight Costs Were Free of Double-Counting Is Not Supported by Substantial Evidence

Under section 772(c)(2) of the Tariff Act, 19 U.S.C. § 1677a(c)(2), Commerce is to

reduce constructed export price by "the amount, if any, included in such price, attributable to any

additional costs, charges, or expenses, and United States import duties, which are incident to

bringing the subject merchandise from the original place of shipment in the exporting country to

the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).  Among the

Department's deductions from the CEP starting prices were surrogate amounts representing the

nonmarket economy cost incurred in China for export brokerage and handling ("B&H") and the

nonmarket economy cost of trans-Pacific ocean freight from China to the United States. *See*

*Prelim. I&D Mem.* 23.  GTC claims that the deductions Commerce made in these two categories

were improper because they double-counted certain costs.  GTC's Br. 47-51.

Commerce valued the trans-Pacific ocean freight using price quotes submitted by GTC

and obtained from a website listing ocean freight costs, http://rates.descartes.com. *Prelim.*

*Surrogate Value Mem.* 15.  Commerce valued export brokerage and handling using information

in a report published in 2013 by the World Bank as *Doing Business 2014: Indonesia*, "Trading

Across Borders Indicators." *Id.* at 16.  From the World Bank publication, Commerce used prices

for what it described as "a price list of export procedures necessary to export a standardized

cargo of goods from Indonesia." *Prelim I&D Mem.* 27.  Commerce concluded that there was no

double-counting between the two data sources, noting that "*Doing Business* states that its

trading-across-borders methodology measures the 'cost necessary to complete every official

procedure for exporting and importing' a 'standardized cargo of goods by seaport,' but not the

'cost for sea transport' itself." *Final I&D Mem.* 44 (footnotes omitted).[20]

The price list Commerce assembled from the data in *Doing Business 2014: Indonesia*

consisted of the following three costs:  "Documents preparation" at "$165"; "Customs clearance

and technical control" at "$125"; and "Ports and terminal handling" at "$165."  *Doing Business*

*2014: Indonesia* 81.  Commerce divided the total of the three costs, $455, by the weight of the

"standardized cargo of goods from Indonesia," which, based on information concerning the

Trading Across Borders methodology provided by Titan and the USW, it determined to be

10,000 kilograms, to calculate "a cost of 0.0455 USD per kilogram in brokerage and handling

fees for goods exported from Indonesia," its chosen surrogate country.  *Id.* at 16.  GTC does not

contest the Department's method of calculation *per se*; its claim, instead, is that several cost

elements included in the Descartes ocean freight price quotes are also included in the brokerage

and handling costs Commerce derived from the *Doing Business* report.

As double-counted costs, GTC points to the following "'Documentation Charges,'

'Traffic Metigation [sic] fee,' 'AMS Charge,' 'Clean Truck Fee,' 'Chassis Usage Charges,'

'Shanghai Port Charges,' 'International Ship & Port Security charges,' and 'ISD Handling

Charge.'"  GTC's Br. 49.  These items are listed separately in one or more of the Descartes

quotes.  On each quote, separate from these items, is a cost item for "Ocean Freight."  GTC Mot.

Appx. Part 3, Document 7, Exhibit 9, ECF No. 45-3 ("Descartes quotes").

---

[20] Although *Doing Business* included costs for both exporting out of Indonesia, and importing into Indonesia, a standard fully loaded cargo container, Commerce used only the charges listed therein for exporting.

Commerce stated in the Preliminary Surrogate Value Memorandum that "[w]e did not exclude any ocean freight handling costs" from the Descartes quotes "as they appeared to be necessary for the shipment of freight and did not appear to have been covered by other brokerage and handling calculations." *Prelim. Surrogate Value Mem.* 15. Commerce also stated in the Final Decision Memorandum that "[t]he surcharges on the Descartes quotes do not appear to overlap with the B&H charge related to exporting, but simply appear to be additional fees imposed by the ocean freight company in order to transport the merchandise from the Chinese port of origin to the U.S. destination port." *Final I&D Mem.* 44.

Upon examining the record evidence consisting of the *Doing Business 2014: Indonesia* report and the documentation showing the Descartes quotes, the court cannot sustain the Department's finding that there was no double counting in the Department's use of the two data sources. The court does not decide that each of the charges identified by GTC necessarily was double counted, but it notes that Commerce stated its finding of no double-counting only generally and not specifically as to each of the charges in the Descartes quotes that GTC identified during the review and to which it now directs the court's attention. Commerce, therefore, did not address the specific question of whether certain charges in the Descartes quotes overlap those in the *Doing Business* report. As an example, one of the three cost elements in the Department's calculation of the $455 brokerage and handling cost from that report is "Documents preparation" at $165. Commerce did not address the specific question of whether this charge overlapped with the item identified on certain of the Descartes quotes as "Documentation Charges" of $45 and the item listed on one of the quotes as "Doc. Handling Charges" of $60. As another example, Commerce also included in the $455 total a charge for "Ports and terminal handling" at $165. Commerce does not explain its reasoning for its apparent

conclusion that this had no overlap with "Shanghai Port Charges" of $66, which is listed on one

of the Descartes quotes.  Because the Department's finding that no double-counting occurred is

not supported by substantial evidence, the court must remand the Department's decisions as to

deductions from CEP for brokerage and handling, and for ocean freight, for reconsideration.  In

reconsidering these decisions, Commerce should address specifically each of the charges in the

Descartes quotes that GTC identifies as charges that overlap with the charges Commerce

obtained from the *Doing Business* report.

### 5.  The Department's Decision Not to Make a Cost-of-Living Adjustment to the Surrogate Value for Domestic Warehouse Costs Was Unsupported by Substantial Evidence

GTC challenges the Department's surrogate valuation of domestic (Chinese) warehouse

costs.  In the Preliminary and Final Results, Commerce calculated a surrogate value for domestic

warehouse costs using a publicly available price quote from GIC Logistics Group, an Indonesian

warehousing and logistics provider.  *Prelim. I&D Mem.* 29; *Final I&D Mem.* 45.  Because they

are not considered publicly available, Commerce prefers not to use price quotes, but "[w]hen

there are no better alternatives, . . . Commerce may use price quotes."  *Vinh Quang Fisheries

Corp. v. United States*, 33 CIT 1277, 637 F. Supp. 2d 1352, 1358 (2009).  In this case, the price

quote Commerce used was the only evidence for valuing domestic warehouse costs that was

submitted for the record.  *See Final I&D Mem.* 45.

GTC is not arguing that Commerce should have refrained from using the price quote,

only that Commerce should have adjusted it for inflation so as to make it contemporaneous with

the period of review.  GTC argues that the date given for the price quote used to value domestic

warehouse costs was April 9, 2014 and that because that date was more than seven months after

the end of the period of review on August 31, 2013, Commerce should have deflated it using the

Producers Price Index (PPI) to make it contemporaneous with the period of review.  *See* GTC's

Br. 51.  GTC argues further that "Commerce's view that the cost for warehousing during the

POR may have been the same as the cost reflected in the April 2014 price quote is nothing more

than unfounded conjecture" and "[i]t is improper for Commerce to base its decisions on such

speculation rather than actual record evidence."  *Id.* at 53.

Commerce regards contemporaneousness with the POR as important to its ensuring it is

valuing factors of production as accurately as possible.  *See Jinan Yipin Corp. Ltd. v. United

States*, 35 CIT __, 800 F. Supp. 2d 1226, 1292 n.76 (2011).  The price quote itself is undated, but

the website from which the quote originated was accessed on April 9, 2014.  *See Petitioner's

Initial Surrogate Value Comments*, Attachment 18 (Apr. 14, 2014), ECF No. 86-43.  The date the

site was accessed is not itself contemporaneous with the period of review, which began on

September 1, 2012 (19 months before the date the site was accessed) and ended on August 31,

2013 (7 months before that date).  In the Preliminary Surrogate Value Memorandum, Commerce

stated that "[w]e did not inflate [*sic*]" the value calculated for domestic warehouse costs

"because it is contemporaneous with the POR."  *Prelim. Surrogate Value Mem.* 15.  In the Final

Results, Commerce justified its decision not to deflate the surrogate value for domestic

warehouse costs on the ground that "there is no indication that the quoted price was not in effect

during the POR and no party provided a better source of data for the warehouse cost."  *Final

I&D Mem.* 45.

"[I]t is not sufficient for Commerce to simply rely on the absence of evidence to reach its

decision."  *Shandong Huarong Machinery Co. v. United States*, 29 CIT 484, 498 (2005).

Commerce does not explain whether, or why, its decision not to adjust the surrogate value for

inflation should be considered to have produced a more accurate margin.  For example,

Commerce offers no discussion of evidence on price trends in Indonesia during the period in

question as context for its decision, or on whether the record even contained such evidence.

Without deciding the question of whether Commerce should have deflated the value according to

the date the site was accessed, a date that was of limited probativity on the question of

contemporaneity with the POR, the court directs Commerce to reconsider its decision not to

make a cost-of-living adjustment and provide a more thorough analysis of the issue that is

grounded in whatever relevant evidence exists on the record.

E.  The Remaining Claims of Titan and the USW

1.  Commerce Did Not Err in Finding that Double Coin Complied with Its Instruction to Revise
the Reporting of Freight Distances for Materials

Titan and the USW argue that Double Coin failed to comply with the Department's

instruction for submitting corrected reporting of the travel distances for manufacturing inputs,

which Commerce used in the calculation of surrogate freight expenses as a component of the

determination of the normal value of Double Coin's merchandise.  They claim the Department's

finding that Double Coin's revised reporting complied with the Department's instruction was not

supported by substantial evidence on the record.  Titan's Br. 24-25.  The court denies relief on

this claim.

In calculating normal value for the subject merchandise of GTC and Double Coin,

Commerce added surrogate freight costs to the surrogate values for Double Coin's materials

inputs so that these prices would represent prices as delivered to the point of tire manufacturing.

*See Prelim. I&D Mem.* 25.  Commerce calculated these freight expenses by applying to the

reported distances an Indonesian surrogate value for the cost of freight.  In doing so, Commerce

applied what it described as its *"Sigma"* methodology, which involves "assuming the input price

is equal between different suppliers and a respondent will select the preferred supplier based

upon minimizing freight costs."[21]  Def.'s Opp'n 47 (citing *Amended Final Results of Redeterm.*

*Pursuant to Court Remand, Sigma Corp. v. United States*, Consol. Court Nos. 91-02-00154,

92-04-00283 (Jan. 30, 1998)).  As explained by defendant, the Department's practice of

calculating surrogate domestic inland freight costs is to use the shorter of: (1) the distance from

the respondent's domestic supplier to the respondent's production facility; or (2) the distance

from the nearest ocean port to the respondent's production facility, which Commerce calls the

"*Sigma* cap distance."  Def.'s Opp'n 46-47, 77.  In explaining its methodology in the fifth

review, Commerce stated that "[i]f there are multiple suppliers for one input, the Department

caps the distance for each supplier before calculating a weighted-average distance for purchases

of that input."  *Prelim. Surrogate Value Mem.* 14.

        The issue underlying Titan's and the USW's claim arose because "at verification, the

Department observed and Double Coin acknowledged that the sub-*Sigma* cap distances reported

for certain suppliers corresponded to trading companies from which certain inputs were

purchased and not the actual producer/supplier of that input."  *Letter from Dep't Commerce to*

*Curtis, Mallet-Prevost, Colt & Mosle LLP re: Request for Revised FOP and U.S. Sales*

*Databases* 1 (Sept. 16, 2014) (Admin.R.Doc. No. 253), ECF No. 89-42 (*"Commerce Letter"*).

Commerce instructed as follows: "Accordingly, please re-report the supplier distances for all

uncapped sub-*Sigma* suppliers to the *Sigma*-capped distance, as appropriate."  *Id.*

        In their brief, Titan and the USW state that "[i]n the *Final Results*, Commerce agreed that

Double Coin had not shown that it had revised the distances in its database as instructed, but

---

[21] In *Sigma Corp. v. United States*, the Court of Appeals for the Federal Circuit employed
a presumption that a nonmarket economy producer would seek inputs with lower freight costs
when deciding between domestically-produced and imported inputs.  117 F.3d at 1408.

stated that Commerce's 'review of the changes. . . demonstrate{d} that the requested changes

were properly reported.'" Titan's Br. 13 (quoting *Final I&D Mem.* 49). Titan's and the USW's

statement informing the court that "Commerce agreed that Double Coin had not shown that it

had revised the distances in its database as instructed" does not accurately characterize the

record. The relevant statements in the Final Issues and Decision Memorandum are as follows:

> We note that Double Coin certified that it made all requested corrections in its
> Post-Verification Corrections submission and further confirmed that it capped the
> underlying line item distances at the distance to the port for the trading companies
> (rather than the distance to the trading companies), as requested. Though Double
> Coin's resubmission did not include the underlying worksheets demonstrating the
> change for every supplier (nor was such information requested), our review of the
> changes to the overall distances reported for each input between the most recent
> factors of production ("FOP") database and the preceding database demonstrate
> that the requested changes were properly reported.

*Final I&D Mem.* 49. The Final Issues and Decision Memorandum does not indicate the

Department's agreement with the notion that Double Coin had not shown it had revised the

freight distances as Commerce had instructed. Any reasonable inference that can be drawn is to

the contrary.

In the statement of facts in their Rule 56.2 brief, Titan and the USW state that "[p]er

Commerce's instructions, the freight distance for each of Double Coin's FOPs should have been

calculated as the weight-averaged *Sigma* distances." Titan's Br. 10. They later repeat this

alleged fact in their argument, stating that "[a]s discussed above, Commerce instructed Double

Coin to report all its freight distances using the capped *Sigma* distances once it discovered that

Double Coin had misreported the freight distances." Titan's Br. 24. The court does not accept

this allegation as the uncontested fact Titan and the USW allege it to be. The Department's

instruction was that Double Coin "re-report the supplier distances for all uncapped sub-*Sigma*

suppliers to the *Sigma*-capped distance, *as appropriate*." *Commerce Letter* 1. Although this

sentence can be interpreted to mean, as Titan and the USW do, that Commerce wanted Double

Coin to re-report all of its freight distances to the *Sigma*-capped distance, i.e., the distance from

the nearest port to the tire plant rather than the distance from the material supplier to the tire

plant, several considerations caution against acceptance of Titan's and the USW's interpretation.

The first consideration is the language Commerce used in the instruction.  In addition to the

words "as appropriate," the previous sentence suggests a more limited context: "at verification,

the Department observed and Double Coin acknowledged that the sub-*Sigma* distances reported

for certain suppliers corresponded to trading companies from which certain inputs were

purchased and not the actual producer/supplier of that input."  *Id.*

      Second, the problem Commerce identified involved distances from trading companies.

Therefore, it is not clear to the court why Commerce would have required Double Coin to use the

distance between the tire plant and the port in all cases, even if there was a shorter distance from

the tire factory to a material supplier that was *not* a trading company.  Had Commerce done so, it

would have imposed a requirement that would have departed from its established *Sigma*-derived

practice of using the shorter of the two distances.

      Finally, Commerce itself was in the best position to interpret its instruction (as well as

whether Double Coin complied with it), and Commerce did not interpret the instruction as Titan

and the USW do.  Commerce stated in the Final Issues and Decision Memorandum that Double

Coin "confirmed that it capped the underlying line item distances at the distance to the port for

the trading companies (rather than the distance to the trading companies), as requested."  *Final

I&D Mem.* 49 ("our review of the changes to the overall distances reported for each input

between the most recent factors of production ('FOP') database and the preceding database

demonstrate that the requested changes were properly reported.").

Titan and the USW include in the fact section of their brief a recalculation of Double

Coin's freight distances in which they attempt to demonstrate that Double Coin did not follow

the Department's instructions and continued to misreport the freight distances.  Titan's Br.

12-13.  Their recalculation, however, is based on their own interpretation of the Department's

instructions.  *Id.* at 10.

In summary, the court finds no error in the Department's determination that Double Coin

complied with the instructions Commerce issued to obtain a re-reporting of Double Coin's

freight distance data base.

    2.  The Court Denies Relief on Titan's and the USW's Claim Contesting the Inventory Carrying
                             Cost Deduction for Sales by CMA

Because Double Coin's U.S. sales were made to an affiliated entity, CMA, Commerce

calculated CEP based on the first sale from CMA to an unaffiliated customer, as provided under

19 U.S.C. § 1677a(b).  Commerce adjusted the CEP starting prices for expenses related to

commercial activity in the United States, including inventory carrying costs, as provided under

19 U.S.C. § 1677a(d)(1).  Titan and the USW claim that Commerce acted contrary to the record

evidence in accepting Double Coin's and CMA's method of estimating time in inventory for

purposes of calculating the inventory carrying cost deduction.  Titan's Br. 3.  According to their

argument, "[t]he record showed that Double Coin's methodology produced an inaccurate and

severe under-counting of time spent in inventory."  *Id.*

In the Final Issues and Decision Memorandum, Commerce concluded that "[b]ecause

CMA does not track the movement of individual tires into its warehouse, the inventory carrying

cost calculation must necessarily rely on an estimate of average days in inventory."  *Final I&D*

*Mem.* 55.  Commerce explained, further, that CMA "does not track individual tires to a specific

shipment into their warehouses, and the accounting for warehouse inventory only tracks the

quantity of a given product in and out of inventory." *Id.* at 56 (footnote omitted).  Commerce

also stated:

> Because they do not know when the first shipment of a tire that has gone out for
> sale came in, Double Coin utilized a last-in-first-out ("LIFO") method to estimate
> average days in inventory for reporting its inventory carrying costs because
> company officials know exactly when a tire went out for sale and exactly when
> the last instance of that type of tire came in to the warehouse.

*Id.*  Commerce found, further, that "[a]s support for this method, CMA provided and Department

officials reviewed documentation demonstrating that, for certain models of their larger selling

tires, the inventory is moving out of inventory at a quicker pace than it is replaced." *Id.* (footnote

omitted).

Commerce stated for the Final Results that "we previously found that the methodology

used by Double Coin to determine average days in inventory is acceptable and verified that the

relevant information was properly reported." *Id.*  Commerce further stated that "we continue to

find Double Coin's reported inventory carrying costs, based on CMA's LIFO method of

estimating average days in inventory, to be acceptable and appropriate for use in these final

results." *Id.*

During the fifth review, the petitioners, Titan and the USW, argued to Commerce that

according to what they termed a "typical" methodology for determining time in inventory, the

average time in inventory should have been calculated as 290.6 days.  *Id.* at 55.  Commerce

described the methodology favored as "typical" by Titan and the USW as "computing a ratio of

the average inventory value during the POR to the total sales during the POR and then applying

that ratio to the number of days in a year." *Id.*  Titan and the USW argued to Commerce that this

estimate is supported by record evidence and that the estimate resulting from the LIFO

methodology reported by Double Coin, which according to Titan and the USW "results in an

average of 13.5 days in inventory for each tire sold," was not. *Id.* Commerce rejected this

position in the Final Results, concluding, *inter alia*, that "Petitioners provide no evidence or

argument to support their contention that their calculation is more accurate or otherwise

representative of Double Coin's commercial reality." *Id.* at 56. Commerce concluded, further,

that the calculation offered by Titan and the USW "is based on total sales and inventory values

for all products[,] both subject and nonsubject." *Id.* Titan and the USW make the same

argument before the court. Titan's Br. 25 ("As has been explained, using the commonly

accepted method of calculating average time in inventory based on average inventory levels and

total sales during the period, the average time Double Coin's products spent in inventory was

290.6 days, over 21 times the 13.5 day average period submitted by Double Coin.") (citing *Final

I&D Mem.* 55-56).

Because neither the statute, 19 U.S.C. § 1677a(d)(1), nor the regulations specify a method

for calculating inventory carrying costs, the court reviews the Department's decision to accept

CMA's method of estimating average time in inventory according to an abuse of discretion

standard. That decision was supported by the finding that CMA's method was directed to

subject merchandise while the suggested alternative considered all CMA merchandise, a finding

Titan and the USW do not contest. The decision to choose CMA's method over the suggested

alternative was also supported by the uncontested finding that "CMA provided and Department

officials reviewed documentation demonstrating that, for certain models of their larger selling

tires, the inventory is moving out of inventory at a quicker pace than it is replaced." *Final I&D

Mem.* 56 (footnote omitted). Commerce grounded its decision in an explanation of its findings

and its reasoning.  The court concludes that Commerce acted within its discretion in adopting the

CMA method rather than the only alternative Titan and the USW put forth.

> 3.  The Court Denies Relief on Titan's and the USW's Claim that Commerce Miscalculated the Freight Expenses for GTC

Titan and the USW challenge the Department's calculation of surrogate freight costs for

GTC's material inputs.  They argue that Commerce erred in using as its cap on freight distance

the *"Sigma"* distance, i.e., the distance from the tire plant to the nearest port, rather than the

distance to a port GTC used in importing its market-economy ("ME") purchases of materials.

Titan's Br. 27.  According to their argument, the Department's decision was not supported by

substantial evidence because "Commerce recognized that the record showed that GTC did not in

fact use the nearest port for imports." *Id.*  They argue, further, that Commerce "used the nearest

port as the *Sigma* cap distance because it was its practice to make this presumption, which

presumption Commerce argues was directed by the Federal Circuit in *Sigma*." *Id.*  They argue

that the Court of Appeals "did not direct this particular outcome" in *Sigma*, which in their view

did not direct Commerce "to apply a particular method" but "only directed Commerce to

consider how a producer would act in sourcing inputs." *Id.* at 27-28.

In the Preliminary and Final Results, Commerce "used GTC's reported distance from the

factory to the closest commercial port (*i.e.*, the Port of Fengcheng, at 710 km) as the *Sigma* cap

distance." *Final I&D Mem.* 47.  Commerce determined that "[t]he record also demonstrates that

GTC's ME input purchases and finished goods exports predominantly transit through a different

port (or ports), which is (are) at a greater distance from GTC's factory." *Id.*

In support of their claim, Titan and the USW summarize their arguments by asserting that

"Commerce's reliance on its practice as an irrebuttable presumption was not directed by the

Federal Circuit, is contrary to substantial evidence on the record, and is otherwise not in

accordance with the law." Titan's Br. 29. The court disagrees with these three arguments.

For the Final Results, Commerce stated that it considered, and declined to follow, the

petitioners' suggestion that Commerce "alter the Department's long established practice of

capping import distances to the closest port . . . for its ME imports and export sales." *Final I&D*

*Mem.* 47. Titan's and the USW's argument that the *Sigma* decision did not require the particular

methodology Commerce used is unpersuasive because Commerce, in the Final Results, did not

state that the holding in *Sigma* compelled it to apply that particular methodology. Instead, in the

Final Issues and Decision Memorandum, Commerce described its adherence to its prior practice

as follows:

> Specifically, the Department added to Indonesian import SVs [surrogate values] a
> surrogate freight cost using the shorter of the reported distance from the domestic
> supplier to the factory or the distance from the nearest seaport to the factory
> where it relied on an import value. This adjustment is in accordance with the
> decision of the Federal Circuit in *Sigma* . . .

*Id.* (footnote omitted). Commerce did not describe its decision as based on a conclusion that the

holding in *Sigma* would permit no other method. Instead, Commerce grounded its decision in its

"*long-standing Department practice* following the Federal Circuit's holding in *Sigma.*" *Id.*

(emphasis added).

Nor can the court agree that the Department's decision was not supported by substantial

evidence on the record. Titan and the USW do not point to a finding of fact Commerce made

that they allege to be unsupported by record evidence; instead, they argue that the decision on the

whole was not supported by substantial evidence because "Commerce recognized that the record

showed that GTC did not in fact use the nearest port for imports." Titan's Br. 27. Properly

construed, their claim is not that Commerce reached an invalid finding of fact but that Commerce

should have used a different methodology.  As Titan and the USW implicitly acknowledge,

Commerce found that GTC used a port other than the nearest port for its *market economy* inputs

(as well as export sales).  *See Final I&D Mem.* 47.  Commerce simply chose not to adopt the

petitioners' suggestion that the distance to this farther port be adopted as the *Sigma* cap distance

for the nonmarket economy inputs.

Finally, the court rejects Titan's and the USW's vague assertion that the Department's

decision not to adopt their suggestion on GTC's freight costs was "otherwise not in accordance

with the law."  Titan's Br. 29.  Because the statute and the regulations are silent on how

Commerce is to determine freight distances when calculating surrogate freight costs for a

respondent's nonmarket economy input purchases, the court considers the Department's decision

according to an abuse of discretion standard.  The court discerns no violation of law in the

Department's decision not to depart from its standard methodology in the circumstance

presented.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court remands the determination of the

International Trade Administration, U.S. Department of Commerce published as *Certain New*

*Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of*

*Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin.

May 7, 2015) for reconsideration and redetermination.  Therefore, upon consideration of all

papers and proceedings in this case, and upon due deliberation, it is hereby

**ORDERED** that the *Amended Final Results* be, and hereby are, set aside as unlawful and
remanded for reconsideration and redetermination in accordance with this Opinion and Order; it
is further

**ORDERED** that Commerce shall issue, within ninety (90) days of the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order; specifically, the Remand Redetermination shall assign the individual weighted-average dumping margin to Double Coin as directed in this Opinion and Order and shall redetermine GTC's margin as necessary; it is further

**ORDERED** that plaintiffs and intervenors may file comments on the Remand Redetermination within thirty (30) days from the date on which the Remand Redetermination is filed with the court; and it is further

**ORDERED** that defendant may file a response within fifteen (15) days from the date on which the last of any such comments is filed with the court.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: February 6, 2017
New York, New York