Slip Op. 19-7

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al., | |
| Plaintiffs, | Before: Timothy C. Stanceu, Chief Judge |
| v. | Consol. Court No. 15-00124 |
| UNITED STATES, | |
| Defendant. | |

## OPINION AND ORDER

[Sustaining in part, and remanding in part, a determination in response to court order in litigation contesting the final results of an administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China]

Dated:  January 16, 2019

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd.  With him on the brief were *James P. Durling*, *Matthew P. McCullough*, and *Tung A. Nguyen*.

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Jordan C. Kahn*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel was *James H. Ahrens II*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge:  Before the court is a decision (the "Remand Redetermination") the

International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") issued in ongoing litigation contesting a determination by Commerce in an

antidumping duty proceeding.  *Final Results of Redetermination Pursuant to Ct. Remand* (June 21, 2017), ECF No. 200 ("*Remand Redetermination*").  Commerce issued the Remand Redetermination in response to the court's Opinion and Order of February 6, 2017.  *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, 205 F. Supp. 3d 1325 (2017) ("*CMA I*").  Also before the court is defendant's motion for a partial remand, which defendant bases on an intervening decision of the Court of Appeals for the Federal Circuit ("Court of Appeals"), *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) ("*Diamond Sawblades*").  Def.'s Mot. for Partial Voluntary Remand (Aug. 28, 2017), ECF No. 218 ("Def.'s Mot. for Remand").  The court sustains in part, and remands in part, the Remand Redetermination and denies defendant's motion for a partial remand.

## I. Background

The background of this consolidated action is set forth in the court's prior Opinion and Order, which is summarized and supplemented herein.  *See CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1329-32.

### A. The Agency Decision Contested in this Litigation

The contested administrative decision, which concluded the fifth periodic administrative review of certain pneumatic off-the-road tires from the People's Republic of China ("China" or the "PRC"), was published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) ("*Amended Final Results*"). The Amended Final Results were issued to correct a ministerial error made in the Department's decision published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed.

Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*").  The Final Results

incorporated by reference the *Issues and Decision Memorandum for Final Results of*

*Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the*

*People's Republic of China; 2012-2013* (Apr. 8, 2015) (Pub. Doc. 293), *available at*

https://enforcement.trade.gov/frn/summary/prc/2015-08673-1.pdf (last visited Jan. 9, 2019)

("*Final I&D Mem.*").

B. The Parties in this Consolidated Case

China Manufacturing Alliance, LLC ("CMA") and Double Coin Holdings Ltd. ("Double

Coin Holdings") (collectively, "Double Coin") are plaintiffs in this consolidated case.[1]  CMA is

a U.S. importer of subject merchandise produced and exported by Double Coin Holdings and its

affiliated entities.[2]  Compl. ¶ 2 (Apr. 28, 2015), ECF No. 6.  A second group of plaintiffs consists

of Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC").

GTC is a producer and exporter of subject merchandise.  Compl. ¶ 3, *Guizhou Tyre Co. v. United*

*States*, No. 15-00128 (May 1, 2015), ECF No. 6.  Double Coin and GTC were the mandatory

respondents in the fifth review and the only two respondents individually examined by

Commerce.  *Final Results*, 80 Fed. Reg. at 20,197.  Also a plaintiff, and a defendant-intervenor,

---

[1] Consolidated under *China Mfrs. Alliance, LLC v. United States*, Consol. Ct. No. 15-00124, are *Guizhou Tyre Co. v. United States*, Ct. No. 15-00128, and *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, Ct. No. 15-00136.  Order (July 17, 2015), ECF No. 24.

[2] Commerce decided that Double Coin Holdings and two companies affiliated with it, Double Coin Group Jiangsu Tyre Co., Ltd. and Double Coin Group Shanghai Donghai Tyre Co., Ltd., should be treated as a single entity ("collapsed") for purposes of the review.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197, 20,198 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*").  This decision is not challenged in this litigation.

is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

Service Workers International Union, AFL-CIO, CLC (the "USW").[3]  Order (May 13, 2015),

ECF No. 17.  The USW was a petitioner in the investigation that gave rise to the underlying

antidumping duty order and participated in this administrative review as an interested party.

Comp. ¶ 3, *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv.*

*Workers Int'l Union, AFL-CIO, CLC v. United States*, No. 15-00136 (May 6, 2015), ECF No. 6.

C. Procedural History

Commerce issued the antidumping duty order on off-the-road tires from China in 2008.

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of*

*Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping*

*Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008).  On November 8, 2013,

Commerce initiated the subject review, which covered entries made during the period of

September 1, 2012 through August 31, 2013 (the "Period of Review" or "POR").  *See Initiation*

*of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in*

*Part*, 78 Fed. Reg. 67,104 (Int'l Trade Admin. Nov. 8, 2013) ("*Initiation Notice*").

Commerce issued the Final Results on April 15, 2015.  *Final Results*, 80 Fed.

Reg. 20,197.  Following a ministerial error allegation, Commerce issued the Amended Final

Results, which assigned GTC a weighted-average dumping margin of 11.41%.[4]  *Amended Final*

*Results*, 80 Fed. Reg. at 26,231.  Commerce assigned to Double Coin the antidumping duty rate

---

[3] Titan Tire Corporation, a U.S. producer of off-the-road tires and former defendant-intervenor, has withdrawn from this litigation.  Order (May 16, 2018), ECF No. 224.

[4] The Final Results had assigned GTC a weighted-average dumping margin of 11.34%. *Final Results*, 80 Fed. Reg. at 20,199.

of 105.31%, which was the rate Commerce assigned to the "PRC-wide entity," concluding that

Double Coin had not established its independence from the government of the PRC.  This rate

was unchanged from the Final Results.  *Id*.

Following the court's decision in *CMA I*, Commerce submitted the Remand

Redetermination on June 21, 2017.  Under protest, the Remand Redetermination changed the

final weighted-average dumping margin for Double Coin from 105.31% to 0.14% (a *de minimis*

margin).  *Remand Redetermination* 39-40.  The Remand Redetermination changed the final

weighted average margin for GTC from 11.41% to 11.33%.  *Id.*

GTC and the USW each filed comments on the Remand Redetermination.[5]  Consol. Pl.

GTC's Comments on Final Results of Redetermination Pursuant to Ct. Order (July 21, 2017),

ECF No. 208 ("GTC's Comments"); Titan Tire Corp. and USW Comments on the Dept. of

Commerce's Redetermination Pursuant to Ct. Remand (July 21, 2017), ECF No. 207 ("USW's

Comments").  Before filing a response to these comments, defendant filed its motion for a partial

remand, under which Commerce would revisit the issue of Double Coin's margin in light of

*Diamond Sawblades*, which was issued after the court's Opinion and Order in *CMA I*.  Def.'s

Mot. for Remand.  On September 1, 2017, defendant filed its response to the parties' comments

on the Remand Redetermination.  Def.'s Resp. to Comments on Remand Results, ECF No. 221

("Def.'s Reply").  Double Coin opposed defendant's motion for a partial remand.  Double Coin

and CMA's Opp'n to Def.'s Mot. for Partial Voluntary Remand (Sept. 18, 2017), ECF No. 222

("Double Coin's Opp'n").  On October 5, 2017, defendant filed a reply in support of its motion

for a partial remand.  Def.'s Reply in Support of its Mot. for Partial Voluntary Remand (Oct. 5,

2017), ECF No. 223.

---

[5] Double Coin did not file comments on the remand redetermination.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section

516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a, including an

action contesting a final determination that Commerce issues to conclude an antidumping duty

administrative review.  In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

### B. The Department's Remand Redetermination

In *CMA I*, the court directed Commerce to submit a redetermination addressing the

following four decisions in the Amended Final Results, which the court had ruled were contrary

to law: (1) the 105.31% antidumping duty rate assigned to Double Coin, *CMA I*, 41 CIT at __,

205 F. Supp. 3d at 1334-41; (2) downward adjustments Commerce made to GTC's export price

("EP") and constructed export price ("CEP") to account for Chinese irrecoverable value-added

tax ("VAT"), *id.*, 41 CIT at __, 205 F. Supp. 3d at 1344-51; (3) the calculation of surrogate

values for GTC's brokerage and handling costs and ocean freight costs, *id.*, 41 CIT at __,

205 F. Supp. 3d at 1356-58; and (4) the Department's decision not to make an inflation

adjustment in calculating a surrogate value for GTC's domestic warehousing costs, *id.*, 41 CIT

at __, 205 F. Supp. 3d at 1358-59.

In the Remand Redetermination, Commerce, under protest and indicating its

disagreement with the court's decision, assigned Double Coin a 0.14% *de minimis* margin to

replace the previous margin of 105.31%, which Commerce assigned in the fifth review.  *Remand Redetermination* 21, 39-40; *see also Amended Final Results*, 80 Fed. Reg. 26,231.

The downward adjustment from 11.41% to 11.33% that the Remand Redetermination made to GTC's margin resulted from two changes from the Amended Final Results.  On the surrogate values for GTC's brokerage and handling costs and ocean freight costs, Commerce concluded that its surrogate value determinations for brokerage and handling costs and ocean freight overlapped, such that "Shanghai Port Charges" were double counted, but it rejected GTC's argument that other charges were double counted as well.  *Remand Redetermination* 12-18.  Commerce also changed its calculation of its surrogate value for GTC's warehousing costs by including an inflation adjustment.  *Id.* at 19.  On the VAT issue, Commerce made no change to its methodology, again reducing GTC's starting prices for EP and CEP by 8% of the FOB value of GTC's exported subject merchandise, upon a finding that GTC had failed to demonstrate that it had not incurred "irrecoverable VAT" in these amounts.  *Id.* at 12.

### C. Positions Taken by the Parties on the Remand Redetermination

Double Coin did not comment on the Remand Redetermination.  GTC opposes the Department's decision to maintain the deductions from EP and CEP starting prices it had made for irrecoverable VAT, GTC's Comments 5-13, and, on the brokerage and handling and ocean freight costs, argues that charges in addition to the Shanghai Port Charges were double counted due to the Department's method of determining a surrogate value, *id.* at 13-16.  The USW supports the Department's maintaining the deductions for VAT, USW's Comments 3-7, supports the decision that only the Shanghai Port Charge was double counted, *id.* at 7-8, and opposes the decision to assign Double Coin the 0.14% margin, arguing instead that the rate for the PRC-wide entity should have been maintained at 210.48%, which was the rate for the PRC-wide entity prior

to the fifth review, and that this rate should have been assigned to Double Coin, *id.* at 8-12.

Defendant United States supports the Remand Redetermination on all issues except for the issue

of Double Coin's margin, Def.'s Reply 9, which it addresses in its partial remand motion, *see*

Def.'s Mot. for Remand.

<u>D. Decisions in the Remand Redetermination to which No Party Objects</u>

In the Final Results, Commerce determined a surrogate value for GTC's domestic

warehousing expenses using a price quote from an Indonesian warehousing and logistics

provider.  *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1358; *see Petitioners' Initial Surrogate Value*

*Comments*, Attach. 18 (Apr. 14, 2014) (Pub. Doc. 108), ECF No. 86-43 (warehousing price

quote from GIC Logistics Group).  The price quote on which Commerce relied was undated, but

the website from which it originated was accessed more than seven months after the close of the

POR.  *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1359.  Before the court, GTC argued that

Commerce should have adjusted this price quote for inflation.  *Id.*, 41 CIT at __, 205 F. Supp. 3d

at 1358-59.  In *CMA I*, the court held that Commerce failed to support adequately its decision not

to make an inflation adjustment and directed Commerce to "provide a more thorough analysis of

the issue that is grounded in whatever relevant evidence exists on the record." *Id.*, 41 CIT at __,

205 F. Supp. 3d at 1359.  In the Remand Redetermination, Commerce concluded that the record

lacked specific information demonstrating that the price quote was contemporaneous with the

POR and adjusted the price quote using the Producer Price Index of the International Monetary

Fund.  *Remand Redetermination* 19.

Because no party objects to the Department's decision to make an inflation adjustment to

GTC's warehouse costs, and because that decision complies with the court's opinion and order in

*CMA I*, the court sustains that decision.  For the same reasons, the court sustains the

Department's decision that the Shanghai Port Charges were double counted in the Department's

calculation of a surrogate value for GTC's brokerage and handling and ocean freight expenses.

E. Issues Remaining in this Litigation

Two issues remain undecided with respect to GTC's margin: (1) whether the deductions

from EP and CEP starting prices for Chinese value-added tax were lawful, and (2) whether

charges other than the Shanghai Port Charges were double counted in the Department's

calculation of a surrogate value for brokerage and handling and international freight expenses.

Only one issue remains undecided with respect to Double Coin: whether the court should permit

Commerce to reconsider the 0.14% *de minimis* margin it assigned to Double Coin in the Remand

Redetermination, due to the decision of the Court of Appeals in *Diamond Sawblades*.  The court

addresses these three issues below.

1. Commerce Unlawfully Made Deductions from GTC's EP and CEP Starting Prices for
Value-Added Tax

In calculating export price or constructed export price of the subject merchandise,

Commerce is directed by the Tariff Act to make certain additions to, and deductions from, the

starting prices used for determining the "U.S. price," i.e., either the export price or the

constructed export price, of the subject merchandise.  Some of these adjustments are made to

achieve a "tax neutral" comparison between U.S. price and normal value.  Among the upward

tax-related adjustments, which reduce a dumping margin, are upward adjustments in U.S. price

to account for import duties imposed by the country of exportation that have been rebated (i.e.,

duty drawback), or not collected, by reason of the exportation of the merchandise to the United

States.  *See* Section 772(c)(1)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(1)(B).  Such duties are

added to the U.S. price to allow a tax-neutral comparison with the home market price of the

foreign like product, which presumably includes import duties, such as duties on materials used

in production in the exporting country.  If the import duties are "irrecoverable," i.e., not rebated or avoided by reason of the exportation, the duties presumably are included in the U.S. price, and no upward adjustment or downward adjustment is made, the price comparison already being tax-neutral.  As explained below, the Tariff Act treats domestic value-added taxes of an exporting country in a way similar to its treatment of import duties imposed by an exporting country; i.e., a dumping margin potentially may be reduced for value-added taxes imposed on a finished good, or the materials used to produce it, if those taxes are refunded or avoided due to the exportation of the good.  But under the statutory scheme, a domestic value-added tax, whether or not refunded or avoided by reason of the exportation of the finished good, does not increase a dumping margin.

In contrast, a downward adjustment, which increases a dumping margin, generally is made to the U.S. price under the "export tax" provision, to adjust for an export tax, duty, or other charge imposed on the exportation of the subject merchandise to the United States, if included in the U.S. price.  Section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B).  A tax subject to this provision is presumed to be present in the price of the exported subject merchandise but, by definition, is not present in the price of the foreign like product in the home market.  *Id.*  The plain meaning of the provision illustrates this point.  Section 772(c)(2)(B) directs Commerce to reduce the price used to establish EP and CEP by "the amount, if included in such price, of any *export* tax, duty, or other charge imposed by the exporting country *on the exportation of the subject merchandise* to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title."[6]  19 U.S.C. § 1677a(c)(2)(B) (emphasis added).  In

---

[6] The "export taxes, duties, or other charges" described in section 1677(6)(C) are those which are "levied on the export of merchandise to the United States specifically intended to
(. . . continued)

contrast, a domestic value-added tax *is* presumed to be included in the price of the subject

merchandise *and also* in the price of the foreign like product.  Therefore, the Tariff Act does not

make a downward adjustment in U.S. price for a domestic value-added tax, as no such

adjustment is necessary or appropriate to achieve tax-neutrality.

Even though 19 U.S.C. § 1677a(c)(2)(B), by its plain meaning, does not address taxes

such as import duties or value-added taxes incurred by producers in the exporting country,

Commerce resorted to this provision in the Final Results to make downward, i.e. margin-

increasing, adjustments to the prices used for determining the U.S. price, i.e., the export price or

constructed export price, of GTC's subject merchandise.  Commerce made these downward

adjustments for irrecoverable value-added taxes included in the prices of materials used to make

GTC's subject merchandise.  *Final I&D Mem.* at 28.  Commerce erroneously reasoned that

"irrecoverable" VAT, by which it meant VAT not rebated by reason of exportation of the

finished good, "amounts to" an "export tax, duty or other charge imposed on exportation of the

subject merchandise to the United States" within the meaning of that term as used in 19 U.S.C.

§ 1677a(c)(2)(B).  *Id.* (internal quotation marks omitted) (footnote omitted).

There is no record evidence in this case demonstrating that China imposed on the subject

merchandise an export tax or anything resembling one.  The record shows that the PRC value-

added tax is incurred by an OTR tire producer in the PRC by the inclusion of this tax in the

prices of materials used in domestic production, regardless of whether the finished tire is sold for

domestic consumption or export.  It also shows that at least some of that tax is rebated, refunded,

or avoided if the tire is sold for export.  The fact that a domestic value-added tax incurred on

                                                                      (continued . . .)
offset the countervailable subsidy received."  19 U.S.C. § 1677(6)(C).  The countervailable
subsidy offset exception has not been invoked in this case.

materials used in producing OTR tires in China might not be fully refunded by reason of

exportation of the finished tire does not convert any unrefunded portion of such a tax from a

domestic value-added tax into an export tax.  In other words, irrecoverable VAT is still VAT, not

an export tax.  When reduced to its basics, the rationale Commerce adopted in the Final Results

appears to have been that irrecoverable value-added tax, which is a domestic tax incurred on

materials used in production in the exporting country, somehow becomes an export tax simply

because it is irrecoverable.

      In the Remand Redetermination, Commerce decided that its deductions from GTC's U.S.

prices, as effected in the Final Results, were correct and should be maintained in the Remand

Redetermination.  *Remand Redetermination* 12.  This decision is contrary to the record evidence

and the intent Congress expressed in the Tariff Act.  Whether recoverable or not, a domestic

value-added tax is not properly the subject of a downward, margin-increasing adjustment under

19 U.S.C. § 1677a(c)(2)(B).

      In contesting the Final Results, GTC claimed, *inter alia*, that the Department's

deductions from U.S. price were unauthorized by the plain language of the statute.  *CMA I*,

41 CIT at __, 205 F. Supp. 3d at 1344-45.  Continuing to pursue this claim, GTC objects that the

Remand Redetermination "does not affirmatively answer the threshold question presented by this

Court; that is, whether the VAT adjustment is consistent with the statutory authorization to

deduct from EP/CEP 'a tax, duty, or other charge . . . so imposed in relation to the subject

merchandise.'"  GTC's Comments 7 (quoting *CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1346).

      *CMA I* did not decide the question of whether any EP and CEP deduction for Chinese

VAT is authorized by 19 U.S.C. § 1677a(c)(2)(B) because Commerce impermissibly resorted

only to a presumption, rather than an actual finding, that a charge, of whatever character, in an

amount equal to 8% of the export value was imposed and was specific to GTC's merchandise.[7]

*Id.* at 1349. "That is why the court need not reach the question of whether any unrefunded VAT

charge that Commerce might have found to have been incurred would have qualified as an

'export' tax, duty or other charge within the meaning of the statute." *Id.*

After *CMA I* was decided and the parties filed their comments on the Remand

Redetermination, another decision of this Court answered the statutory interpretation question

*CMA I* did not reach.  In *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1338-47, this Court

analyzed the plain meaning, statutory history, and legislative history of 19 U.S.C.

§ 1677a(c)(2)(B).  *Qingdao Qihang* concluded that Congress, in enacting that and related

provisions in the Tariff Act, intended that a domestic value-added tax imposed by an exporting

country on subject merchandise or the materials used to produce it, whether or not "recoverable"

by reason of exportation of the subject merchandise, would not increase a dumping margin.[8]

Moreover, the opinion explained that the application of § 1677a(c)(2)(B) does not depend on

whether or not the exporting country is treated by Commerce as a nonmarket economy country,

as are China and Vietnam.

---

[7] Contrary to the Department's conclusions, in neither the Final Results nor in the
Remand Redetermination did Commerce reach a finding supported by substantial evidence that
GTC incurred irrecoverable VAT in the amount of 8% of the export value of the subject
merchandise.  But as the court explains in the Opinion and Order, the Department's decision to
make deductions in U.S. price for irrecoverable VAT was unlawful regardless of the
Department's erroneous presumption as to how much VAT was irrecoverable.

[8] Prior decisions of this Court had sustained as reasonable the Department's interpretation
of 19 U.S.C. § 1677a(c)(2)(B) to apply to irrecoverable VAT.  *See Qingdao Qihang Tyre Co. v.
United States*, 42 CIT __, 308 F. Supp. 3d 1329, 1346 ("*Qingdao Qihang*") (citing other
decisions of this Court).  *Qingdao Qihang* opined that in these prior decisions, the issue of
whether the Department's interpretation was consistent with statutory purpose and legislative
history does not appear to have been argued, as it was not addressed in the various opinions.

The *Qingdao Qihang* opinion noted that Congress, when enacting 19 U.S.C. § 1677a(c) and its related provisions, addressed the precise question of how a domestic tax such as a value-added tax, imposed by the exporting country directly upon an exported good or the components used to produce that good, would affect a dumping margin.  The court pointed out that Congress intended that VAT avoided or refunded by reason of exportation of the subject merchandise, i.e., "recoverable" VAT, would have the potential to reduce a dumping margin.  It explained that prior to the enactment of the Uruguay Round Agreements Act ("URAA"), the Tariff Act contained a provision that potentially increased U.S. price by the amount of recoverable VAT, thereby reducing a dumping margin, while the export tax provision, in the ordinary instance, would increase a dumping margin.  *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1340-41. The former increased U.S. price (and thereby reduced a dumping margin) by "the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation."  19 U.S.C. § 1677a(d)(1)(C) (1982).  The provision generally was understood to apply to recoverable value-added tax imposed by the country of exportation.  *See Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1576-78 (Fed. Cir. 1995).  *Qingdao Qihang* reasoned that Congress had to have been aware of the difference between an "export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise," which it addressed in one paragraph of the provision on U.S. price, and a recoverable domestic tax such as a VAT, which it addressed in a separate paragraph of that provision, with the opposite result. *Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1338-39.  It noted that Congress used

distinctly different language in the export tax provision than it used in the provision addressing

recoverable domestic taxes (such as VAT taxes) that are imposed by the exporting country

directly on the exported subject merchandise or the materials used to produce it. *Id.* Congress,

therefore, could not have intended that a VAT tax imposed directly upon an exported good or the

components thereof, which it addressed in the domestic tax provision, would also fall within the

scope of the export tax provision.

    The *Qingdao Qihang* opinion further explained that after enactment of the URAA, the

statute converted the upward adjustment to U.S. price for recoverable VAT to a downward

adjustment in normal value, whether determined by price in the comparison market or by

constructed value, thereby again providing that recoverable VAT, in the ordinary instance, would

lower a dumping margin. *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1339-44. The opinion went on to

discuss that under the URAA, goods exported from NME countries do not get the benefit of the

lowering of the margin for recoverable VAT because normal value in those proceedings

ordinarily is determined by the special procedures of 19 U.S.C. § 1677b(c), not by home market

price or by constructed value. *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1344-46. But as the opinion

also discussed, nothing in the Tariff Act, either before or after amendment by the URAA,

reasonably can be interpreted to *increase* a dumping margin for VAT, whether "recoverable" or

"irrecoverable," and the legislative history is contrary to any such interpretation. *Id. Qingdao

Qihang* also concluded that the Department's interpretation of 19 U.S.C. § 1677a(c)(2)(B) is

contrary to the statutory scheme and the clearly expressed intent of Congress, regardless of

whether the good is exported from a nonmarket economy country such as the PRC. The opinion

explained that in 19 U.S.C. § 1677a(c)(2)(B), which pertains to U.S. price, not normal value,

Congress made no distinction between market economy and nonmarket economy countries.  *Id.*, 41 CIT at __, 308 F. Supp. 3d at 1344-45.

In *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ("*Senmao*"), this Court considered specifically the question of whether record evidence supported the finding of Commerce in that review that Chinese irrecoverable VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales."  *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1342.  *Senmao* concluded that this finding, which was critical to the Department's rationale, was directly contradicted by the evidence on the administrative record of the review at issue in that case.  That record contained detailed information about the workings of the PRC VAT scheme as applied to a respondent in the review, Jiangsu Senmao Bamboo and Wood Indus. Co., Ltd. ("Senmao").  The court concluded that Commerce erroneously presumed that China irrecoverable VAT was not incurred on domestic sales of the good.  *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1344 ("Commerce lacked evidentiary support for its finding that under the PRC's VAT system a producer of exported merchandise such as Senmao did not incur irrecoverable input VAT on domestic sales.").  The record in that case showed that potential liability for Chinese "output" VAT affected both domestic sales and sales for export, with the export sales incurring output VAT at a preferentially lower rate.  *Id.*  The record also showed that the taxpayer applied the total value of input VAT incurred on all materials used (whether used in production for domestic sale or for export) against the potential combined liability for output VAT on domestic sales.[9] *Id.*, 42 CIT at __, 322 F. Supp. 3d at 1343.

---

[9] In this case, unlike in *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018), there is no record evidence that sales of (. . . continued)

The finding the court ruled unsupported by record evidence in *Senmao* was also made in the review at issue in this case.  Commerce stated in the Final Issues and Decision Memorandum as follows:

> In a typical VAT system, companies do not incur any VAT expense; they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT"), and, in the case of domestic sales, the company can credit the VAT they pay on input purchases for those sales against the VAT they collect from customers.  That stands in contrast to the PRC's VAT regime, where some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded.  This amounts to a tax, duty, or other charge imposed on exports *that is not imposed on domestic sales*.

*Final I&D Mem.* at 28 (emphasis added) (footnotes omitted).  The Issues and Decision Memorandum cited no factual basis for its finding that Chinese irrecoverable VAT "amounts to a tax, duty, or other charge imposed on exports "that is not imposed on domestic sales," and the Remand Redetermination is also defective in this respect.  There is no record evidence that could support such a finding, and it is hard to imagine that there could be such evidence.  If all value-added tax incurred on domestic sales were "recoverable," then it would appear that the taxation scheme would produce no revenue for the government on domestic sales, defeating the purpose of a VAT.

The Remand Redetermination relies on a finding that "[i]n this case, the record demonstrates that the Chinese VAT system can result in companies [*sic*] having un-refunded or

---

(continued . . .)

the subject merchandise incurred output VAT.  GTC argues that the record evidence shows that the output VAT rate on exported OTR tires is zero.  GTC's Mem. in Support of Mot. for J. on the Agency R. 8 (Sept. 24, 2015), ECF No. 36.  Regardless, the important point is that in this case, no record evidence demonstrates that OTR tires sold in the Chinese domestic market receive preferential value-added tax treatment of *any* kind over OTR tires sold for export.  The record evidence in this case, as in the review at issue in *Senmao*, shows that the opposite is true: sales for exportation from China are treated more favorably than domestic sales under the PRC VAT scheme.

irrecoverable VAT, in which some portion of the VAT that a company pays on purchases of

inputs used in the production of exports of subject merchandise is not refunded," *Remand

Redetermination* 9.  This reliance is misplaced.  A value-added tax that a domestic producer

incurs on its domestic sales but does not avoid entirely on its export sales is not the same as a

tax, duty, or charge imposed on the exportation of the good.  In the Remand Redetermination, as

in the Final Results, the Department's illogical rationale appears to be that for purposes of

19 U.S.C. § 1677a(c)(2)(B), irrecoverable Chinese VAT is an "export tax, duty, or other charge"

that is "imposed by the exporting country on the exportation" of the good simply because it is

irrecoverable.  See *id.* at 28.  Commerce emphasizes the term "charge" as used in the statutory

phrase "export tax, duty, or other charge," noting the lack of a statutory definition, and claims

entitlement to "deference" for its "reasonable" interpretation.  *Id.* at 8-9 ("'[E]xport tax, duty, or

other charges' includes 'a cost that arises as the result of export sales,' consistent with other

cases interpreting the word 'charges.'") (footnote omitted).  But the question of whether Chinese

value-added tax is a "tax" or, alternatively, some form of "other charge" is not the question

posed by this case.  To the contrary, the question is whether the Department's statutory

interpretation is reasonable.  Because it contravenes the plain meaning, statutory history, and

legislative history of § 1677a(c)(2)(B), it is not.  An agency interpretation that disregards the

clearly expressed intent of Congress is not a reasonable one.

In summary, Congress had a specific intent with respect to VAT imposed by an exporting

country on subject merchandise or the materials used to produce it.  Congress did not intend that

irrecoverable VAT, i.e., VAT that was not refunded or avoided by reason of exportation of the

good, would increase a dumping margin (although it did intend that *recoverable* VAT, in some

circumstances not present here, could reduce a dumping margin).  In addition, Commerce erred

in finding, without any evidentiary support, that Chinese irrecoverable VAT is a tax not imposed

on the domestic good.  In its redetermination in response to this Opinion and Order, Commerce

must take the appropriate corrective action to remove from the calculation of GTC's margin its

downward EP and CEP adjustments for VAT.

>      2. The Department's Finding that Only One Cost Category of B&H and Freight Costs Was
>         Double Counted Is Not Supported by Substantial Evidence on the Record

The statute directs Commerce to reduce U.S. price (i.e., the starting prices for

determining EP or CEP) by "the amount, if any, included in such price, attributable to any

additional costs, charges, or expenses, and United States import duties, which are incident to

bringing the subject merchandise from the original place of shipment in the exporting country to

the place of delivery in the United States."  19 U.S.C. § 1677a(c)(2)(A).

For GTC's export brokerage and handling costs paid in RMB or provided by a Chinese

freight carrier in the Final Results, Commerce used a surrogate value of 0.0455 USD per

kilogram that it obtained from information pertaining to Indonesia, its chosen surrogate country.

This information was published by the World Bank as *Doing Business 2014: Indonesia* ("*Doing

Business Indonesia*").  *See Petitioners' Initial Surrogate Value Comments*, Attach. 17

(Apr. 14, 2014) (Pub. Docs. 107-108), ECF Nos. 86-42, 86-43 ("*Petitioners' Initial SV

Comments*") (placing on the administrative record portions of *Doing Business Indonesia*);

*Surrogate Value Comments for GTC*, Ex. 11 (Apr. 14, 2014) (Pub. Doc. 111), ECF No. 90-1

("*SV Comments for GTC*") (same).

Commerce obtained the surrogate value of 4.55 cents per kilogram for export brokerage

and handling by adding three cost categories shown in *Doing Business Indonesia* for "trading a

standard shipment of goods by ocean transport" from Indonesia.  These costs were: "documents

preparation" of $165, "Customs clearance and technical control" of $125, and "Ports and

terminal handling" of $165.  *See CMA I*, 41 CIT at __, 205 F. Supp. 3d at 1357.  Commerce

presumed (and GTC does not contest) that a "standard shipment" of goods would consist of a

standard, fully-loaded oceangoing cargo container of 10,000 kilograms.  *See Petitioners' Initial*

*SV Comments*, Attach. 17 (Apr. 14, 2014) (methodology for *Doing Business Indonesia*).  To

calculate the per-kilogram surrogate value, Commerce divided the sum of the costs, $455, by this

kilogram quantity.

     To value GTC's trans-Pacific ocean freight from China to the United States, Commerce

calculated an average of monthly per-container shipping price quotes to both the east and west

coasts of the United States using information published online by Descartes Systems Group Inc.

("Descartes") and provided to the record by GTC.  *Final Results Surrogate Value Mem*. 2

(Apr. 8, 2015) (Pub. Doc. 294), ECF No. 107-6 ("*Final Surrogate Value Mem.*"); *Preliminary*

*Results Surrogate Value Mem.* 15-16 (Sept. 30, 2014) (Pub. Doc. 265), ECF No. 108-1 ("*Prelim.*

*Surrogate Value Mem.*"); *see SV Comments for GTC*, Ex. 8.  Commerce converted the per-

container costs to per-kilogram costs using an average kilograms-per-container factor obtained

from GTC's proprietary information.  *Prelim. Surrogate Value Mem.* 15-16.  Commerce also

included in its deduction under 19 U.S.C. § 1677a(c)(2)(A) an amount for U.S. domestic inland

freight for those sales in which GTC paid shipping charges all the way to the customer.  *Final*

*Surrogate Value Mem*. 2.  Commerce obtained this U.S. inland freight amount from "price lists

from Descartes for delivery from ports on the East and West coasts, averaged the cost of delivery

per container from the price list, and applied the same average proprietary kilograms-per-

container factors as we did for the ocean freight."  *Prelim. Surrogate Value Mem.* 16 (footnote

omitted).

Before Commerce and again before the court, GTC claimed that Commerce double

counted some costs by including them both in the brokerage and handling surrogate value and in

the ocean freight costs, thereby overstating the CEP deduction required by 19 U.S.C.

§ 1677a(c)(2)(A).  *See* GTC's Comments 6-10.  The costs in question were listed for one or more

of the Descartes ocean freight quotes and described as surcharges separate from the cost item for

ocean freight itself.  *CMA I* directed Commerce to reconsider its conclusion in the Final Results

that double counting did not occur and also directed Commerce to "address specifically each of

the charges in the Descartes quotes that GTC identifies as charges that overlap with the charges

Commerce obtained from the *Doing Business* report."  *CMA I*, 41 CIT at __, 205 F. Supp. 3d

at 1358.  Noting that Commerce did not address adequately "the specific question" of the double

counting raised by GTC, the court stated:

> As an example, one of the three cost elements in the Department's calculation of
> the $455 brokerage and handling cost from that [*Doing Business*] report is
> "Documents preparation" at $165.  Commerce did not address the specific
> question of whether this charge overlapped with the item identified on certain of
> the Descartes quotes as "Documentation Charges" of $45 and the item listed on
> one of the quotes as "Doc. Handling Charges" of $60.  As another example,
> Commerce also included in the $455 total a charge for "Ports and terminal
> handling" at $165.  Commerce does not explain its reasoning for its apparent
> conclusion that this had no overlap with "Shanghai Port Charges" of $66, which is
> listed on one of the Descartes quotes.

*Id.*

In a draft version of the remand redetermination, Commerce considered the following

eight cost categories for possible double counting with the *Doing Business* report:

(1) "Documentation charges," (2) "Traffic Metigation {sic} fee," (3) "AMS Charge," (4) "Clean

Truck Fee," (5) Chassis Usage Charges," (6) "Shanghai Port Charges," (7) "International Ship &

Port Security charges," and (8) "ISD Handling Charge."  *See Draft Results of Redetermination*

*Pursuant to Court Remand* 11 (May 4, 2017) (Remand Pub. Doc. 1), ECF No. 210-5 ("*Draft*

*Remand Redetermination*").  Commerce concluded in the draft results that of the eight costs, all

but two—cost (3), "AMS Charge," and cost (5), "Chassis Usage Charges"—were double

counted, having "appeared in both ocean freight and shipping and handling charges." *Id.* at 12.

Commerce removed the other six costs from the ocean freight cost calculation.  Commerce

reasoned that the "AMS Charge" referred to the cost of providing manifest information to U.S.

Customs and Border Protection through the Automated Manifest System ("AMS") and,

accordingly, "are necessarily charged by the freight forwarder and not a port charge covered by

*Doing Business.*"  *Id.* at 12-13.  Commerce found that a "Chassis Usage Charge" is "the

additional charge for renting the chassis to support and transport full container loads transported

via ocean freight at the destination" and therefore "not port charges covered by *Doing Business.*"

*Id.* at 13 (footnote omitted).

After admitting new factual information to the record, Commerce decided in the Remand

Redetermination that only cost (6), the "Shanghai Port Surcharge," is within the costs reported in

*Doing Business* and therefore double counted.  The effect of this change was to increase the

11.24% margin for GTC determined in the draft remand redetermination to 11.33%.  *Compare*

*Draft Remand Redetermination* 16-17, *with Remand Redetermination* 39-40.

Commerce, relying on information submitted during the remand proceeding by the

petitioner, concluded that four of the costs in question were related to activities in the United

States occurring after ocean transport and therefore were not included in the brokerage and

handling costs covered by the *Doing Business* report.  These were cost (2), the Traffic Mitigation

Fee, cost (3), the Chassis Usage Charges, cost (5), ISD Handling Charges, and cost (7), the

"Clean Truck Fee."  *See Remand Redetermination* 15-17.  Commerce found that the Chassis

Usage Charges were "additional charges for renting the chassis to support and transport full

container loads transported via ocean freight at the destination." *Id.* at 16 (footnote omitted).  It

concluded that the ISD handling Charges "are not related to on-ocean services, but rather are

charged by the U.S. Consumer Product Safety Commission (CPSC) for inspection of cargo

entering the United States" and therefore are "not covered by *Doing Business.*"  *Id.* (footnote

omitted).  Commerce added that the Traffic Mitigation Fee and Clean Truck Fee "are not

expenses related to on-ocean services, but, rather, are post-ocean pass-through fees specific to

the ports of Los Angeles and Long Beach."  *Id.* (footnote omitted).

      In commenting on the Department's draft remand redetermination, GTC objected that the

costs Commerce associated with post-ocean transport are more appropriately valued under U.S.

inland truck freight, *see Remand Redetermination* 35-36, and GTC renews that objection before

the court, GTC's Comments 15-16.  GTC argues that "Commerce refused to exclude costs that it

found related to services undertaken in the United States based on a technicality: 'the scope of

the remand permits the Department only the discretion to evaluate fees potentially double

counted with the surrogate for PRC brokerage and handling.'"  *Id.* at 15 (*quoting Remand

Redetermination* 37 n.174).  The Remand Redetermination also gave a second reason for

rejecting the argument that the costs Commerce associated with post-ocean transport were not

double counted: "Regardless, the use of a 'fully loaded' international freight SV [surrogate

value] renders this question moot."  *Remand Redetermination* 37 n.174.  The court finds both of

these reasons unconvincing.

      Commerce was not precluded by *CMA I* from considering whether alleged double

counting occurred between the brokerage and handling surrogate value and the ocean freight

costs.  Commerce reopened the record during the remand proceeding, accepted new information

during that proceeding and, following its issuance of its draft for comment by the parties,

changed its position on most of the costs it determined to have been double counted in the draft, based on the new record information.  Because the Department's latest decision on double counting raises a new issue, GTC must be given the opportunity to object to the Department's new determination on double counting, which stemmed from the new information Commerce admitted to the record.  Accordingly, Commerce must consider GTC's objection that four cost categories (i.e., cost (2), the "Traffic Mitigation Fee," cost (3), the "Chassis Usage Charges," cost (5), "ISD Handling Charges," and cost (7), the "Clean Truck Fee") appear to overlap with domestic transportation costs that would be included in the prices reflected by the Descartes price lists Commerce used to calculate GTC's U.S. inland freight costs.  *See Prelim. Surrogate Value Mem.* 16, Attach. X (explaining that Commerce added U.S. inland freight costs—based on the Descartes price lists—to ocean freight costs to calculate "a total freight value for shipments entering through both East and West coast ports").  Commerce has not reached a valid determination that the cost categories GTC identified as double counted are separate from charges incurred during inland transportation in the United States, and it cannot be permitted to avoid this obligation by citing what it narrowly considered to be the scope of the court's order in *CMA I.*

The second reason Commerce gave—that the Department's international freight surrogate value was a "fully loaded" cost—is not adequately demonstrated.  *See Remand Redetermination* 12-13, 17.  Commerce stated that the "international freight surrogate value did not encompass only ocean freight, but also all post-exportation expenses incurred to deliver the merchandise to the unaffiliated customer (*i.e.*, ocean freight, U.S. inland freight charges, U.S. brokerage and handling expenses, etc.) – a 'fully-loaded' transportation charge."  *Remand Redetermination* 12-13 (footnote omitted).  But in its Remand Redetermination, Commerce

failed to explain why certain "ocean freight" charges identified in the Descartes quotes were not

accounted for again in the "U.S. inland freight" charges, which were derived from separate

Descartes price lists.  *See id.*  Specifically, Commerce found that the "'Automated Manifest

System (AMS) Charge,' 'Chassis Usage Charges,' 'ISPS- Int'l Ship and Port Security Charges,'

'ISD Handling Charges,' 'Traffic Mitigation Fee,' 'CTF- Clean Truck Fee,' and 'Documentation

Charges' are unique to ocean freight *or* activities at the U.S. destination."  *Id.* at 15 (emphasis

added).  If any of these "ocean freight" costs also are encompassed by the "U.S. inland freight"

costs, it would appear that they were double counted in the Department's "fully loaded

transportation charge" calculation.  *See id.* at 12-13.

 Commerce engaged in a complex calculation, and used multiple sources of data, to

determine the transportation-related and logistics-related costs for deduction under 19 U.S.C.

§ 1677a(c)(2)(A).  That provision requires Commerce to determine the "additional costs,

charges, or expenses . . . which are incident to bringing the subject merchandise from the original

place of shipment in the exporting country to the place of delivery in the United States."

19 U.S.C. § 1677a(c)(2)(A).  It must do so as accurately as possible based on the record

information.  On remand, therefore, Commerce must review and reconsider all aspects of its

determination that only one cost identified by GTC was double counted and may not rely on its

narrow conception of the scope of the court's previous order of remand to refuse to consider

whether costs were double counted.  In summary, Commerce must ensure that no costs are

double counted either as between (1) brokerage and handling (based on the *Doing Business*

report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the

Descartes quotes) and U.S. inland freight (based on the Descartes price lists).

<u>3. The Court Denies Defendant's Motion for a Partial Remand</u>

Commerce selected Double Coin for individual examination as a mandatory respondent,

the other mandatory respondent having been GTC.  *Respondent Selection Mem.* 7

(Dec. 13, 2013) (Pub. Doc. 27) (Conf. Doc. 6), ECF No. 85-12.  Commerce based its choice on

import data showing Double Coin to be one of the two largest exporters of subject merchandise

into the United States during the POR.  *Id.*

The sales and production data Double Coin submitted during the fifth review enabled

Commerce to calculate for Double Coin an individually-determined margin of 0.14%.  *Final*

*Results*, 80 Fed. Reg. at 20,199.  Rather than assign this margin to Double Coin, either

individually or to the PRC-wide entity of which it considered Double Coin to be a part,

Commerce assigned the PRC-wide entity (and therefore Double Coin) a rate of 105.31%.  *Id.*

Commerce calculated this rate as "a simple average of the previously assigned PRC-wide rate

(210.48 percent) and Double Coin's calculated margin (0.14%)."  *Id.* (footnotes omitted); *see*

*Amended Final Results*, 80 Fed. Reg. at 26,231.  The pre-existing 210.48% PRC-wide rate was

the rate Commerce applied to the PRC-wide entity in the investigation, which Commerce did not

change in any of the periodic reviews of the antidumping duty order prior to the fifth review.

*See Final I&D Mem.* at 12-13.  Commerce included Double Coin in the PRC-wide entity

because it concluded that Double Coin "failed to demonstrate absence of *de facto* government

control over export activities due to the fact that its controlling shareholder is wholly-owned by

the State-owned Assets Supervision and Administration Commission of the State Council and

the significant level of control this majority shareholder wields over the respondent's Board of

Directors."  *Final Results*, 80 Fed. Reg. at 20,199 (footnote omitted).

a. The Adjudication of Double Coin's Claim in *CMA I*

In support of its claim challenging the 105.31% rate, Double Coin made several

arguments before the Court of International Trade, including that Double Coin demonstrated the

absence of *de facto* control by the PRC government.  The court did not reach this argument in

*CMA I*, granting relief on Double Coin's claim on other grounds.  The court ruled that in the

particular circumstance presented by this case, the statute required Commerce to assign Double

Coin "an individual weighted average dumping margin."  *CMA I*, 41 CIT at __, 205 F. Supp. 3d

at 1334-41.  The particular circumstance included the facts that Commerce selected Double Coin

for individual examination and that all parties, including Double Coin, fully cooperated in the

review.  The court concluded that the *de minimis* margin of 0.14% calculated for Double Coin

qualified as an "individual weighted average dumping margin" within the meaning of 19 U.S.C.

§ 1677f-1(c)(1), but the rate of 105.31% that Commerce assigned to Double Coin, which was

determined by averaging the individual margin with the existing PRC-wide rate of 210.48%, did

not.  *See* 19 U.S.C. § 1677f-1(c)(1) (stating the general rule that Commerce "shall determine the

individual weighted average dumping margin for each known exporter and producer of the

subject merchandise").

The court reasoned, first, that Commerce had discretion under 19 U.S.C. §§ 1675(a) and

1677f-1(c)(2) *not* to examine Double Coin individually and, had it exercised that authority, could

have assigned Double Coin a rate other than an individual margin.  *CMA I*, 41 CIT at __,

205 F. Supp. 3d at 1335.  The court noted that Commerce intentionally decided not to exercise

that discretion and instead designated Double Coin (but not the rest of the PRC-wide entity) for

individual examination under 19 U.S.C. § 1677f-1(c)(1), thereby placing itself under the

statutory obligation to assign Double Coin an individual weighted-average dumping margin. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1334-35.

Second, the court concluded that although Commerce has authority under 19 U.S.C. § 1677e(a) to use "facts otherwise available" in "reaching the applicable determination," it could not validly use that authority here, Commerce having found Double Coin's submitted information sufficient for calculation of an individual weighted average margin. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1336-37. Mentioning that 19 U.S.C. § 1677e(a) may be invoked when "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), the court concluded that Commerce did not make a valid finding that "necessary information" was unavailable. *Id.* The court noted that Commerce said it lacked "complete information" with which to establish a new rate for the PRC-wide entity, i.e., information on the portion of the PRC-wide entity not constituted by Double Coin. *Id.* The court concluded, nevertheless, that Commerce had no need for such information because it expressly had declined to designate the non-Double Coin portion of the PRC-wide entity for individual examination. *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1336-41.

Third, the court concluded that even had it been permissible for Commerce to use facts otherwise available, Commerce could not permissibly use its "adverse inference" authority of 19 U.S.C. § 1677e(b) to apply the 105.31% rate, which was based in part on "adverse facts available" ("AFA"). *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1338. The court reasoned that Commerce found Double Coin to have fully cooperated and did not find the PRC-wide entity, or any portion of it, to be an uncooperative respondent in the review. *Id.*

Seeing no statutory exception allowing Commerce to assign anything other than an individual dumping margin to Double Coin, the court directed Commerce "to assign the 0.14%

*de minimis* margin to Double Coin because it is the only possible result that, on the record of the

fifth administrative review, could comply with all statutory requirements." *Id.*, 41 CIT at __,

205 F. Supp. 3d at 1344.

> b. Defendant's Motion for a Partial Remand and Double Coin's Opposition

In the Remand Redetermination, Commerce assigned Double Coin a 0.14% *de minimis*

margin.  *Remand Redetermination* 19-21.  It did so "under respectful protest," noting that it

disagreed with the "rationale and holding" of *CMA I*.  *Id.* at 21.  After Commerce submitted the

Remand Redetermination to the court, defendant filed its motion for a partial remand "so that

Commerce can revisit the issue of Double Coin's margin in light of *Diamond Sawblades.*"

Def.'s Mot. for Remand 2 (citing *Diamond Sawblades*, 866 F.3d at 1313 n.6).  Defendant's

motion directs the court's attention, in particular, to footnote 6 of the *Diamond Sawblades*

opinion.  Responding to an argument that appellant Advanced Technology & Materials ("ATM")

had based on *CMA I*, the footnote expressed disapproval of the analysis in *CMA I*.  In the

footnote, the Court of Appeals stated as follows:

> The CIT's analysis in *China Manufacturers Alliance* suffers from the same
> deficiencies as ATM's arguments in this appeal.  The analysis does not properly
> apply our precedent upholding Commerce's use of the PRC-wide entity rate for
> companies that fail to rebut the presumption of government control and is
> incompatible with the underlying NME presumption.  *See Transcom*[*, Inc. v.
> United States*], 294 F. 3d [1371] at 1381.  Accordingly, we do not find the CIT's
> decision in *China Manufacturers Alliance* persuasive.

*Diamond Sawblades*, 866 F.3d at 1313 n.6.  Defendant argues in its motion that the decision of

the Court of Appeals in *Diamond Sawblades* constitutes intervening legal authority that

Commerce could not have considered when making its decision in the Remand Redetermination

to address Double Coin's margin.  Def.'s Mot. for Remand 5.  Defendant argues, further, that the

appellate decision "'may affect the validity of the agency action' of assigning Double Coin,

under protest, a *de minimis* margin in its *Remand Redetermination*."  *Id.* (quoting *SKF USA Inc.*

*v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).

        Double Coin opposes the remand motion.  It argues, first, that "Commerce cannot at this

time seek to change the remand result" in this situation, in which Commerce assigned Double

Coin an individual weighted-average dumping margin as required by the court's order.  Double

Coin's Opp'n. 1.  According to Double Coin, "[b]ecause this Court has already opined on the

matter, Commerce must respect and abide by such opinion—until and unless it is changed or

vacated."  *Id.* at 3.  Double Coin adds that granting defendant's motion "would result in

inefficient litigation and resolution of this appeal."  *Id.* at 4.  Double Coin argues, in the

alternative, that if the court grants the motion, it also must address the three other arguments it

made in contesting the 105.31% rate, i.e., the arguments the court did not reach in granting relief

on Double Coin's claim.  Those arguments, as recounted in its opposition to the remand motion,

were that: (1) Commerce lacked authority to issue a "country-wide" rate such as the PRC-wide

rate, being limited by the statute to assigning individual margins and an all-others rate, (2) the

Department's presumption of government control in China is no longer valid given the changes

in China to the underlying factual basis that previously gave rise to that presumption, and (3) in

this case, Double Coin rebutted the presumption of government control.  *See id.* at 4-5.

        The court will deny the motion for a partial remand.  Were the court to grant the motion,

upon reconsideration the only rate Commerce reasonably could assign the PRC-wide entity on

the record of the fifth review would be the 0.14% rate Commerce assigned Double Coin in the

Remand Redetermination.  This result obtains under the relevant holding in *Diamond Sawblades*,

as discussed below.  Because Commerce has requested to reconsider only the rate it assigned

Double Coin, and not the 105.31% rate assigned to the entire PRC-wide entity that Commerce

left unchanged in the Remand Redetermination, no purpose would be served by granting

defendant's motion.

One of the holdings of *Diamond Sawblades* bears directly on this case and is intervening

legal authority.  *See SKF USA*, 254 F.3d at 1028-29 (explaining that an agency may seek remand

in order to consider new legal decisions).  *Diamond Sawblades* holds that the Tariff Act allows

Commerce to assign the rate it assigns to the PRC-wide entity to a cooperative respondent it

selected as a mandatory respondent, provided the respondent fails to rebut the Department's

presumption of control by the government of the PRC.  *Diamond Sawblades*, 866 F.3d at 1313

& n.6.  The analysis by which *CMA I* ordered Commerce to assign Double Coin the calculated

individual margin of 0.14% does not conform to the holding in *Diamond Sawblades* because it

did not require expressly that the rate to be assigned to Double Coin be the rate ultimately

determined for the PRC-wide entity as a whole.[10]  Therefore, in order to rule on defendant's

motion, the court reconsiders, in light of the holding in *Diamond Sawblades*, its decision in

*CMA I* to require Commerce to assign that margin to Double Coin.  In doing so, the court applies

the analysis the Court of Appeals applied in *Diamond Sawblades*.  Also, solely for purposes of

ruling on defendant's motion for a partial remand, the court presumes, but does not decide, that

the Department's rebuttable presumption that the export activities of all firms within the PRC are

subject to government control is factually supported and that Commerce permissibly found that

Double Coin had not rebutted that presumption.

---

[10] It should be noted that *CMA I* did not *preclude* Commerce from assigning the 0.14% margin to the PRC-wide entity as well as to Double Coin.  No party other than Double Coin challenged the PRC-wide rate in this litigation.

      c. *Diamond Sawblades* Does Not Hold that Commerce May Assign the PRC-Wide Entity an
      Adverse Inference Rate if the PRC-Wide Entity Did Not Fail to Cooperate in the Review

      In ruling on defendant's motion for a partial remand, the court first considers what

*Diamond Sawblades* does *not* hold.  The Court of Appeals did not hold that Commerce may

assign a rate derived, in whole or in part, from an adverse inference rate in an administrative

review of an antidumping duty order when no party to the review failed to cooperate for

purposes of 19 U.S.C. § 1677e(b).

      In *Diamond Sawblades*, which involved the final results of the first review of an

antidumping duty order, the Department's remand redetermination assigned the respondent ATM

the rate (82.12%) it calculated in the review for the PRC-wide entity.  *Diamond Sawblades*,

866 F.3d at 1309.  Commerce calculated this rate as a simple average of the individually-

determined margin it calculated for ATM, which was 0.15%, and the rate for the PRC-wide

entity prior to the review, which was 164.09%.  *Id.*  On remand, Commerce reached a finding

(which the Court of Appeals sustained) that ATM had failed to rebut the Department's

presumption of control by the PRC government.  *Id.* at 1308.  As it did in this case, Commerce

concluded that "it did not have the necessary information 'from the remaining unspecified

portion of the PRC-wide entity to calculate a margin for the unspecified portion of the PRC-wide

entity.'"  *Id.* at 1309 (quoting the remand redetermination in that case).  Like Double Coin, ATM

was a mandatory, fully cooperative respondent in the review.  *See id.* at 1311.  The Court of

Appeals held that "[b]ecause ATM failed to rebut the presumption of government control,

Commerce's decision to apply the PRC-wide rate to ATM was not contrary to law."  *Id.* at 1312.

      The 82.12% rate applied to the mandatory respondent ATM in *Diamond Sawblades* was

affected by an adverse inference, having been calculated as a simple average of ATM's

individually-determined 0.15% margin in the first review and the 164.09% rate, which was the

rate determined for the non-cooperating PRC-wide entity in the immediately-preceding less-

than-fair-value investigation. *See id.* at 1309. In *Diamond Sawblades*, 21 companies that were

part of the PRC-wide entity failed to cooperate in the review, and therefore the PRC-wide entity

as a whole could be considered to have failed to cooperate.[11] Such is not the case here. In

concluding the fifth review, Commerce stated that Double Coin was a fully cooperative

respondent and that "no other part of the [PRC-wide] entity failed to cooperate." *Final I&D*

*Mem.* at 19.

    d. *Diamond Sawblades* Does Not Hold that the "Simple Average" Rate Commerce Assigned to
      the PRC-Wide Entity in that Case Necessarily Was Reasonable on the Facts of that Case

      As the court mentioned above, in the review in *Diamond Sawblades* Commerce

calculated the PRC-wide rate of 82.12% as a simple average of the individually-determined

margin it calculated for ATM, which was 0.15%, and the rate for the PRC-wide entity prior to

the review, which was 164.09%. *Diamond Sawblades*, 866 F.3d at 1309. The Court of Appeals

expressly declined to decide whether this method of determining a rate for the PRC-wide entity

was reasonable. *Diamond Sawblades*, 866 F.3d at 1309 n.3 ("Neither party challenges

---

      [11] In the remand redetermination at issue in *Diamond Sawblades*, Commerce stated a
finding that "'unlike the less-than-fair-value investigation, no part of the PRC-wide entity failed
to cooperate to the best of its ability.'" *Diamond Sawblades Mfrs. Coal. v. United States*,
866 F.3d 1304, 1309 (Fed. Cir. 2017) (internal citation omitted). In the Court of International
Trade decision on appeal in that case, which the Court of Appeals affirmed, the Court of
International Trade had interpreted that finding to apply only to the cooperation of the mandatory
respondent Advanced Technology & Materials ("ATM") and not to that of the PRC-wide entity
as a whole. *Id.* The CIT concluded that the record in that case lacked substantial evidence to
support a finding that the entire PRC-wide entity cooperated in the review. *Id.* The PRC-wide
entity in that case included ATM and 21 other companies, all of which failed to demonstrate
independence from government control. While ATM fully cooperated, that was not the case for
the other 21 companies. As the Court of Appeals stated, "the PRC-wide entity comprised
twenty-one other companies, aside from ATM, that also had failed to demonstrate a lack of
government control. The other twenty-one companies *did not cooperate in the first
administrative review*." *Id.* at 1309 n.2 (emphasis added).

Commerce's decision to take a simple average of the two rates as its method for recalculating the

PRC-wide entity rate based on the information it had before it.  We therefore do not address the

reasonableness of that decision.").

    In this case, Double Coin challenged the PRC-wide rate on numerous grounds that

necessarily encompass a challenge to the reasonableness of the method by which Commerce

derived it.[12]  *See* Double Coin's Corrected Br. in Support of Mot. for J. on the Agency R. 8-13,

51-59 (Oct. 5, 2015) ECF Nos. 48 (conf.), 49 (public) ("Double Coin's Br.").

    <u>e. The Only Rate Commerce Reasonably Could Assign to the PRC-Wide Entity Is One
    Equivalent to the Individual Margin It Calculated for Double Coin</u>

    Were the court to grant defendant's partial remand motion and thereby permit it to

determine a new rate that would apply to Double Coin and to the entire PRC-wide entity, it

would not be permissible for Commerce to choose the 105.31% rate Commerce assigned to the

PRC-wide entity in the Final Results and the Remand Redetermination.[13]  Nor could Commerce

assign any other rate derived, in whole or in part, from an adverse inference.  As discussed

previously, Commerce found that every party to the fifth review, including the PRC-wide entity,

was a fully cooperating party.

    A party to an antidumping duty proceeding ordinarily may be subjected to a rate based in

whole or in part on an adverse inference only if that party "failed to cooperate by not acting to

---

[12] The Court of Appeals also noted in *Diamond Sawblades* that the plaintiff did "not challenge Commerce's ability to apply a PRC-wide entity rate under the statutory framework." *Diamond Sawblades*, 866 F.3d at 1310 n.4.  Double Coin brings that challenge in this case.

[13] Because Double Coin is the only party to this litigation that challenged the PRC-wide rate, and because Double Coin received a rate more favorable than the existing 105.31% PRC-wide rate on remand, Commerce permissibly did not change the PRC-wide rate in the Remand Redetermination.  As noted herein, defendant does not seek to change the PRC-wide rate in its motion for a voluntary remand.

the best of its ability to comply with a request for information from the administering authority"

in that proceeding, i.e., the proceeding in which the agency is "reaching the applicable

determination under this subtitle." 19 U.S.C. § 1677e(b).  As the Court of Appeals has opined,

"applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal

of the AFA statute." *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367,

1378 (Fed. Cir. 2012).[14]  Nor could it plausibly be argued that a rate only partially derived from

an adverse inference would not suffer from this defect.  *See id.* ("Commerce misses the point

when it argues that the appellant cannot complain because it does not bear an AFA rate directly,

but only a separate rate derived from the AFA rate, which is only half as adverse.").

        The next question, then, is what rate Commerce could assign to the PRC-wide entity that

is *not* derived, in whole or in part, from an adverse inference.  A rate equal to the 0.14% margin

Commerce calculated in the Final Results for Double Coin clearly qualifies under that criterion,

as it used the actual data for Double Coin, which fully cooperated in the review, but the court

must consider whether any rate other than that one also would be reasonable on the record of the

fifth review.

        Commerce has a longstanding practice of assigning a single rate to all exporters and

producers of subject merchandise in a nonmarket economy country that do not rebut its

presumption of government control, and it followed that practice in the fifth review.  *See Final*

*I&D Mem.* at 10-11.  Generally, the Department's practice has been to base the PRC-wide rate

_____

        [14] The Court of Appeals has recognized a circumstance in which Commerce, applying
19 U.S.C. § 1677e, may rely on policies of deterrence "as part of a margin determination for a
cooperating party" to ensure that another party does not benefit from its own noncompliance, so
long as Commerce does not confine itself to a deterrence rationale and also considers accuracy.
*Mueller Com. De Mex., S. De R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed.
Cir. 2014).  This case does not present a factual situation analogous to that of *Mueller*.

directly or, as in the Final Results and in the review at issue in *Diamond Sawblades*, indirectly, on an adverse inference rate (typically, a "total AFA" rate).  The facts of the fifth review, in which there was no uncooperative party, require Commerce, in order to comply with the limitations in 19 U.S.C. § 1677e(b), to depart from its prior practice of deriving the PRC-wide rate from an adverse inference rate.

In this litigation, Double Coin claims that the Department's practice of issuing a single, "country-wide" rate to the PRC-wide entity is contrary to the Tariff Act.  It argued in its Rule 56.2 motion, and argues again in opposition to defendant's motion for a partial remand, that the statute provides for only two types of antidumping duty rates: individual weighted-average dumping margins, which are assigned to exporters and producers that are individually investigated or examined, and an "all-others" rate that applies to all exporters and producers not individually investigated or examined.  Double Coin's Br. 8; *see* Double Coin's Opp'n 3-4.  A recent decision of the Court of International Trade agreed with that argument.  *Thuan An Production Trading and Service Co. v. United States*, 42 CIT __, 2018 WL 5794540, at *4-6 (Nov. 5, 2018) ("*Thuan An*") (holding that the Vietnam-wide rate Commerce assigned in an administrative review of an antidumping duty order "cannot stand" under the Tariff Act if it "is something other than one of the two statutorily authorized rates, i.e., it is not an individual rate or an all-others rate").  This Court reasoned in *Thuan An* that these are the only two types of rates the statute, in 19 U.S.C. § 1673d(c)(1)(B)(i)(I)-(II), authorizes for investigations, *id.* at *4-6, and that this principle applies with equal force to reviews, *id.* at *4 n.11 (citing *Albemarle v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016)).  The court considers the reasoning of *Thuan An* persuasive.  Moreover, the Tariff Act provides for the assignment of dumping margins (whether or not they are individual margins) to exporters and producers of the subject merchandise, not

countries (although state-owned enterprises may be exporters or producers).  *See* 19 U.S.C.

§§ 1673b(d)(1)(A) (preliminary determinations in investigations); 1673d(c)(1)(B)(i)(I)-(II) (final

determinations in investigations); 1677f-1(c) (determination of dumping margins in

investigations and reviews).

      In this case, an "all others" rate could not be assigned to the PRC-wide entity so long as

that entity includes Double Coin.  An all-others rate applies to respondents in an investigation

that are *not* selected for individual examination, *see* 19 U.S.C. § 1673d(c)(1)(B)(i)(I)-(II),  and

this principle also applies to reviews, *see Albemarle*, 821 F.3d at 1352.  In the fifth review,

Commerce designated Double Coin as a mandatory respondent (although declining to so

designate the remainder of the entity).[15]  Therefore, under the holding, and the reasoning, this

Court adopted in *Thuan An*, any rate Commerce could apply to the PRC-wide entity must be an

individual weighted-average dumping margin.

      Two individual weighted-average dumping margins are available for assignment in the

fifth review: the rate that will be assigned to GTC (which has not yet been determined in this

litigation), and the 0.14% rate that Commerce already determined based on Double Coin's data.[16]

Because Commerce included Double Coin, but not GTC, in the PRC-wide entity, the 0.14% rate

---

[15] Designating only part of an entity as a mandatory respondent would seem inconsistent with the Department's treating the PRC-wide entity as a "single" entity in which all exporters within the entity are "subject to government control and influence," *Final I&D Mem.* at 10, 13. Regardless, in this case the court need not decide if the designation of only part of an entity for individual examination under 19 U.S.C. §§ 1673d(c)(1)(B)(i)(I)-(II) and 1677f-1(c) is statutorily permissible.

[16] A PRC-wide rate based on "total AFA" arguably could be characterized as an individual rate that is assigned to a single entity, the PRC-wide entity, even though it is not based on examination of individual sales or entries.  But as the court has discussed, it would not be permissible for Commerce to assign an AFA-based rate to the PRC-wide entity in this case.

is, in that respect, representative of the entity, and therefore it would be reasonable for

Commerce to assign the PRC-wide entity Double Coin's individual rate.  That is not the case

with the margin to be determined for GTC, which Commerce found not to be part of the

PRC-wide entity.

 The holding of *Thuan An* is one reason for the court's conclusion that only the 0.14% rate

could be assigned to the PRC-wide entity.  But there is another reason as well: *Thuan An* aside,

the 0.14% rate is the only rate that reasonably could be applied to the PRC-wide entity according

to the particular facts of the fifth review, whether or not the court holds that the rate to be

assigned to the PRC-wide entity is required by statute to be an individual rate.  Commerce

explained that the PRC-wide entity consisted of Double Coin and any other exporter "that has

not established its eligibility for a separate rate" by demonstrating independence from

"government control and influence."  *Final I&D Mem.* at 10.  But in the fifth review, no Chinese

exporter or producer of OTR tires other than Double Coin was in a position to be determined to

be part of the PRC-wide entity, with the result that the record contained no information on any

part of the PRC-wide entity except for Double Coin.  The administrative record for the fifth

review confirms this point.

 In the *Initiation Notice*, Commerce announced that it initiated a review of five Chinese

producers or exporters of OTR tires: Double Coin, GTC, Hangzhou Zhongce Rubber Co., Ltd.

("Zhongce"), Trelleborg Wheel System (Xingtai) China, Co. Ltd., and Weihai Zhongwei Rubber

Co., Ltd. ("Zhongwei").  *Initiation Notice*, 78 Fed. Reg. at 67,108.  Double Coin and GTC were

the mandatory respondents.  *Final Results*, 80 Fed. Reg. at 20,197.  Trelleborg was found to have

no shipments during the POR and therefore was not a reviewed entity.  *Id.*  Commerce found that

Zhongce and Zhongwei had established independence from the PRC government and were

treated as "separate-rate" respondents in the fifth review, i.e., they were respondents that were

under review by Commerce but were not individually examined.  *Id.*, 80 Fed. Reg. at 20,198.

Therefore, only four companies—Double Coin, GTC, Zhongce, and Zhongwei—were reviewed.

In the Amended Final Results, Zhongce and Zhongwei each were assigned a rate equal to the

margin individually determined for GTC; i.e., they all received the all-others rate applicable to

entities separate from the PRC-wide entity.  *Amended Final Results*, 80 Fed. Reg. at 26,231.

Like the Final Results, the Amended Final Results listed only four rates, each of which it

described as a "[w]eighted average dumping margin (percent)": GTC, 11.41%, Zhongce,

11.41%, Zhongwei, 11.41%, and the "PRC-wide entity," in which Commerce included Double

Coin, 105.31%.  *Id.* (footnote omitted).

Commerce considered the PRC-wide entity to be under review in the proceeding at issue

in this case, but it conceded that the only reason for this was that Double Coin was under review:

> Though Double Coin notes that the NME entity is not listed as one of the
> companies for which review was requested in the *Initiation Notice*, the *Initiation
> Notice* plainly states that "If one of the above-named companies does not qualify
> for a separate rate, all other exporters of Certain Pneumatic Off-the-Road Tires
> {from} the PRC who have not qualified for a separate rate are deemed to be
> covered by this review as part of the single PRC entity of which the named
> exporters are a part.  Thus, the Department explicitly put the PRC-wide entity and
> all other interested parties on notice that the PRC-wide entity would be reviewed
> if one of the named exporters did not qualify for a separate rate.  Thus, pursuant to
> Double Coin's failure to demonstrate a lack of *de facto* government control, the
> PRC-wide entity is subject to review.

*Final I&D Mem.* at 12 (footnote omitted).  Although Commerce conceded that that the record

contained no information "with respect to the composition of the PRC-wide entity," *id.*, and

although Double Coin was the only producer or exporter Commerce identified as a member of

the PRC-wide entity, Commerce nevertheless seemed to imply that Double Coin was not the

only reviewed exporter or producer the PRC-wide entity included:

> Having not demonstrated the absence of *de facto* control from the government
> over selection of its management, Double Coin constitutes a part of the PRC-wide
> entity.  Further, the PRC-wide entity *is comprised of producers and exporters that
> can provide answers to questions*, as evidenced by Double Coin in this review.

*Id.* at 14 (emphasis added).  The record does not support any such implication.

As Double Coin argued in the review, *see id.* at 10, and argues before the court, *see* Double Coin's Br. 54-55, Commerce never requested any information from the government of the PRC or from any part of the PRC-wide entity other than Double Coin.  In explaining the Final Results, Commerce did not dispute that in conducting the fifth review it did not request such information.  *See Final I&D Mem.* at 14.  In its brief in response to this argument in Double Coin's Rule 56.2 motion, defendant does not dispute that in conducting the fifth review Commerce never requested information from the PRC government or from any other exporter or producer Commerce potentially could have deemed to be part of it.  *See* Def.'s Response to Mots. for J. on the Admin. R. 39-40 (Dec. 7, 2015), ECF No. 60 ("Def.'s Br.").  As a factual matter, only four exporters or producers of OTR tires specifically were included in the fifth review: two were cooperating mandatory respondents and the other two were unexamined respondents (and were assigned GTC's margin).  Therefore, if the PRC-wide entity can be presumed to include any exporters or producers of OTR tires other than Double Coin, they cannot be identified and do not appear in the record of the review.[17]

In opposing Double Coin's Rule 56.2 motion, defendant points out that "Commerce did not preclude a company from participating in this review, nor did it preclude a company from seeking a review of a part of the PRC-wide entity."  Def.'s Resp. 39; *see Final I&D Mem.* at 14.

---

[17] This is in contrast to the review at issue in *Diamond Sawblades*, in which 21 companies in addition to ATM were specifically included in the PRC-wide entity.  *Diamond Sawblades*, 866 F.3d at 1309 n.2.

This argument does not address the problem posed by the limited record evidence.  That one or more additional Chinese exporters or producers *could* have participated in the review, and, had they done so, might have been found to be part of the PRC-wide entity, does not change the record fact that none actually did.  As a result, the only record information relevant to determining a rate for the PRC-wide entity was the information pertinent to Double Coin.  Commerce acknowledged that the record lacked any information on the non-Double Coin portion of the PRC-wide entity: "[t]he Department must calculate a single rate for the PRC-wide entity, and in this review, we do not have the necessary information, *i.e.*, sales and production data, from the remaining unspecified portion of the PRC-wide entity."  *Final I&D Mem.* at 12.

When "necessary information is not available on the record" and there is no failure to cooperate, Commerce may resort to "facts otherwise available" without an adverse inference (to which information Commerce refers as "neutral" facts otherwise available).  *See* 19 U.S.C. § 1677e(a).  Here, the only information on the record that reasonably could serve as facts otherwise available for determining a rate for the PRC-wide entity is Double Coin's information.  While it might be argued that it would be reasonable for Commerce to use information pertinent to GTC for this purpose, this argument would be unconvincing for the reason the court mentioned earlier.  While both sets of data pertain to the current (fifth) review, Double Coin's information is representative of the PRC-wide entity while the information of GTC, which Commerce excluded from the PRC-wide entity, is not.

In conclusion, the only rate supported by the record evidence that Commerce reasonably could apply to the PRC-wide entity—and therefore to Double Coin—were the court to grant the requested partial remand, would be one equivalent to the 0.14% margin Commerce already determined for Double Coin in the Remand Redetermination.  Because Commerce assigned that

rate to Double Coin in the Remand Redetermination and does not seek to reconsider the 105.31%

rate it assigned to the PRC-wide entity (except with respect to Double Coin), granting

defendant's motion for a partial remand would serve no purpose.  The court, therefore, must

deny this motion.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands to Commerce the decision

published as the Final Results of Redetermination Pursuant to Court Remand (June 21, 2017),

ECF No. 200 (the "Remand Redetermination") for further consideration in accordance with this

Opinion and Order.  Upon consideration of the Remand Redetermination, Defendant's Motion

for Partial Voluntary Remand (Aug. 28, 2017), ECF No. 218, all comments thereon, and all

papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that Defendant's Motion for Partial Voluntary Remand, be, and hereby is,
denied; it is further

**ORDERED** that the Department's decision to make an inflation adjustment to GTC's
warehouse costs and its determination that the Shanghai Port Charges were double counted in the
Department's calculation of GTC's freight and handling expenses, both of which are
uncontested, be, and hereby are, sustained; it is further

**ORDERED** that Commerce shall submit a new determination upon remand ("Second
Remand Redetermination") in which it redetermines export price and constructed export price
for GTC as directed in this Opinion and Order; it is further

**ORDERED** that Commerce will submit its Second Remand Redetermination, which
shall comply with the directives in this Opinion and Order, within 90 days of the date of this
Opinion and Order; it is further

**ORDERED** that all plaintiffs may file comments on the Second Remand
Redetermination no later than 30 days after the filing of the Second Remand Redetermination;
and it is further

      **ORDERED** that defendant may file a response to any comments on the Second Remand Redetermination no later than 15 days from the date on which the last comments are filed.


<u>/s/ Timothy C. Stanceu</u>
Timothy C. Stanceu
Chief Judge


Dated:  January 16, 2019
       New York, New York