Slip Op. 19-115

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHINA MANUFACTURERS ALLIANCE, LLC and DOUBLE COIN HOLDINGS LTD., et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES,** <br><br> Defendant. | **Before: Timothy C. Stanceu, Chief Judge** <br><br> **Consol. Court No. 15-00124** |

## OPINION

[Sustaining a remand redetermination issued in response to court order in an action contesting the final results of an administrative review of an antidumping duty order on pneumatic off-the-road tires from the People's Republic of China]

Dated:  September 3, 2019

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd.  With him on the brief were *James P. Durling*, *Matthew P. McCullough*, and *Tung A. Nguyen*.

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the brief were *Brandon M. Petelin*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Jordan C. Kahn*.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel was *James H. Ahrens II*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Chief Judge: In this consolidated case, plaintiffs contested a final determination

of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the

"Department") concluding the fifth periodic administrative review of an antidumping duty order on certain off-the-road pneumatic tires ("OTR tires") from the People's Republic of China ("China" or the "PRC").

Before the court is the Department's decision (the "Second Remand Redetermination") responding to the court's order in *China Mfrs. Alliance, LLC. v. United States*, 43 CIT __, 357 F. Supp. 3d 1364 (2019) ("*CMA II*"). *Final Results of Redetermination Pursuant to Ct. Remand* (Apr. 16, 2019), ECF No. 231-1. The court sustains the Second Remand Redetermination because it complies with the court's order in *CMA II* and because no party has commented in opposition.

## I. BACKGROUND

Background on this case is presented in the court's prior opinions and supplemented briefly herein. *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1366-68; *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, 205 F. Supp. 3d 1325 (2017) ("*CMA I*").

### A. The Parties

Plaintiffs China Manufacturers Alliance, LLC and Double Coin Holdings Ltd. (collectively, "Double Coin"), and plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Export and Import Co., Ltd. (collectively, "GTC") were the mandatory respondents in the fifth review. They are the plaintiffs in this litigation. Defendant is the United States.

### B. The Contested Decision

The contested administrative decision is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 26,230 (Int'l Trade Admin. May 7, 2015) ("*Amended Final Results*"). Commerce issued the Amended Final Results to correct a

ministerial error in its earlier decision, *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Int'l Trade Admin. Apr. 15, 2015) ("*Final Results*").  In the Amended Final Results, Commerce assigned GTC a weighed average dumping margin of 11.41%.  Commerce determined that Double Coin was a member of the "PRC-wide entity," concluding that Double Coin had failed to establish its independence from the government of the PRC and assigned it the rate it determined for that entity, which was 105.31%.

## II. Discussion

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction pursuant to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), which grants the Court of International Trade jurisdiction of any civil action commenced under 19 U.S.C. § 1516a.[1]  The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

### B. Prior Judicial Proceedings

In *CMA I*, the court remanded the Amended Final Results to Commerce with respect to four determinations.  Only one of those determinations pertained to Double Coin: the court rejected the Department's decision to assign Double Coin the 105.31% rate that Commerce determined for the PRC-wide entity and directed Commerce to assign Double Coin the weighted-average dumping margin of 0.14% (a *de minimis* margin) that Commerce determined from its examination of Double Coin's own sales.  *CMA I,* 41 CIT at __, 205 F. Supp. 3d

---

[1] All citations to the United States Code herein are to the 2012 edition.

at 1334-41.  The other three determinations pertained to GTC's margin.  First, the court held unlawful the Department's decision to make an 8% reduction in the starting prices used to determine export price ("EP") and constructed export price ("CEP") to account for what Commerce termed "irrecoverable" value-added tax ("VAT").  *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1344-51.  The court reasoned that Commerce, based on an impermissible construction of 19 U.S.C. § 1677a(c)(2)(B), resorted to a presumption in reducing the starting prices without reaching a finding that any specific amount actually was imposed by the government of the PRC as an "export tax, duty, or other charge" within the meaning of that provision.  *Id.*  Second, the court ordered Commerce to reconsider its calculations of deductions from CEP for GTC's brokerage and handling costs and ocean freight costs, concluding that the Department's finding that these calculations were free of "double counting" was not supported by substantial evidence on the record.  *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1356-58.  Finally, the court ordered Commerce to reconsider its decision not to make an inflation adjustment for GTC's domestic warehousing costs.  *Id.*, 41 CIT at __, 205 F. Supp. 3d at 1358-59.

In *CMA II*, the court ruled on the decision ("First Remand Redetermination") Commerce submitted to the court in response to the court's opinion and order in *CMA I*.  In the First Remand Redetermination, Commerce, under protest, assigned Double Coin a weighted average dumping margin of 0.14% (*de minimis*).  Making several changes to its calculations, Commerce revised GTC's margin from 11.41% to 11.33%.  *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1367.

*CMA II* sustained two of the changes to GTC's margin calculation in the First Remand Redetermination, changes to which neither party objected.  Commerce concluded that one element of its calculation of deductions from CEP for GTC's brokerage and handling and ocean freight expenses, "Shanghai Port Charges," was double counted and made a correction for this

purpose. Commerce also redetermined GTC's surrogate warehousing expenses, adjusting for inflation. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1369.

In the First Remand Redetermination, Commerce, under protest, assigned Double Coin the 0.14% margin it had calculated based on Double Coin's own sales, in response to the court's order. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1381. After Commerce submitted the First Remand Redetermination to the court, defendant moved for a partial remand that would allow Commerce to revisit the issue of Double Coin's weighted-average dumping margin in light of the decision of the Court of Appeals for the Federal Circuit in *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) ("*Diamond Sawblades*"). *Id.* Three issues then remained in this litigation: (1) defendant's motion for a partial remand to reconsider Double Coin's rate; (2) whether the Department's deductions from the EP and CEP starting prices for irrecoverable VAT were lawful; and (3) whether elements of the Department's calculation of deductions for GTC's brokerage and handling costs, and ocean freight costs, other than the Shanghai Port Charges, also were double counted.

In considering defendant's motion for a partial remand, the *CMA II* opinion analyzed the holdings in *Diamond Sawblades*, one of which the court considered to bear on this case. The opinion described that holding as follows: "*Diamond Sawblades* holds that the Tariff Act allows Commerce to assign the rate it assigns to the PRC-wide entity to a cooperative respondent it selected as a mandatory respondent, provided the respondent fails to rebut the Department's presumption of control by the government of the PRC." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1382. Without deciding the question of whether Double Coin had rebutted the Department's presumption of government control, the *CMA II* opinion concluded, for various reasons as explained therein, that "the only rate supported by the record evidence that Commerce

reasonably could apply to the PRC-wide entity—and therefore to Double Coin—were the court to grant the requested partial remand, would be one equivalent to the 0.14% margin Commerce already determined for Double Coin in the Remand Redetermination." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1388. The court observed that "Commerce never requested any information from the government of the PRC or from any part of the PRC-wide entity other than Double Coin." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1387. The court also observed that only four exporters or producers of OTR tires specifically were included in the fifth review. *Id.* Two of these were the mandatory, and fully cooperating, respondents, i.e., Double Coin and GTC, and the other two were unexamined respondents Commerce found to have demonstrated independence from the PRC government, both of which were assigned the rate determined for GTC. *Id.* Noting that Double Coin was the only Chinese exporter or producer of OTR tires that Commerce considered to be part of the PRC-wide entity and that can be identified from the record as actually being in the fifth review, the court concluded that "the only record information relevant to determining a rate for the PRC-wide entity was the information pertinent to Double Coin." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1388. The court reasoned that because Commerce already had assigned the 0.14% *de minimis* rate to Double Coin in the First Remand Redetermination and "does not seek to reconsider the 105.31% rate it assigned to the PRC-wide entity (except with respect to Double Coin), granting defendant's motion for a partial remand would serve no purpose." *Id.*

For the First Remand Redetermination, Commerce retained the 8% reduction in GTC's EP and CEP starting prices for what Commerce considered to be irrecoverable value-added tax. The court set aside that decision as unlawful in *CMA II*. Citing *Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1329, 1338-47 (2018), which was issued after *CMA I* was decided, the court concluded that the statutory interpretation under which Commerce

made deductions from EP and CEP starting prices for irrecoverable VAT "contravenes the plain meaning, statutory history, and legislative history" of 19 U.S.C. § 1677a(c)(2)(B). *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1375. After discussing provisions in the Tariff Act that addressed domestic taxes such as value-added taxes separately from the export taxes falling within the scope of § 1677a(c)(2)(B), the court concluded that "Congress had a specific intent with respect to VAT imposed by an exporting country on subject merchandise or the materials used to produce it." *Id.* "Congress did not intend that irrecoverable VAT, i.e., VAT that was not refunded or avoided by reason of exportation of the good, would increase a dumping margin (although it did intend that *recoverable* VAT, in some circumstances not present here, could reduce a dumping margin.)" *Id.* "In addition, Commerce erred in finding, without any evidentiary support, that Chinese irrecoverable VAT is a tax not imposed on the domestic good." *Id. CMA II* ordered Commerce to "take the appropriate corrective action to remove from the calculation of GTC's margin its downward EP and CEP adjustments for VAT." *Id.*

　　　*CMA II* held that substantial evidence on the record was not available to support the Department's finding in the First Remand Redetermination that only one cost category of the brokerage and handling and ocean freight costs, i.e., the Shanghai Port Charges, were double counted. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1379. The court ordered Commerce to ensure that no costs are double counted either as between brokerage and handling costs and ocean freight costs, or as between ocean freight costs and U.S. inland freight costs. *Id.*

　　　　　　　　　　　　　　　　C. The Second Remand Redetermination

　　　In the Second Remand Redetermination, Commerce recalculated GTC's weighted average dumping margin, reducing it from 11.33%, as determined in the First Remand Redetermination, to 4.59%. *Second Remand Redetermination* 14. Commerce, under protest,

eliminated its deductions for irrecoverable VAT and, reconsidering its calculations of GTC's brokerage and handling and ocean freight costs, eliminated additional cost elements it determined to have been double counted. The court addresses each of these changes below.

1. Elimination of Irrecoverable VAT Adjustment in Calculating GTC's Dumping Margin

In *CMA II*, the court directed Commerce to recalculate EP and CEP without making a reduction in the EP and CEP starting prices for irrecoverable VAT. Commerce, in response, eliminated its irrecoverable VAT deduction. Commerce stated that "[w]e respectfully disagree with the court's decision in *China Mfr. Alliance II* [*CMA II*] concerning the irrecoverable VAT adjustment used in GTC's weighted-average margin calculation," *Second Remand Redetermination* 4, but provided no explanation of why it disagreed with the analysis of the VAT issue in *CMA II*.

2. Recalculation of GTC's Ocean Freight Surrogate Value

Commerce obtained a surrogate value for GTC's export brokerage and handling costs from a World Bank publication, *Doing Business 2014: Indonesia*, Indonesia being the surrogate country Commerce used for surrogate values in the review. *CMA II*, 43 CIT at __, 357 F. Supp. 3d at 1375. Commerce valued GTC's trans-Pacific ocean freight using shipping price quotes published online by Descartes Systems Group, Inc. ("Descartes"). *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1376. It also used Descartes price data to derive a value for U.S. inland freight. *Id*. In *CMA II*, the court ordered Commerce to "ensure that no costs are double counted either as between (1) brokerage and handling (based on the *Doing Business* report) and ocean freight (based on the Descartes quotes), or (2) ocean freight (based on the Descartes quotes) and U.S. inland freight (based on the Descartes price lists)." *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1379. The court concluded in *CMA II* that Commerce did not explain why seven charges

identified as ocean freight charges in Descartes price quotes were not accounted for again in the U.S. inland freight charges. These were the Automated Manifest System ("AMS") Charge, Chassis Usage Charges, International Ship and Port Security Charges, ISD Handling Charges, Traffic Mitigation Fee, Clean Truck Fee, and Documentation Charges. *Id.*, 43 CIT at __, 357 F. Supp. 3d at 1378.

Commerce stated in the Second Remand Redetermination that, pursuant to the court's order in *CMA I*, it reopened the record to solicit information on potential double counting. *Second Remand Redetermination* 6. On the basis of the expanded record, Commerce eliminated the Shanghai Port Charge from the ocean freight calculation. *Id.* Upon re-examining the record, Commerce concluded in the Second Remand Redetermination that no additional double counting of costs occurred between the brokerage and handling and the ocean freight cost categories. *Id.* at 8. Also, Commerce noted that, after the Shanghai Port Charge was removed from the ocean freight surrogate value, no party argued that additional double counting occurred between brokerage and handling costs and ocean freight costs. *Id.*

In examining potential double counting between ocean freight charges and U.S. inland freight charges, Commerce concluded that four of the seven charges listed above appeared on only one of the twenty-four ocean freight price quotes Commerce used and therefore did not appear to be customary charges. Commerce eliminated this price quote from its calculation. Commerce then considered whether the remaining three types of charges—AMS Charges, Documentation Charges, and Traffic Mitigation Fees—were duplicated in the data it used for inland freight charges. *Id.* at 9-10.

Of the three charges in question, Commerce concluded that only the Traffic Mitigation Fees are reasonably attributable to inland freight expenses and removed these fees from its

calculation of international freight expense. Commerce cited record evidence from the first remand in concluding that the Traffic Mitigation Fees are "charged to truck freight carriers upon pick-up of cargo from the port, to fund operations of the port to allow for off-peak hour pick up of freight from the ports of Los Angeles and Long Beach to mitigate traffic congestion," *id.* at 12 (footnote omitted), and are "reasonably attributable to U.S. inland freight expenses," *id.* at 13.

Commerce cited record information—specifically, the Descartes logistics and supply chain glossary—in concluding that the Automated Manifest System Charge is an ocean freight expense related to arrival of cargo at the port of destination. *Id.* at 11. The record information indicates that the charge is for the providing electronic transmission of manifest information from the vessel to Customs and Border Protection. *Id.* The record supports the Department's conclusion that the charge is not related to U.S. inland movement of freight and therefore was not double counted.

Commerce stated that "Documentation Charges" appear on approximately half of the Descartes quotes for ocean freight charges. *Id.* at 11-12. Commerce reiterated its finding from the First Remand Redetermination that these charges relate to documents such as the master bill of lading, which covers all containers aboard an ocean-going vessel, and to U.S. destination document fees. *Id.* at 12. Commerce concluded that evidence did not support a finding that these documentation charges related to inland freight, *id.*, a conclusion the record supports.

In summary, the court concludes that Commerce's findings and conclusions pertaining to possible double counting were supported by substantial evidence on the augmented record and comply with the court's order in *CMA II*.

## II. CONCLUSION

The court concludes, for the reasons discussed above, that the Second Remand Redetermination complies with the court's order in *CMA II*. Judgment sustaining the determinations therein will enter accordingly.

                                                                /s/ Timothy C. Stanceu
                                                          Timothy C. Stanceu, Chief Judge

Dated: September 3, 2019
       New York, New York