# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*:  **The Honorable Timothy C. Stanceu, Senior Judge**

| | |
|---|---|
| **China Manufacturers Alliance, LLC and Double Coin Holdings Ltd.,** )))) | |
| *Plaintiffs* ) | **NONCONFIDENTIAL VERSION** **Consol. Court No. 15-00124** |
| ) | |
| **v.** ))) | Business proprietary information subject to Protective Order on pages: 7, 8, 33, 36, 42, 44, and 45. |
| **United States,** ) | |
| *Defendant.* ))) | |

## OPENING BRIEF OF PLAINTIFFS
## CHINA MANUFACTURERS ALLIANCE, LLC AND DOUBLE COIN HOLDINGS, LTD.

Daniel L. Porter
James P. Durling

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 452-7373

**December 6, 2021**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

SUMMARY OF ARGUMENT .......................................................................................9

ARGUMENT ...............................................................................................................12

I.    COMMERCE'S SEPARATE RATE CONCLUSION THAT THE
CHINESE GOVERNMENT CONTROLS DOUBLE COIN'S EXPORT
ACTIVITIES IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ............................12

    A.    Commerce's Rebuttable Presumption Analysis Does Not Follow Its Stated
Policy and Ignored Three Of The Four Factors Stated In That Policy .......................12

    B.    Commerce's Application of the Separate Rate Test and Resulting
Conclusion That The Chinese Government Controls Double Coin's Export
Activities Ignores The Substantial Evidence Showing The Absence of Any
Such Control ...............................................................................................20

        1.    Commerce has applied a presumption that can be rebutted with
sufficient evidence ..........................................................................23

        2.    Commerce's conclusion that the Chinese government controls Double
Coin's day-to-day activities is not supported by substantial evidence ...........27

            (a)    Double Coin is a publicly traded company ................................29

            (b)    Double Coin's Articles of Association create
further obligations of independence ........................................31

            (c)    Double Coin has minority shareholders with
specific rights ....................................................................33

            (d)    Double Coin has independent directors ....................................37

            (e)    Not a single actual instance of the exercise of
control over  day-to-day operations ........................................38

        3.    In Any Event, There Is No Evidence That The Chinese Government
Controlled Double Coin's *Export Activities;* In Fact, All The Record
Evidence Demonstrates The Lack of Control ....................................39

    CONCLUSION.........................................................................................51

# TABLE OF AUTHORITIES

**Cases**

*Advanced Tech. & Materials Co. v. United States*,
  885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ................................................. 15, 16

*Advanced Tech. & Materials Co. v. United States*,
  938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) .................................... 16, 17, 39, 50

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998) .................................................................................... 21

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
  971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ...................................................... 24

*Consolidated Edison Co. v. NLRB*,
  305 U.S. 197 (1938) .................................................................................... 21

*Fort Stewart Schools v. Federal Labor Relations Auth.*,
  495 U.S. 641 (1990) .................................................................................... 19

*GPX et al v. United States*,
  587 F. Supp. 2d 1278 (Ct. Int'l Trade 2008) ....................................................... 3

*Jiangsu Jiasheng*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ...................................................... 27

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*,
  519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021) ..................................................... 18

*Mitsubishi Heavy Indus., Ltd. v. United States*,
  275 F.3d 1056 (Fed. Cir. 2001) .......................................................................... 20

*Nippon Steel Corp. v. United States*,
  301 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) ..................................................... 21

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) .......................................................................... 22

*Saddler v. Department of the Army*,
  68 F.3d 1357 (Fed. Cir. 1995) .......................................................................... 19

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997) .......................................................................... 24

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001) .......................................................................... 20

*Suramerica de Aleacinones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994) .......................................................................... 22

*Timken Co. v. United States,*
    699 F. Supp. 300 (Ct. Intl. Trade 1988) ............................................................ 22

*Torrington Co. v. United States,*
    82 F.3d 1039 (Fed. Cir. 1996) ........................................................................... 19

*Transactive Corp. v. United States,*
    428, 91 F.3d 232 (D.C. Cir. 1996) ..................................................................... 20

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ........................................................................................... 22

*Yantai CMC Bearing Co. v. United States,*
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ..................................................... 17

*Zhejiang Mach. Imp. & Exp. Corp. v.  United States,*
    521 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ..................................................... 17

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,*
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................... 18, 19, 27, 38

**Statutes**

19 U.S.C. § 1677g(a) ................................................................................................ 7

**Administrative Decisions**

*Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:
    Final Affirmative Determination of Sales at Less Than Fair Value and Partial
    Affirmative Determination of Critical Circumstances,* 73 Fed. Reg. 40,485 (July
    15, 2008) ............................................................................................................... 2

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China:
    Final Results of Sunset Reviews and Revocation of Antidumping Duty and
    Countervailing Duty Orders,* 84 Fed. Reg. 20,616 (May 10, 2019). ................... 6

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:
    Notice of Amended Final Affirmative Determination of Sales at Less Than Fair
    Value and Antidumping Duty Order,* 73 Fed. Reg. 51,624 (Sept. 4, 2008) ..... 2, 6

*Final Determination of Sales at Less than Fair Value: Sparklers from the People's
    Republic of China,* 56 Fed. Reg. 20,588 (May 6, 1991) ............................... 12, 15

*Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide
    From the People's Republic of China,* 59 Fed. Reg. 22,585 (May 2, 1994) 12, 13

**Other Authorities**

*Black's Law Dictionary* (6th ed. 1990) ................................................................. 24

*Import Administration Policy Bulletin 05.1 Separate-Rates Practice and
    Application of Combination Rates in Antidumping Investigations involving Non-
    Market Economy Countries* (Apr. 5, 2005) ................................................. passim

*Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties*, 86, Fed. Reg. 53,335 (U.S. Customs and Border Protection, Sept. 27, 2021) ....................................................................... 7

## INTRODUCTION

This appeal challenges the determination by the Department of Commerce (hereinafter "Commerce" or " Department") to assign Double Coin the "PRC-wide entity" antidumping (AD) assessment rate of 105 percent instead of the Commerce calculated rate of 0.14 percent.  This Commerce determination was based on the conclusion that Double Coin was not eligible for "separate rate" status because, according to Commerce, the mere fact that Double Coin had a shareholder structure in which a state-owned entity (Huayi) had a majority of the equity meant there was *de facto* Chinese government control over Double Coin.  This finding is deeply flawed for many reasons and cannot be sustained.

In this Opening Brief we argue (again) those specific reasons why Commerce's conclusion about *de facto* control over Double Coin cannot be sustained.  This brief thus addresses those arguments that were not addressed in this Court's earlier review of Commerce's decision, and is being submitted pursuant to this Court's Order of October 6, 2021.  *October 6 Order*, ECF No. 258.

Given the rather long passage of time since this Court's review of Commerce's conclusion for Double Coin, we believe it is helpful to review the key underlying facts and history.  Although this case addresses an issue that comes up frequently, the procedural posture of this case and the unique facts on the record here are quite distinctive.

1

The Initial AD Investigation That Led to AD Order

The AD Order for which Commerce conducted the underlying AD review and imposed its AD assessment rate on Double Coin was published in September 2008. *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Sept. 4, 2008) ("*OTR Tires AD Order*"). Like it does for all of its cases against China, in that underlying original investigation, Commerce required all Chinese producer-exporters to submit "separate rate applications." *Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-The-Road Tires From the People's Republic of China*, 72 Fed. Reg. 43,591 (Aug. 6, 2007). Such applications required the Chinese producer-exporter to provide full details concerning its corporate ownership structure and the management of its day-to-day operations, as well as examples of sales negotiations with U.S. customers.

Double Coin submitted a complete separate rate application during the original investigation and in July 2008 (at the conclusion of the original AD investigation) Commerce made a factual finding that Double Coin was eligible for separate rate status. *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (July 15, 2008).

The 2012 – 2013 AD Review

The Commerce 2012 – 2013 AD review for the *OTR Tires* cases was initiated pursuant to a request of Petitioner. Such request was the first AD review that Petitioner

had made of Double Coin.  Petitioner did not request any AD review of Double Coin for the AD review period 2008 – 2009, 2009 – 2010, 2010 – 2011 and 2011 – 2012.

In its 2012 – 2013 AD review results Commerce did not make any factual finding that the shareholder ownership of Double Coin in 2013, and specifically majority control by the state-owned entity Huayi, was any different from the shareholder ownership of Double Coin in 2008.  (Indeed, it is certain that it was not.[1])  Moreover, in its 2012 – 2013 AD review results Commerce did not make any factual finding that the composition of the Double Coin's Board of Directors in 2013, was any different from 2008.  (Indeed, it is certain that it was not.[2])  The underlying facts were the same.

Given this prior finding of separate rate eligibility and the unchanged facts, and because Double Coin was selected to be a "mandatory respondent," during its 2012 – 2013 AD review Commerce required Double Coin to spend an entire year responding to multiple AD questionnaires.  Commerce thus collected the necessary data to compare Double Coin's actual U.S. prices to a calculated normal value based on Double Coin's factors of production and the application of surrogate values.  And Commerce determined that such comparison yielded a Double Coin specific AD rate of 0.14 percent (*de minimis*).

---

[1] Given that the court appeal of the OTR investigation did not end until June 2015 (*see GPX et al v. United States*, 587 F. Supp. 2d 1278 (Ct. Int'l Trade 2008)), at the time it made its decision in this review  the Department still had in its possession Double Coin's 2008 separate rate application.

[2] *See id.*

Commerce determined, however, that it would ignore all of this actual data, ignore the fact that the actual dumping margin was *de minimis*, and instead impose a 105 percent AD rate to Double Coin because of Commerce's new conclusion that the shareholder ownership of Double Coin was somehow improper.

<u>Double Coin's 2016 Court Appeal of Commerce's AD Review Results</u>

Double Coin initiated a timely court appeal to challenge Commerce's 2012 – 2013 AD review results for the *OTR Tires* case.  Double Coin's Complaint identified five counts, five different reasons why Commerce's determination was not supported by substantial evidence and otherwise not in accordance with law. And Double Coin's opening brief organized the various arguments in four different sections.

In Section I of that brief, we argued that Commerce had no statutory authority to render a separate "PRC-wide" AD rate.  In Section II, we argued that even if Commerce had the statutory authority to impose a special PRC-wide AD rate at all, the imposition of that rate in this review was unlawful because Commerce relied on an outdated presumption of fact to justify the application of this rate to Double Coin.  In Section III, we argued Commerce's conclusion that the Chinese Government controls Double Coin's export activities was not supported by substantial evidence and that Commerce had not undertaken a proper separate rate analysis.  And in Section IV, we argued that Commerce's decision to impose a 105 percent AD rate and 105 percent AD liability on Plaintiffs CMA and Double Coin constitutes impermissible application of "<u>adverse</u> facts available."

4

As can be seen, three of the four primary sections advanced broader legal arguments concerning Commerce's authority to apply the PRC-entity rate, and one argument addressed the specifics of Commerce's analysis as to whether the evidentiary record supported a conclusion that Double Coin's export activities were controlled by the Chinese Government.

This Court rendered its first decision in 2017. *See* Slip Op. 17-12, ECF No. 192. This Court broadly agreed with Double Coin's argument that Commerce had no legal authority to impose the PRC-entity AD assessment rate to Double Coin, albeit with a  somewhat different legal analysis. In an obvious exercise of judicial economy, this Court's decision did not advance any rulings concerning Double Coin's arguments that Commerce's conclusion that the Chinese Government controls Double Coin's export activities was not supported by substantial evidence and that Commerce had not undertaken a proper separate rate analysis. Given this Court's ruling, this Court remanded the case back to Commerce for a new determination vis-à-vis Double Coin.

In its remand redetermination, Commerce changed its approach (under protest) and concluded that Double Coin should be granted separate rate status and thereby entitled to receive an AD assessment rate of 0.14 percent.

Primarily because the court case was a consolidated court appeal that included arguments from another Chinese producer-exporter that resulted in multiple remands to Commerce, this Court's final judgment was not rendered until 2019. *See* Slip Op. 19-115, ECF No. 242.

<u>Revocation of the AD Order</u>

September 2018 was the second five year anniversary of the *OTR Tires AD Order*. As such, the statute provided an opportunity for any U.S. producer to inform Commerce that they wanted the AD Order to continue for another five years. However, neither Petitioner nor any other U.S. producer did so. Accordingly, Commerce officially revoked the *OTR Tires AD Order* in 2019. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 20,616 (May 10, 2019). The *OTR Tires AD Order* no longer exists because there is no interest by the U.S. industry. And indeed, the Petitioner, Titan Tire, subsequently withdrew from participating in Double Coin's court appeal.

<u>Court of Appeals for The Federal Circuit</u>

In November 2019, Commerce filed its Notice of Appeal indicating an intention to appeal this Court's conclusion vis-à-vis Double Coin to the Court of Appeals for the Federal Circuit ("CAFC"). In mid-June 2021, the Federal Circuit issued its decision, reversing this Court's decision and remanding the case back to this Court. *See* <u>Judgment</u>, *China Manufacturers Alliance et al v. United States*, Court No. 2020-1159, dated June 10, 2021, (ECF. No. 251).

<u>AD Liability Faced By CMA</u>

CMA is Double Coin's U.S. corporation affiliate that served as the importer of record for virtually all of Double Coin's U.S. exports of OTR tires during the

6

NONCONFIDENTIAL

2012 – 2013 time period. *Section A Questionnaire Response* at 1, Jan. 22, 2014

(P.R. 48) (ECF No. 85, Attach. 33) ("*Section A QR*").  During the 2012 -2013 AD

review time period, the total f.o.b value of CMS's imports of OTR tires was

[                    ]. *Commerce Final Analysis Memo* at 139, Apr. 8, 2015 (C.R. 259)

(ECF No. 185, Attach 2).  The AD cash deposit rate paid on these import entries

was the same cash deposit rate that was assigned to Double Coin in the original

investigation; namely 12.9 percent.  *OTR AD Order*. Applying this AD assessment

rate of 105 percent yields a base AD liability for CMA of [                ] and an

amount of additional AD liability owed of [                ], which equals the base

AD liability minus the cash deposits already paid.  However, under the law, CMA

must also pay interest on the additional AD liability.  19 U.S.C. § 1677g(a)

("Interest shall be payable on overpayments and underpayments of amounts

deposited on merchandise entered, or withdrawn from warehouse, for

consumption.").  The applicable interest rates are those published by Customs and

Border Protection governing underpayment (and overpayment) of customs duties.

*See, e.g.*, *Quarterly IRS Interest Rates Used in Calculating Interest on Overdue*

*Accounts and Refunds on Customs Duties*, 86, Fed. Reg. 53,335 (U.S. Customs

and Border Protection, Sept. 27, 2021).  And given the rather long time since 2012

– 2013 time period, and the application of the interest rates to the base AD

liability, such interest amount is substantial.  We set forth below CMA's current

AD liability based on these facts:

**NONCONFIDENTIAL**

Total entered value of OTR imports:                        [                    ]

AD cash deposit paid (12.9%):                              [                  ]

Actual AD liability (105.3%):                              [                    ]

Difference (amount owed): (approx.)                        [                    ]

Interest (to-date) of amount owed: (approx.)              [                  ]

Total amount of additional AD duty owed (to-date)        [                    ]

As detailed above CMA's current additional AD liability is more than [

] million dollars.  To place this amount in context, we note that the evidentiary

record before Commerce indicates that CMA's net income in 2012 was just  [

        ].  *Section A QR* at Ex. A-20 (C.R. 33) (ECF No. 121, Attach 3).  Or

stated differently, CMA's additional AD liability is [

                                    ]

This case thus presents an extreme situation in two respects.  Commerce is

applying a presumption to find massive dumping liability when Commerce in fact

actually investigated and confirmed the lack of any such dumping.  And

Commerce is applying its presumption to create crippling dumping liability that

has no basis in the facts of this record, pursuant to an antidumping order that has

since lapsed due to lack of any domestic industry interest.  Presumptions are not

facts, and a presumption cannot overcome overwhelming facts to the contrary.

## SUMMARY OF ARGUMENT

In the sections below we renew the arguments that we made previously concerning why Commerce's conclusion that the Chinese Government controls Double Coin's export activities is not supported by substantial evidence.

In Section I.A, we explain that Commerce improperly ignored three of the four categories under its own Policy Bulletin 05.1.  At the time of its decision, Commerce's policy required consideration of four factors and Commerce essentially ignored three of these factors.  Although Commerce has changed its emphasis over time, it has not abandoned the basic framework of this Policy Bulletin 05.1 that identifies four factors to evaluate and uses government majority ownership only as a presumption.  A presumption still must be tested by actual evidence on the particular record before Commerce.  Yet rather than test its presumption, Commerce used its presumption as the excuse to ignore the actual evidence on the record about possible government control.

Section I.B then turns to what this record evidence actually shows in this case.  Commerce's determination in this case confirms that it applied a presumption based on majority ownership, and asserted Plaintiffs had not rebutted that presumption. But this conclusion ignored the actual record evidence. Specifically, Commerce's conclusion  that the Chinese Government had the ability to control the day-to-day activities of Double Coin simply because Double Coin is majority-owned by Huayi (a state-owned entity) ignores Commerce's own conclusion about lack of *de jure* control, and fundamentally misunderstands the

operation of (a) Chinese law, (b) the special regulations governing publicly listed companies such as Double Coin, (c) Double Coin's own Articles of Association, and particularly (d) the presence of independent directors.  Commerce largely ignored this evidence and what it meant for the possibility of actual control is this case.  These facts, individually and collectively, fatally undermine the basis for Commerce's conclusion of actual control.

In addition, we explain why, even if the Court were to disagree with arguments about the operation of the special regulations governing publicly listed companies,  the other facts about corporate control and the independent directors, the Court must still conclude that Commerce' determination is not supported by substantial evidence on the record.  There is no evidence that the Chinese Government exercised *de facto* control over Double Coin's <u>export activities</u> (that is, pricing in the U.S. market); in fact, all the record evidence is to the contrary. Moreover, we summarize the record evidence under all four factors – including the three of those factors that Commerce effectively ignored – showing the absence of any actual control in this case.  There is absolutely no factual dispute that one hundred percent of Double Coin's "export pricing" is handled by American employees of the U.S. company CMA, after importation, without any influence by Double Coin, let alone any influence by Double Coin's shareholder. This is the business reality codified in the operating agreement between Double Coin and CMA.  Double Coin does not even know the U.S. prices being set and charged by CMA.  Commerce ignored and did not address any of this record

evidence, which leaves its determination legally defective as not based on

substantial evidence.

**ARGUMENT**

I.  **COMMERCE'S SEPARATE RATE CONCLUSION THAT THE CHINESE GOVERNMENT CONTROLS DOUBLE COIN'S EXPORT ACTIVITIES IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

 A. **Commerce's Rebuttable Presumption Analysis Does Not Follow Its Stated Policy and Ignored Three Of The Four Factors Stated In That Policy**

At the time of its decision, Commerce had in place an explicit policy for determining whether the Chinese Government controlled an exporter's activities.  But instead of following that policy and considering all the relevant factors, Commerce ignored three of the four categories of evidence deemed relevant under that policy.

In the context of NME proceedings, Commerce relies on a rebuttable presumption that companies operating within the People's Republic of China are controlled by the government in such a way that data submitted by those companies is so unreliable it cannot be used in the accurate calculation of a dumping margin.  *Final IDM* at 10 (P.R. 293) (ECF No. 107, Attach 5).  Those entities are, therefore, treated as part of an "NME-wide entity" and subject to an adverse inference with respect to the dumping rate applied to any subject entries those entities make.  *Id.*  This presumption has its roots in a pair of determinations made in the early 90s, which established the broad contours of Commerce's current government control test.  *Final Determination of Sales at Less than Fair Value: Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (May 6, 1991) ("*Sparklers*"); *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585 (May 2, 1994) ("*Silicon Carbide*").  These cases established that "a PRC respondent may receive

a separate rate if it established on a *de jure* and *de facto* basis that there is an absence of government control." *Silicon Carbide*, 59 Fed. Reg. at 22,587 (adapting and amplifying the test set out in the *Sparklers* case).  Essentially, these cases placed the burden on separate rate applicants in NME proceedings to produce affirmative evidence that they were not controlled by the government of their country.

In 2005, Commerce formalized its test in Policy Bulletin 05.1.  *Import Administration Policy Bulletin 05.1 Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (Apr. 5, 2005) ("Policy Bulletin 05.1").  Policy Bulletin 05.1 stated that "the test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level."  *Id.*  Further, Policy Bulletin 05.1 announced three *de jure* control criteria and four *de facto* criteria that Commerce would consider.  *Id.*  Policy Bulletin 05.1 also noted the "growing administrative burden in analyzing requests for separate rate status" and announced certain procedural controls on the separate rate application process to mitigate that burden.  *Id.*

Specifically, the four factors of the *de facto* control test identified in Policy Bulletin 05.1 are as follows:

(1)    whether the <u>export prices</u> are set by, or subject to the approval of, a governmental authority;

(2)    whether the respondent has authority to negotiate and sign contracts and other agreements;

(3)    whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and

> (4)     whether <u>the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits</u> or financing of losses.

*See* Policy Bulletin 05.1 (emphasis added).  These factors cover a range of considerations and all of the factors are relevant.  Under its own policy – the policy in effect at the time of the decision – Commerce had four factors to consider.

Only <u>one</u> of these four factors is "whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management."  *Id.*  There is nothing, however, in Policy Bulletin 05.1 to indicate that this factor (or any other single factor) is sufficient in and of itself to disqualify a company from receiving a separate rate, depending on the overall facts with regard to all of the factors.  Moreover, it must be remembered that all four factors are intended to provide a basis for determining whether a company's <u>export functions</u> are free from government control.  The overall purpose of the four-factor test cannot be ignored or frustrated by the application of any one single factor set forth in the test.

Yet although there are four factors, Commerce's decision basically ignored three of the four factors.  Indeed, during oral argument in the early stage of this litigation, this Court itself asked and the Defendant explicitly conceded Commerce's failure to address three of the four factors in Policy Bulletin 05.1 in this specific case.  Transcript of Oral Argument at 182-191, *China Manufacturers Alliance, LLC et al., v. United States*, Consol. Court No. 15-00124 (2016) (ECF No. 259) ("THE COURT: How can I possibly sustain reasoning where they say they applied a four-factor test and they don't tell me

what the four factors even were as opposed to what their decisions were thereunder? How can I do that?").

This Commerce decision to ignore three of the four factors is perplexing. Indeed, as evidenced by numerous past Commerce determinations, for two decades Commerce's <u>primary</u> focus in applying its *de facto* control test was whether the respondent is able to <u>negotiate selling prices with U.S. customers</u> free of Chinese Government influence. Essentially, for two decades Commerce has agreed that, provided that the respondent could demonstrate actual price negotiations with U.S. customers, the respondent was eligible for separate rate status.[3]

Although the emphasis has shifted in recent cases, the basic policy has not. Policy Bulletin 05.1 is still in effect. It still calls for the consideration of four factors. And no one factor is legally dispositive. Commerce applies presumptions, but those presumptions can still be tested and rebutted by evidence.

A 2012 decision by the Court of International Trade ("Trade Court"), and the subsequent appeals, resulted in a shift in Commerce's approach to applying its separate rate test. Specifically in *Advanced Tech. & Materials Co. v. United States*, the Trade Court remanded Commerce's decision to continue to grant certain diamond sawblade

---

[3] That Commerce's *de facto* analysis has a particular focus on actual price negotiation with U.S. customers has a long history. Indeed, such focus on the actual price negotiations with U.S. customers is evident in the very case that is considered the grandfather of Commerce's separate rate test, *Sparklers*, 56 Fed. Reg. at 20,588. In *Sparklers*, Commerce noted as follows: "*De facto* absence of central government control with respect to exports is based on two prerequisites: (1) Whether each exporter sets its own export prices independently or the government and other exporters, and (2) whether each exporter can keep the proceeds from its sales." *See also* Priya Alagir, 26 Law & Policy Int'l Bus at 1071 ("In Sparklers . . . Commerce developed {the} criteria, which, if met, demonstrate sufficient independence from the central Chinese government to overcome the China Inc presumption and to warrant the granting of a separate rate.").

manufacturers separate rate status for further explanation regarding how the separate rate

test had been applied in light of government controlled entities within the ownership

structure of the exporter.  *Advanced Tech. & Materials Co. v. United States*, 885 F. Supp.

2d 1343, 1349 (Ct. Int'l Trade 2012).  In its review of the first remand redetermination

the court found that Commerce's reliance on certain aspects of corporate law in China,

including corporate forms, disciplines on board influence, Shanghai State-owned Assets

Supervision and Administration Commission of the State Council's ("Shanghai

SASAC") regulations and provisions within the articles of association, were not

themselves sufficient to allow the Court to conclude that granting a specific rate to the

exporter under review was supported by substantial evidence.  *Id.* at 1363 ("the court

emphasizes it is not here substituting judgment for that of Commerce on these issues or

insisting upon application of the separate rates test in a certain way . . . {t}he court

simply seeks to discern the reasonableness of a determination, and the wisdom to do

so.").

  In the second remand redetermination, Commerce reversed course, abandoning its

focus on the exporting entity, "altering its analysis under protest given this Court's prior

remand orders."  *Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d

1342, 1350 (Ct. Int'l Trade 2013) (quoting remand redetermination).  Commerce found

that "the {entity which included the exporter} is not entitled to a separate rate based on

the *de facto* criterion regarding the autonomy to select its management independent from

government oversight or control. Therefore, we find the {entity including the applicant}

to be part of the PRC-wide entity." Final Results of Remand Redetermination Pursuant to

16

Remand Order Diamond Sawblades and Parts Thereof from the People's Republic of China, *Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. with Bosun Tools Group Co. Ltd. v. United States and Diamond Sawblades Manufacturers Coalition, Weihai Xiangguang Mechanical Industrial Co., Ltd., and Qingdao Shinhan Diamond Industrial Co., Ltd.*, Slip op. 12-147 (May 6, 2013), Consol. Court No. 09-00511 at 15 ("*Advanced Tech. Remand*").  The remand redetermination was upheld by the Trade Court and the CAFC affirmed the Trade Court's decision.  *Advanced Tech. & Materials Co.,* 938 F. Supp. 2d 1342, *aff'd* 581 Fed. Appx. 900 (Fed. Cir. 2014) (*per curiam*).

The shift in focus from the actual operations of the exporter to the potential ability of a state-owned or controlled entity to impact decisions regarding board membership and thus company management has governed Commerce's separate rate analysis ever since. But the holdings of the *Advanced Tech.* cases did not necessarily dictate that result.  In fact, as noted above, Judge Musgraves' remand in *Advanced Tech. II* took pains to state that he was not dictating a particular result only urging Commerce to further explain. *Advanced Tech. & Materials Co.*, 938 F. Supp. 2d at 1363.  Commerce also expressed reluctance to abandon its prior method of analysis, conducting the remand "under protest."  *Advanced Tech. Remand* at 20 n. 47.

Application of this new shareholder focused standard has, in recent years, been challenged as an irrebuttable presumption.  *See, e.g.*, *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2017); *Zhejiang Mach. Imp. & Exp. Corp. v.  United States*, 521 F. Supp. 3d 1345, 1352 (Ct. Int'l Trade 2021); *Jilin Forest*

*Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1233 (Ct. Int'l Trade 2021).  In *Jilin Forest*, the court found that Commerce's analysis was unsupported by substantial evidence because it failed to establish the link between equity ownership and export activities that are the stated focus of Commerce's separate rate analysis.  *Jilin Forest*, 519 F. Supp. 3d at 1234.

In the ensuing remand redetermination, Commerce stated that its four *de facto* criteria "and the related questions that appear in the {separate rate questionnaires} identified above constitute Commerce's analysis of 'export functions.'"  Final Results of Remand Redetermination, *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States* Slip Op. 21-49 (April 29, 2021), CIT Court No. 18-00191 at 9 ("*Jilin Forest Remand Redetermination*").  Further, Commerce stated that "company operations" include the full compass of business activities and thus any aspect of the applicant's operations, including the actual or potential selection of board members, was necessarily linked to export activities.  *Jilin Forest Remand Redetermination* at 9, 11.  Although it has shifted its emphasis, Commerce has not formally abandoned the four factors announced in Policy Bulletin 05.1.

In *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, the Trade Court endorsed Commerce's practice of according "more weight to evidence of an exporter's government ownership as a consequence of the *Diamond Sawblades* proceeding."  *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1324 (Ct. Int'l Trade 2018).  That case, however, cites the United States brief for the proposition that in Commerce's separate rate test "{t}he presence of direct or indirect

majority government ownership may require exporters to surmount a high bar to

demonstrate the absence of de facto control, but it does not necessarily preclude exporters

from obtaining a separate rate." *Id.* at 1323.  That means that while a focus on

government ownership may be appropriate, the Defendant, i.e the Department of

Commerce, acknowledged, and the Court specifically noted, that there is some level of

evidence that would warrant granting a separate rate despite a majority government

owned entity in an applicant's corporate tree.  In fact, the Trade Court's opinion in

*Zhejiang Quzhou* arguably requires this conclusion stating "{t}hat Commerce did not

forecast the type of evidence that would be sufficient to rebut the presumption does not

render its determination unreasonable or unsupported by substantial evidence."  *Id.*

 The emphasis may have shifted over time, but the basic policy and its four factors

remain in place.  Even if there is a "high bar" to demonstrate the absence of government

control, that fact that there is a bar at all means the evidence in a particular case still

matters.  And in this case, Commerce simply ignored the relevant evidence under three of

the four factors set forth in the policy and thus did not ground its finding of government

control in substantial evidence.

 Commerce, like other agencies, must follow its own regulations, rules and

practice.. *Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (citing

*Fort Stewart Schools v. Federal Labor Relations Auth.*, 495 U.S. 641, 654 (1990);

*Saddler v. Department of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995)).  This rule is a

statement of common sense, having articulated a rule it would be highly irregular for an

agency to subsequently proceed on a basis inconsistent with that rule.  There is also a

presumption of regularity in Commerce's proceedings, *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1061 (Fed. Cir. 2001), and "it is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 428, 91 F.3d 232, 237 (D.C. Cir. 1996)).  These controls on agencies generally support the proposition that having announced a rule, an agency must follow it or provide an explanation for why a specific situation calls for the application of a different rule.  Commerce's application of its separate rate test, however, does not comport with these rules and deviates in fundamental ways from the policy announced in Policy Bulletin 05.1.  Specifically, Commerce has identified four criteria for examining *de facto* control but in this case treated a single one of those criteria as a dispositive test to the exclusion of analysis of any of the three remaining criteria.  Commerce cannot permissibly ignore these factors without an explanation.  Even if Commerce can impose a "high bar," it still must consider the relevant evidence under all four factors of its policy to see if the party at issue has in fact cleared that "high bar."

      **B.**      **Commerce's Application of the Separate Rate Test and Resulting Conclusion That The Chinese Government Controls Double Coin's Export Activities Ignores The Substantial Evidence Showing The Absence of Any Such Control**

The case now before the this Court suffers from the fundamental flaw identified above.  In the instant case, Commerce has focused its analysis entirely on ownership of the ultimate shareholders of the exporting entity to the exclusion of the other categories

of evidence under the policy.  Ignoring this evidence is itself a fatal flaw.  But more fundamentally this ignored evidence actually demonstrates the exporter sets prices, negotiates with customers, and otherwise conducts its export operations free from government control.  In other words, the evidence affirmatively demonstrates the absence of government control over what matters – the export activities under investigation. Accordingly, the substantial evidence on this record meets the high bar and rebuts any presumption of control.

As the courts have repeatedly ruled, the substantial evidence standard requires a full examination of <u>all</u> the evidence that exists on evidentiary record.  "{S}ubstantial evidence" requires more than "a mere scintilla."  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Any conclusion must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  "Substantial evidence review exists precisely to ensure that {the agency} achieves minimal compliance with this obligation, which is the foundation of all honest and legitimate adjudication."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378-79 (1998).  For this reason, the courts have repeatedly noted that "to determine the substantiality of the evidence, the court must also take into account "whatever in the record fairly detracts from its weight."  *See, e.g.*, *Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355, 1364 (Ct. Int'l Trade 2003) (citing *Universal Camera*, 340 U.S. at 488; *Suramerica de Aleaciones Laminadas*, 44 F.3d at 985).  In gauging whether Commerce has met this burden, a reviewing court will consider "'evidence from which conflicting inferences could be drawn'" to ensure that the decision is supported by substantial

evidence. *Suramerica de Aleacinones Laminadas, C.A. v. United States*, 44 F.3d 978, 985

(Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

Additionally, Commerce's decisions must comport with the "record as a whole." *Nippon

Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citing 19 U.S.C.

§1516a(b)(1)(B)(i)).  "The 'whole record' means that the Court must consider both sides

of the record. It is not sufficient to merely examine the evidence that sustains the

agency's conclusion."  *Timken Co. v. United States*, 699 F. Supp. 300, 306 (1988), *aff'd*,

894 F.2d 385 (Fed. Cir. 1990) (citing *Universal Camera*, 340 U.S. at 474).

 Proper application of the substantial evidence standard in this case demonstrates

unequivocally that Commerce's conclusion that the Chinese Government exercised *de

facto* control over Double Coin's export activities is not supported by substantial

evidence.  Below we demonstrate the absence of substantial evidence that the Chinese

Government exercised *de facto* control over Double Coin's day-to-day activities.  We

then demonstrate that, even if the Court were uncertain about this argument, there is no

evidence that the Chinese Government controlled Double Coin's <u>export activities</u>; in fact,

all the record evidence is to the contrary.

 In its final results, Commerce concluded that in the absence of any *de jure* control,

the record nonetheless reflected the Chinese Government's *de facto* control of Double

Coin's export activities.  In doing so, Commerce never allowed its findings on *de jure*

control to inform its *de facto* analysis, as if they had no relationship with each other.  As

importantly, Commerce's *de facto* analysis rested entirely on the Government of China's

<u>potential</u> to control Double Coin's export activities, as opposed to weighing all of the

evidence submitted by Double Coin regarding its independence from the Government of China.   The record evidence rebuts any presumption of control.

### 1. Commerce has applied a presumption that can be rebutted with sufficient evidence

Commerce acknowledged that it applied a presumption in this case.  In the original determination underlying this appeal, Commerce stated that "managers should be presumed 'to be beholden to the board that controls their pay, in particular to the chairman of the board as the de facto company head under the PRC model," until proven otherwise. Similarly, we find that as Huayi is the controlling shareholder, it is the entity controlling Double Coin's board and management." *Final IDM* at 15 (internal citations omitted) (P.R. 293) (ECF No. 107, Attach 5).  Commerce further stated, in response to Double Coin's evidence showing that such control had not occurred in fact, that "{t}he standard for determining such a status is that an NME exporter is presumed to be under government control until such a presumption is sufficiently rebutted.  As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder <u>does nothing to rebut this presumption</u>."  *Id.* at 15-16 (P.R. 293) (ECF No. 107, Attach 5) (emphasis supplied).  Yet, Commerce's approach to the presumption in this case essentially ignored the evidence that rebutted the presumption.

Commerce's reliance on formulating its NME policy as a presumption and then considering only the presumption presents a certain awkwardness with respect to traditional conceptions of a presumption.  A presumption can be rebutted.  Although a presumption may endure in the absence of contrary facts "{o}nce evidence tending to

rebut the presumption is introduced, the force of the presumption is entirely dissipated and the party with the burden of proof must come forward with evidence." *Black's Law Dictionary* 1186 (6th ed. 1990). It is wholly appropriate, under the presumption paradigm, for Commerce to presume that a non-responding company is controlled or that an applicant that fails to meet the standards laid out in its questionnaire is controlled. Once an applicant adduces affirmative evidence of the lack of control, in the form required by Commerce, Commerce must analyze that evidence and Commerce's determination that flows from that analysis must then be supported by substantial evidence and otherwise comply with the law. Commerce's current approach is perhaps better characterized as placing the burden of proof on the exporter to bring forward evidence demonstrating a lack of control, a formulation that the CAFC has adopted. *Sigma Corp. v. United States*, 117 F.3d 1401, 1406 (Fed. Cir. 1997).

Treating this burden shifting as a "presumption" is not, however, a license to ignore record evidence merely because an exporter is located in a country that has been designated as non-market. Fundamentally, "a rebuttable presumption is not evidence." *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014). Commerce's factual analysis must still be grounded in the record and the legal test Commerce applies must comport with its stated policy in Policy Bulletin 05.1. Commerce's application of its separate rate test in this case made prong three of the *de facto* control test dispositive in contravention of Policy Bulletin 05.1 and the case law that has developed around its implementation.

24

Commerce's current test can be summarized as follows: if there is any ability, actual or potential, of a government-owned entity to impact the selection of board members that directly or indirectly can influence the compensation or hiring of the management of the exporter then the exporting entity cannot qualify of a separate rate. Commerce characterizes this outcome as a failure to rebut the presumption of government control.  An imprecise term perhaps, but Commerce's decision in this case makes clear that Commerce simply decided to ignore the evidence that would overcome the "presumption of government control" if a SASAC supervised entity is a majority in a company's corporate ownership chart.  Commerce's position is essentially that if that single fact is present (i.e. there is an entity controlled by SASAC that owns a majority of an applicant's parent or parent of a parent), then a company can never qualify for a separate rate.  Double Coin submits that this is not how the test is written in Policy Bulletin 05.1 and that the test as written still applies and serves as the measuring stick for the sufficiency of this determination.  Further, to the to the extent that the test is actually implemented in this manner it is not a presumption at all, but a mechanical threshold test that ignores the evidence to the contrary.

While a truncated test may serve Commerce's interests in administrative efficiency, it falls afoul of Commerce's obligation to base its decision on the whole record.  Commerce's final determination makes clear the conclusion that the Chinese Government controls Double Coin's export activities is based on the following facts and "logic:"  (1) the overall legal environment in China is "permissive of individual firms maintaining independent operations with respect to export activities" and therefore not

dispositive of *de jure* control;  (2) however, Double Coin is majority owned by Huayi; (3) as majority owner, Huayi is entitled to nominate a majority of Double Coin's Board of Directors; (4) Huayi, in turn, is wholly owned by the Shanghai State-owned Assets Supervision and Administration Commission of the State Council; and therefore (5) the Chinese Government exercises *de facto* control over Double Coin's export activities.  *See Final IDM* at Comment 1(P.R. 293) (ECF No. 107, Attach 5).

This is the entire sum and substance of Commerce's conclusion that the Chinese Government controls Double Coin's export activities.  Indeed, Commerce's final determination readily admits that its conclusion is premised entirely on ownership:

> <u>Whether or not</u> the Huayi Group, which is the majority owner of Double Coin, <u>demonstrably exercised</u> control over Double Coin's day-to-day operations does not refute the fact that a government-owned entity has near complete control of shareholder decisions of Double Coin.

*Final IDM* at 16 (emphasis added) (P.R. 293) (ECF No. 107, Attach 5).

Commerce's "analysis" is breathtaking in its audacity and simplicity.  Commerce first begins with a concession that it can reach no finding on *de jure* control in light of the existing legal framework in China.  Commerce then addresses the *de facto* analysis by completely ignoring the logical implications of its own *de jure* conclusion.  In sum, Commerce's position is that, essentially, actual evidence of control in fact does not matter for Commerce's analysis ("whether or not"), merely the potential for control. Commerce's conclusion cannot be sustained under the statutory substantial evidence standard. The possibility of control cannot be dispositive, and can be rebutted by showing the absence of any actual control.

This court has recently ruled that while Commerce is authorized to weigh the presence of Government ownership in the corporate hierarchy of an exporter heavily, the separate rate test is a balancing exercise and is lawful because there is some level of evidence that can overcome the presumption.  *See Zhejiang Quzhou Lianzhou Refrigerants*, 350 F. Supp. 3d at 1324 ("though Commerce now accords more weight to evidence of an exporter's government ownership as a consequence of the *Diamond Sawblades* proceeding, it does so within the confines of its longstanding separate rate test."). The Trade Court has rejected logic similar to the approach Commerce has taken in this case, finding the potential to control export activities alone to be insufficient to deny separate rate status.  *See Jiangsu Jiasheng*, 28 F. Supp. 3d 1317, 1348-49 (Ct. Int'l Trade 2014).  The same conclusion should be reached in the instant case.

> **2.** **Commerce's conclusion that the Chinese government controls Double Coin's day-to-day activities is not supported by substantial evidence**

In its final determination, Commerce asserted that it could not reach a finding of *de jure* control of Double Coin's export activities.  To the contrary, it found:

> The PRC laws and regulations at issue provide a framework for various corporate entities to form and operate at some distance from the central government. . . . {T}he Department continues to find  that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities.

> {T}he PRC Company Law and other laws and regulations demonstrate that, within the PRC's NME, distance can exist between decisions made at the central government level and decisions made at the firm level with respect to exports.

*Final IDM* at 14-15 (P.R. 293) (ECF No. 107, Attach 5).

As discussed below, Commerce departed from the logic of its analysis recognizing *de jure* space for Double Coin's *de facto* autonomy.  Namely, Commerce chose to find that because there might be some possibility for involvement in Double Coin's commercial affairs, this conclusion necessarily leads to the further conclusion that Double Coin's export activities are in fact controlled.  If anything, Commerce's findings with respect to *de jure* control should have informed its analysis of the Chinese Government's *de facto* control over Double Coin's export activities.  They did not.  Instead, Commerce effectively concluded the record regarding *de jure* control was irrelevant, even in the absence of actual evidence of control of export activities, and even if it meant that *de facto* control could mean the violation of Chinese law.  But such a fact would seemingly have some bearing on a *de facto* analysis where Commerce was limited to assessing *possibilities*.  If there are legal consequences associated with the exercise of *de facto* control, at some point the mere possibility of *de facto* control must fade into speculation far removed from the tenets of substantial evidence.  Commerce never really addressed the point in its determination.  Rather, Commerce focused its reasoning on possibility alone without considering additional evidence detailing the actual absence of day-to-day control.  This failure to test whether Double Coin had reached Commerce's "high bar" was unreasonable and not supported by substantial evidence.

In essence Commerce concluded that the Chinese Government had the ability to control the day-to-day activities of Double Coin <u>simply because</u> Double Coin is majority-owned by Huayi, an entity which is wholly-owned by Shanghai SASAC.  This position is evidenced by Commerce's preliminary determination in which Commerce succinctly

stated: "Because of this level of government ownership, and the control that *such ownership on its own* establishes, we preliminarily conclude that {Double Coin}, does not satisfy the criteria demonstrating an absence of *de facto* government control over export activities." *Preliminary Results IDM* at 10 (emphasis added) (P.R. 259) (ECF No. 89, Attach 48). For the final results, Commerce continued to emphasize SASAC's 100 percent ownership of the Huayi Group. *See Final IDM* at 14 (P.R. 293) (ECF No. 107, Attach 5).

Commerce's conclusion about the meaning of government ownership is not supported by the evidentiary record, and therefore is not premised upon a proper understanding of Double Coin's actual operations or the evidentiary record. There are several key facts that demonstrate why Commerce's conclusion about the meaning of ownership has no basis in the factual record and therefore cannot be sustained. These facts— the extensive evidence of limits and constraints on the majority shareholder combined with the lack of any evidence at all that the majority shareholder actually exercised any control—collectively demonstrate that the Commerce decision finding actual *de facto* control has no basis in substantial evidence. We address each of these in further detail below.

### (a)      Double Coin is a publicly traded company

Commerce discounts the fact that, as a publicly listed company, Double Coin is governed by specific rules. *See Final IDM* at 14-15 (P.R. 293) (ECF No. 107, Attach 5). As the record demonstrates, these rules limit the rights of shareholders with a majority or

controlling interest, and grant certain rights of supervision and control to minority shareholders.  This fact is readily discerned from the record of this case, beginning with an examination of China's Company Law, which establishes the independent legal and financial interests of corporate entities and restricts the ability of shareholders, directorship, or management to act contrary to those interests through an abuse of their position.  *See* Article 20, Article 21 and Article 22 of Company Law, Exhibit S2-8 of Double Coin and CMA's Response to Department's 2nd Sections A, C and D Supplemental Questionnaire, July 31, 2014 ("*July 31 Response*") (P.R. 192) (ECF No. 88, Attach 31).

These restrictions and the legal liability connected to them are reinforced in the case of publicly listed companies through the Code of Corporate Governance for Listed Companies.  The Code, much like the Company Law, provides that a publicly traded company should act independently from the controlling shareholders for all issues of substantial relevance for the company and that directors and management act in the interests of the company.  This is the unavoidable conclusion from review of several of the Articles contained in the Code, including Articles 22 – 27.  *See* Code of Corporate Governance for Listed Companies, Exhibit S2-9 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

Therefore, as a matter of Chinese law, <u>Double Coin is required to act as an independent company</u>, and the directorship and management must act in accordance with the interests of the company, not the shareholders, regardless of the composition of a company's equity structure, directorship, or management.  Indeed these laws are why

Commerce found no *de jure* control.  Commerce's conclusion about "control" does not bother with these facts, but instead continues to dwell on the potential to control derived from being a majority shareholder without considering the additional evidence available in this case that distinguishes it from instances where corporate form alone was found insufficient to insulate the exporter from central government control.

**(b)**     **Double Coin's Articles of Association create further**
**obligations of independence**

Commerce's conclusion also discounts the fact that Huayi's authority is further tempered by Double Coin's Articles of Association ("Double Coin AOA") that are given legal effect through the Company Law.  *See* Double Coin Holdings Ltd. Articles of Association, provided in Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).  Articles 34, 35, and 36 of the Double Coin AOA expose both shareholders, directors, and senior managers to prosecution should they act against the interests of the company in violation of the law and administrative regulations.  Article 37 furthers sets forth the obligations of all shareholders including, *inter alia*, that they:

> Shall not abuse the Shareholder's rights to damage the company or interests of other shareholders; shall not use the independent status of the company and limited liability of the share holders to damage the interests of the company's creditors.  If the shareholder of the company abuse their rights and damage the company and other shareholders, he or she shall liable for the responsibility of compensation. If the shareholder abuse the independent status and the limited liability to dodging payment of debts and materially damage the interests of the creditors, he or she shall liable jointly for the company debt.

Article 39 of the Double Coin AOA creates further specific obligations for controlling shareholders, stating:

31

> Controlling shareholders and Actual Controllers may not use their
> relationship to violate interests of the company.  Those break this regulation
> and cause loss of the company shall reliable for the damage. Controlling
> shareholders and Actual Controllers is under the obligation of faithfulness
> & credit to other shareholders. Controlling shareholder should exert the
> rights as investor, and cannot make damages to the company and other
> shareholders in the profit distribution, assets re-composition, investment,
> occupation of funds, loan guarantee or figure for additional profits from the
> special position.

With respect to Directors, Article 110 limits the scope of their activities and duties

to those strategic decisions of the company distinct from the day-to-day operations of the

company such as export sales.  Similarly, Article 113 entitles Directors to directly decide

on those matters involving no less than 10 percent of the total audited assets of the

company.  Double Coin Holdings Ltd. Articles of Association, provided in Exhibit S2-5

of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

With respect to senior managers, Article 144 makes clear that they cannot serve

the interests of any holding company of Double Coin or actual controllers of Double Coin

and still serve as an executive of Double Coin.  Rather, consistent with Article 143, they

must act in good faith and diligence for the benefit of Double Coin.  Article 154 makes

clear, yet again, that where senior managers of the company "violate laws, administrative

rules, regulations and the relevant provisions in the Articles of Association on the

occasion of performing his (her) duty and caused losses to the company," they shall be

held liable.  *Id.*  This fact, in conjunction with the other facts on the record, is also

crucial to demonstrating the Double Coin has met Commerce's high bar and is eligible

for a separate rate.

NONCONFIDENTIAL

(c)  **Double Coin has minority shareholders with specific rights**

Commerce's conclusion ignores the fact that Double Coin's <u>minority shareholders have *bona fide* rights</u> that temper the control that Huayi can exert.  Commerce dismisses the rights of Double Coin's minority shareholders on the basis that they "are limited only to the [                              ] and not for other resolutions … and that, regardless of any such [                                        ], the majority shareholder … has near complete control over any shareholder decisions."  *Commerce Memorandum Re: Preliminary Analysis for Double Coin*, Sept. 30, 2014 at 13 ("*Preliminary Analysis Memo*") (C.R. 244) (ECF No. 43 at Tab 5).

In its final results Commerce attempts to respond to this argument, but all Commerce does is fall back on its flawed "potential to control" standard without considering any context.  Specifically, Commerce states:

> {T}he existence of certain minority shareholder rights (such as the ability to bring suit against a board member or manager who acts against the interests of the company, and the right of minority shareholders to call a shareholder meeting) prove the absence of government control.

*Final IDM* at 15-16 (P.R. 293) (ECF No. 107, Attach 5).  However, Commerce is confusing two issues.  All shareholder decisions do <u>not</u> automatically translate into control of the day-to-day operations of the company.  And in fact, the day-to-day operations are the responsibility of managers, who by the terms of the Company Law, the Code of Corporate Governance, and the Double Coin AOA must serve the interests of the Company and definitively cannot serve the interests of controlling shareholders or "actual controllers."

33

In addition, the rights afforded to minority shareholders are to protect their rights as shareholders, not somehow to convert them into the controlling shareholders.  Indeed, the rights of Double Coin's minority shareholders mean that Huayi cannot exercise unilateral and unlimited control over Double Coin.  One of the key minority rights ignored by Commerce is the right to bring suit against a member of the board or senior management who acts against the interests of the company, breaching applicable law or Double Coin's AOA.  *See* Double Coin AOA at Article 35.  Another minority shareholder right ignored by Commerce is the right of minority shareholders representing 10 percent of the shares to call a meeting of the shareholders.  *See* Double Coin AOA, Articles 45 and 50, Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31). Understanding this right in conjunction with the conflict of interest rule—also included in Double Coin AOA (*see* Article 82)—demonstrates that anytime a decision is debated by the meeting of the shareholders in which Huayi has a conflict of interest, Huayi's shares would have to be excluded from voting, rendering the percentage of its shareholding moot.  The same protection would exist if shareholders representing 3 percent of Double Coin's shares were to raise a proposal at a meeting of the shareholders which created a conflict of interest for Huayi—a minority right also protected in Double Coin's Articles of Association.  *See* Double Coin AOA at Article 55, Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

In the final analysis, given Double Coin's actual corporate organization and the laws governing that organization, Commerce adopted an <u>incorrect inference—indeed an</u> <u>adverse inference—that the right to appoint Double Coin's board of directors</u> somehow

results in unrestricted control by Huayi.  In its preliminary results Commerce concluded that since "Huayi has the potential … to nominate and appoint all members of {Double Coin's} board" Huayi is therefore in control or has the potential to control Double Coin because Double Coin's "Articles of Association set up a structure where the majority-owner … has effective control over the composition of the board of directors, which appoints all management and maintains operational control." *Preliminary Analysis Memo* at 12 (P.R. 264) (ECF No. 91, Attach 3).  Commerce reiterated this reasoning in its final results. *Final IDM* at 16 (P.R. 293) (ECF No. 107, Attach 5).  However, this analysis confuses the right to appoint the members of the board with effectively exercising control over the board's actions, decisions and policies, as well as confusion over the scope of the Board's duties.[4]

The Board is not directly involved in the day-to-day operation of the company, and members of management who do involve themselves in day-to-day operations may not serve as controlling shareholders or actual controllers of the Company.  Rather, both the Board and managers must discharge their duties faithfully and honestly, and to diligently perform their duties in the best interests of Double Coin.  Additionally, the members of the board are responsible to all the shareholders of Double Coin, not just to the shareholders who appointed them.  *See* Company Law, Article 46; Code of Corporate

---

[4] In addition, Commerce's understanding about how directors are nominated to the Board of Directors, *see* Commerce's Verification Report with regard to Double Coin, September 30, 2014, at n. 3 ("*Verification Report*") (C.R. 243) (ECF No. 182, Attach 7) is not entirely correct.  Specifically, Commerce misunderstands how Double Coin's Articles of Association applies for <u>independent</u> directors.  Of the seven directors, three are independent directors.  Commerce was wrong to ignore this fact.

NONCONFIDENTIAL

Governance, Article 42; Double Coin AOA, Article 108, Exhibits S2-5, S2-8 and S2-9 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

As a result, although a majority shareholder has significant influence in the constitution of the board, and even in the selection of Double Coin's management, such right does not automatically result in control by Huayi over the board and management because: (a) the members of the board are required to act in the best interest of Double Coin; (b) the minority shareholders have a right to bring a suit against members of the board who fail such duty; (c) there are independent members of the board.

Commerce is also wrong to conclude that the fact of intertwined management and board membership between Double Coin and Huayi provides unequivocally the existence of control by Huayi. *See Final IDM* at 16-17 (P.R. 293) (ECF No. 107, Attach 5). The undisputed fact is that only one member of Double Coin's board is an employee at Huayi at any given time. *See* Double Coin *Verification Report* at Section III (C.R. 243) (ECF No. 182, Attach 7). Moreover, the fact that members of the board of one company have been in the employ of the other company does not create control of one over the other, but is rather a common occurrence in publicly-traded companies with this type of profile.

Commerce relies heavily on the fact that "Double Coin was unable to provide an example . . . where [

].ᵂ According to Commerce this means that "Huayi has *de facto* control over the composition of Double Coin's board." *Preliminary Analysis Memo* at 13 (C.R. 244) (ECF No. 43 at Tab 5) (unchanged in the final results). This conclusion is wrong. The fact that a minority shareholder has never nominated a director, or that no

Huayi nominees have ever been rejected, does not signify that Huayi has *de facto* control

over Double Coin; again, it simply means it has not happened yet.

### (d)   Double Coin has independent directors

In addition to the controls inherent in Chinese Corporate Law and the Double

Coin's own articles of association there are certain facts unique to this case that

demonstrate Commerce's failure to examine the record as a whole and render a decision

supported by substantial evidence.  Commerce's conclusion regarding control ignores the

importance of the independent members of Double Coin's board of directors.  Pursuant to

the Double Coin AOA, more than a third of the members of the board shall be

"independent directors."  "Independent directors" are required to act "without the

interference of the principal shareholders or the persons in actual control of, or other

entities or individuals that have a material interest in" Double Coin.  *See* Article 130 of

AOA, Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

Although Commerce makes light of the rights and obligations of the independent

directors, *see Preliminary Analysis Memo* at 13 (P.R. 264) (ECF No. 91, Attach 3), the

reality is that independent directors have rights and authorities beyond those granted to

the shareholder-appointed directors, including the right to engage independent auditors.

*See* Article 137 of Double Coin AOA, Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF

No. 88, Attach 31).  Further the obligations of the independent directors are expressly

required to favor solely the company's (Double Coin's) interest, not the majority

shareholders.  *Id.*  Indeed, the Double Coin AOA makes clear that the independent

directors shall "in particular, pay attention that the lawful rights and interests of small and medium shareholders are not prejudiced." *See* Article 130 of the Double Coin AOA, Exhibit S2-5 of *July 31 Response* (P.R. 192) (ECF No. 88, Attach 31).

This is a fundamental factual difference from the situation that the Trade Court considered in *Zhejiang Quzhou Lianzhou*.  Although that decision considered several features of Chinese corporate law that are also at issue here, that decision did not address the unique facts of independent directors and how they affect the overall analysis.   The presence of independent directors here demonstrates the high level of evidence before Commerce in this case demonstrating actual independence from any supposed government control.

In sum, Commerce's conclusion that the nature of Double Coin's corporate organization gives Huayi the ability to exercise control over Double Coin is premised upon an incorrect understanding of how Double Coin is governed.  A proper understanding of the underlying documents demonstrates that, in fact, Huayi does not have the control upon which Commerce's determination rests.

**(e)**  **Not a single actual instance of the exercise of control over day-to-day operations**

Finally, and perhaps most importantly, although Double Coin vigorously believes that Commerce's understanding of Double Coin's corporate organization and governance is wrong, this issue is really beside the point.  All of the "evidence" cited by Commerce concerns the legal rights of a majority shareholder.  Commerce does not—because it cannot—cite a single example in which Huayi <u>actually exercised</u> its legal right to control

or influence a day-to-day decision about the manner in which Double Coin sold subject merchandise to the United States.  In in our view, no matter how one decides to interpret the different provisions of the various documents governing Double Coin's corporate structure, this lack of any actual evidence of control or influence is fatal to Commerce's finding of *de facto* control.  Although we appreciate that Commerce may be relying on some perceived "potential to control," the implication of Commerce's standard is that shareholders, directors, and management will break the law.  If this is the standard, facts that rise to the point of "potential control" are virtually limitless.  If this is the foundation of Commerce's conclusions those conclusions are completely unreasonable.  There is no basis to support Commerce's adverse inference.

We recognize that Commerce was relying on the holding approach affirmed in *Advanced Tech. & Materials Co.,* 938 F. Supp. 2d. 1342, *aff'd* 581 Fed. Appx. 900 to rely on government majority ownership as dispositive of *de facto* control.  *See Final IDM* at 14-17 (P.R. 293) (ECF No. 107, Attach 5).  However, we respectfully submit that Commerce's logic here cannot be sustained.  Majority ownership may provide a basis for a presumption, but it does not provide a basis to ignore all other record evidence that disproves the correctness of that presumption.

### 3. In Any Event, There Is No Evidence That The Chinese Government Controlled Double Coin's *Export Activities;* In Fact, All The Record Evidence Demonstrates The Lack of Control

In the section above we detail why Commerce's conclusion that the Chinese Government had the ability to control the day-to-day activities of Double Coin through

Double Coin's majority shareholder, Huayi, reflects a fundamental misunderstanding of the operation of (a) Chinese law, (b) the special regulations governing publicly listed companies such as Double Coin, and (c) the Double Coin AOA.  And it ignores the relevance of independent directors in this particular case.  A proper understanding of these laws and corporate organization documents demonstrates that the Chinese Government cannot influence the day-to-day activities of Double Coin, and therefore Commerce's conclusion is not supported by substantial evidence on the record

In this section we explain why, even if the Court were to disagree with our assessment above, the Court still  should conclude that Commerce' determination is not supported by substantial evidence on the record.  There is no evidence that the Chinese Government exercised *de facto* control over Double Coin's <u>export activities</u>; in fact, all the record evidence is to the contrary and shows the absence of any such control.

Specifically, in applying a PRC-wide rate to Double Coin in the instant case, Commerce has denied Double Coin separate rate status eligibility without any evidence that Double Coin's <u>export prices</u> were influenced by "central government control."  As detailed above, the sole reason for Commerce's determination to include Double Coin with the PRC-wide entity is Commerce's determination that its "controlling shareholder is wholly-owned by the State-owned Assets Supervision and Administration Commission" and that this shareholder exercises a "significant level of control . . . over the respondent's Board of Directors." Even assuming (for purposes of argument) that Commerce's determination that Double Coin's board of directors was effectively chosen by an agency of the Chinese government, this does not demonstrate that the government

exercised control over Double Coin's <u>export activities</u>, as required by Commerce's Policy Bulletin 05.1.

This lack of any operational control can be seen by the figure below which illustrates the very remote nature of the  Chinese Government control that Commerce is assuming:

**Ownership Structure of Double Coin and CMA**
*Source:* **Section A Response of Double Coin and CMA (CR 15)**



Commerce has effectively concluded that the Chinese Government somehow has control over the selling prices the CMA negotiates with its U.S. customers.  Simply looking at the figure above demonstrates that such contention makes little sense, because it ignores the attenuated nature of any Chinese Government ownership stake.  The U.S. based company CMA is simply too far removed from the Chinese government and there are too many other intervening actors who have a role the decision making.

We fully recognize that, in the absence of any contradictory evidence, the Commerce *might* be able *presume* that a company whose board of directors is chosen in whole or in part by a government is subject to government control in its export activities.  However, such presumption is not appropriate in this case because substantial contrary evidence exits.  In this case, when properly reviewed in total and in context, the evidentiary record before Commerce demonstrates that neither the government of China (nor any government-controlled entity) exercises *control* over Double Coin's *export* activities.  We summarize below in  a chart the evidence that was before Commerce concerning each of the four factors in the Policy Bulletin 05.1:

NONCONFIDENTIAL

**Actual Evidence on Record for Each of the Four *De Facto* Criterion**

| Factor | Evidence on Record |
|---|---|
| (1) whether the export prices are set by, or subject to the approval of, a governmental authority | <ul><li>All – one hundred percent – of Double Coin's U.S. sales of subject merchandise were made by Double Coin's U.S. corporate subsidiary China Manufacturers' Alliance (CMA) after importation.[5]</li><li>The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that "[<br><br><br>]."[6]</li><li>CMA sales of subject OTR customers are handled by [<br><br><br>].[7]</li><li>CMA sets prices directly with its U.S. customers [<br>].[8]</li><li>Double Coin [<br><br>] with Double Coin.[9]</li></ul> |

---

[5] *See* Double Coin *Preliminary Analysis Memo*, at 2 (P.R. 264) (ECF No. 91, Attach 3).

[6] *See Verification Report* at II (C.R. 243) (ECF No. 182, Attach 7).

[7] *See id.* at V (C.R. 243) (ECF No. 182, Attach 7); *see also July 31 Response* at 8 (P.R. 191) (ECF No. 88, Attach 30).

[8] *See July 31 Response* at 8, Exhibit S2-13 (C.R. 136, 139) (ECF No. 146, Attach 14, 17); Commerce's Verification Report with regard to Double Coin at V (C.R. 243) (ECF No. 182, Attach 7).

[9] *See Verification Report* at V (C.R. 243) (ECF No. 182, Attach 7).

NONCONFIDENTIAL

| (2) whether the respondent has authority to negotiate and sign agreements | • As a publicly held company operating under the Company Law, Double Coin [ ].[10] • CMA, an American affiliate run by American employees has full authority to bind Double Coin to sales contract with U.S. customers.[11] |
|---|---|
| (3) whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management | • Commerce factual finding of no *de jure* control by Chinese Government.[12] • Double Coin's Articles of Association that give shareholders rights in proportion to their ownership.[13] • Double Coin's Articles of Association that require the independent status of Double Coin.[14] • Existence of independent directors.[15] • Protections for minority shareholders against majority shareholder abuse.[16] • Requirement that directors and officers must act in interest of company.[17] • Not a single example of any shareholder influencing day-to-day operations .[18] |

[10] *See id.* at II (C.R. 243) (ECF No. 182, Attach 7).

[11] *See id.* at V (C.R. 243) (ECF No. 182, Attach 7); *see also July 31 Response* at 8 (P.R. 191) (ECF No. 88, Attach 30).; *July 31 Response* at 10, Exhibit S2-13 (C.R. 136, 139) (ECF No. 146, Attach 14, 17).

[12] *Final IDM* at 14-15 (P.R. 293) (ECF No. 107, Attach 5).

[13] *See* Double Coin Holdings Ltd. Articles of Association, *July 31 Response* at Exhibit S2-5 (P.R. 192) (ECF No. 88, Attach 31).

[14] *Id.* (P.R. 192) (ECF No. 88, Attach 31).

[15] *See* Double Coin AOA at Article130, *Id.* (P.R. 192) (ECF No. 88, Attach 31).

[16] *See* Double Coin AOA at Article 35, 45, 50 and 55, *Id.* (P.R. 192) (ECF No. 88, Attach 31).

[17] *See* Double Coin AOA at Articles 34, 35, 36 and 39, *Id.* (P.R. 192) (ECF No. 88, Attach 31).

[18] *See Final IDM* (P.R. 293) (ECF No. 107, Attach 5).

| (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses | • Double Coin's Articles of Association that require the independent status of Double Coin.[19]<br><br>• The operating agreement between Double Coin and its affiliate CMA (an American company run by American personnel) provides that "the day to day affairs of the company – including disposition of profits from sales  –  are operated and managed by CMA's own officers.[20] |
| --- | --- |

---

[19] *See* Code of Corporate Governance for Listed Companies, *July 31 Response* at Exhibit S2-9 (P.R. 192) (ECF No. 88, Attach 31).
[20] *See Verification Report* at II (C.R. 243) (ECF No. 182, Attach 7).

We respectfully ask the Court to review <u>each</u> of the above facts carefully. Not a single one of the above facts is in dispute. Indeed, most are reflected in the Commerce own verification report, and therefore each one constitutes separate piece of evidence on the administrative record.

And so, there is absolutely no factual dispute about the key facts of control, there is no dispute that, during the AD review time period, one hundred percent of Double Coin's "export pricing" was handled by American employees of the U.S. company CMA. Commerce presumes there is control over export pricing but the specific record evidence here shows just the opposite. Commerce never actually addresses this evidence and instead just dismisses it.

Moreover, there is no dispute that these export prices are set after importation. Given this reality it is hard to see any possible influence by the exporter Double Coin, let alone any influence by Double Coin's SASAC-owned shareholder. The relevant prices in the U.S.. market are not set until after the product has left China and Double Coin has finished its involvement with the individual transactions. Commerce never considers the export price in its analysis, and focuses only on the resale price by the affiliated importer.

Finally, there is also no dispute that this business reality was codified in the operating agreement between Double Coin and CMA. Indeed, Double Coin does not even know the U.S. prices being set and charged by CMA. This business reality precludes the possibility for government control, since there would be no mechanism for such control. It simply defies belief that the Government of China is somehow controlling the prices being set by American employees of CMA.

And we note there are undisputed facts under each of the three categories of evidence that Commerce simply ignored.   Indeed, some of these undisputed facts are relevant under more than one of the Policy Bulletin 05.1 factors that should all have been considered.

Commerce's final determination does not attempt to refute a single one of these facts (all of which were referenced in Double Coin's Case Brief to Commerce.)  Rather, Commerce attempts to dismiss the legal significance of all of these critical facts with a single paragraph:

> Double Coin further argues that Huayi's control of Double Coin's board cannot be equated to control of Double Coin's export activity and that the PRC ownership structure has no effect on sales prices in the United States because the prices are set by Double Coin's U.S. affiliate, CMA.  We note that the respondent in the *Diamond Sawblades* litigation made similar arguments in that proceeding. The CIT rejected this line of reasoning in *Advanced Technology I*, stating that "the actual setting of price is only one of the four de facto factors described in the Policy Bulletin, whereas governmental manipulation of the cost of inputs,… or rationalization of industry or output are among numerous other scenarios of concern that can affect seller pricing."  Similarly, we find that Double Coin's arguments regarding U.S. sales by CMA does not overcome the rebuttable presumption of government control.

*Final IDM* at 16 -17 (P.R. 293) (ECF No. 107, Attach 5).

There are two fundamental problems with Commerce's treatment of this evidence.  First, Commerce conveniently ignores that Double Coin's argument is about substantial evidence <u>in this case</u>.  The question is whether all of the <u>undisputed specific facts in this case</u> (identified above) demonstrating how even Double Coin does not control CMA export pricing (let alone Huayi) sufficiently rebuts the general presumption of Chinese Government control over export activities.  And yet, instead of appropriately addressing

these very specific facts (facts which are, by definition, unique to Double Coin),

Commerce simply notes that in some other case "similar arguments" (not even evidence,

"arguments") were rejected.   We respectfully submit that a factual ruling in another case

involving a different product, different Chinese producers, and a different time period has

little bearing on the proper analysis of the specific substantial evidence in this case.

Second, Commerce quotes language from another court case in which the court

noted that "actual setting of price is only one of the four *de facto* factors described in the

Policy Bulletin, whereas governmental manipulation of the cost of inputs, . . . or

rationalization of industry or output are among numerous other scenarios of concern that

can affect seller pricing."  However, Commerce's assessment stops there – simply

quoting the language from another court case. Commerce makes absolutely no attempt to

explain how the underlined evidentiary record in this case demonstrates that there is evidence of the

alleged concerns identified by the Court.  Commerce makes no attempt to detail evidence

on the record in this case that there is a sufficient basis to believe that the Chinese

Government undertook "manipulation of cost of inputs . . . or rationalization or industry

or output."  Commerce makes no attempt, because there is no evidence in this case.

There is not a single shred of evidence that the Chinese Government actually manipulated

the input costs for producing OTR tires or attempted to undertake rationalization of the

Chinese OTR industry.

In short, Commerce's decision to apply the PRC-wide rate to Double Coin, based

solely on its determination that a PRC affiliate controlled appointments to the board of

directors flatly contradicts *Commerce's own* factual findings that the Double Coin board

49

of directors exercised no influence over the setting of export prices.  Since the purpose of

the country-wide rate policy is to determine "whether there is government control of a

nonmarket company's export activities," *Advanced Tech. & Materials Co.*, 938 F. Supp.

2d at 1347 (quoting Commerce's decision memorandum), Commerce has applied a single

factor in its *de facto* control test to frustrate and contradict the very reason for its policy.

Commerce's action in this case is thus unreasonable under its own policy criteria, and

therefore unlawful.  As importantly, Commerce's conclusions are not supported by

substantial evidence on the record.

## CONCLUSION

For all of the foregoing reasons, Double Coin and CMA respectfully request that the Court hold unlawful the final AD determination that Commerce rendered in the underlying administrative review and remand with instructions for Commerce to reissue its AD determination consistent with the court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling

*Counsel for China Manufacturers Alliance LLC and Double Coin Holdings, Ltd.*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Court's Order of September 23, 2015.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 12,618 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<u>/s/ Daniel L. Porter</u>

Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel for Plaintiffs China Manufacturers Alliance LLC and Double Coin Holdings Ltd.*