UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____
)
CHINA MANUFACTURERS ALLIANCE, LLC   )
AND DOUBLE COIN HOLDINGS LTD.,   )
)
　　　　Plaintiffs,   )
)   Consol. Court No. 15-00124
　　v.   )
)
UNITED STATES,   )
)
　　　　Defendant.   )
_____)

DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

　　　　　　　　　　　　BRIAN M. BOYNTON
　　　　　　　　　　　　Acting Assistant Attorney General

　　　　　　　　　　　　PATRICIA M. MCCARTHY
　　　　　　　　　　　　Director

　　　　　　　　　　　　FRANKLIN E. WHITE, JR.
　　　　　　　　　　　　Assistant Director

　　　　　　　　　　　　JOHN J. TODOR
OF COUNSEL:　　　　　　Senior Trial Counsel
PAUL KEITH　　　　　　　U.S. Department of Justice
Attorney　　　　　　　　Commercial Litigation  Branch
Office of the Chief Counsel　Civil  Division
　For Trade Enforcement and Compliance　P.O. Box 480
U.S. Department of Commerce　Ben Franklin Station
Washington, D.C. 20230　　Washington, DC 20044
　　　　　　　　　　　　Tel: (202) 616-2382
　　　　　　　　　　　　Fax: (202) 307-0972
　　　　　　　　　　　　Email: john.todor@usdoj.gov

February 4, 2022　　　　Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ..............................................................1

    I.    Administrative Determination Under Review ..................................... 1

    II.   Statement Of The Issues .................................................................2

STATEMENT OF FACTS ...................................................................................... 2

    I.    Proceedings Before Commerce......................................................... 2

    II.   Proceedings Before The Court Of International Trade ....................... 4

    III.  Proceedings On Appeal And Following Remand ................................ 6

SUMMARY OF THE ARGUMENT ......................................................................... 7

ARGUMENT ........................................................................................................ 8

    I.    Standard Of Review ........................................................................ 8

         A.    Review Of Commerce's Determinations ................................8

         B.    Legal Framework For Establishing An Absence Of Government Control In Proceedings Involving Non-Market Economy Countries ..................... 9

    II.   This Court Should Not Reopen The Issue Of Double Coin's Eligibility For A Separate Rate ................................................................................12

    III.  Commerce's Determination That Double Coin Failed To Qualify For A Separate Rate Is Supported By Substantial Evidence And In Accordance With Law........ 16

         A.    Commerce Properly Determined That Double Coin Failed To Rebut The Presumption Of *De Facto* Chinese Government Control ....................... 17

         B.    Double Coin's Argument That The *De Jure* Factors Should Be Treated As Dispositive Of Commerce's *De Facto* Analysis Is Incorrect .................21

         C.    Double Coin's Challenges To Commerce's *De Facto* Analysis Are Meritless ..............................................................................24

i

D.      Double Coin's Contention That It Showed *De Facto* Independence Due
        To A Lack Of Board Control Of Its Export Activities Is Unfounded ......28

CONCLUSION .......................................................................................................................32

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) .................................................................. 10

*Advanced Tech. & Materials Co. v. United States,*
    885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ........................................................... passim

*Advanced Tech. & Materials Co. v. United States,*
    938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) ...........................................................passim'

*Advanced Tech. & Materials Co. v. United States,*
    581 F. App'x 900 (Fed. Cir. 2014) ....................................................................... 12, 19

*Am. Silicon Techs. v. United States,*
    261 F.3d 1371 (Fed. Cir. 2001) ...............................................................................29

*AMS Assocs. v. United States,*
    719 F.3d 1376 (Fed. Cir. 2013) .................................................................... 9, 10, 11

*Atl. Sugar, Ltd., v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ..................................................................................9

*Bannum, Inc. v. United States,*
    779 F.3d 1376 (Fed. Cir. 2015) ................................................................................13

*China Mfrs. Alliance LLC v. United States,*
    205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) ....................................................... 4, 5, 14

*China Mfrs. Alliance, LLC v. United States,*
    357 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ..................................................... 6, 15, 16

*China Mfrs. Alliance, LLC v. United States,*
    2019 WL 416527 (Ct. Int'l Trade Sept. 3, 2019).............................................................6

*China Mfrs. Alliance, LLC v. United States,*
    1 F.4th 1028 (Fed. Cir. 2021) ............................................................................. passim

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) ..................................................................................9

*Consol. Edison Co. of N.Y. v. NLRB,*
    305 U.S. 197 (1938) ..................................................................................................8

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ............................................................... 9, 29

*Daewoo Elecs. Co. v. United States,*
    6 F.3d 1511 (Fed. Cir. 1993) ................................................. 25

*Diamond Sawblades Mfrs. Coalition v. United States,*
    866 F.3d 1304 (Fed. Cir. 2017) ............................................ 5, 10

*Dupont Teijin Films USA, LP v. United States,*
    407 F.3d 1211 (Fed. Cir. 2005) ............................................ 12

*Engel Indus., Inc. v. Lockformer Co.,*
    166 F.3d 1379 (Fed. Cir. 1999) ............................................ 13

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ............................................. 8, 13

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ......................... 9

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) ............................................................. 9

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States,*
    28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .......................... 30

*Michaels Stores, Inc. v. United States,*
    766 F.3d 1388 (Fed. Cir. 2014) ............................................ 10

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ............................................ 9

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................ 9

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997) ...................................... 9, 10, 11

*SNR Roulements v. United States,*
    402 F.3d 1358 (Fed. Cir. 2005) ............................................ 12

*Tronzo v. Biomet, Inc.,*
    236 F.3d 1342 (Fed. Cir. 2001) ............................................ 13

*United States v. Husband,*
    312 F.3d 247 (7th Cir. 2002) ..................................................................... 13

*Usinor Sacilor v. United States,*
    215 F.3d 1350 (Fed. Cir. 1999) ................................................................. 30

*Yantai CMC Bearing Co. v. United States,*
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ................................... 11, 12, 20

## REGULATIONS

*Sparklers from the People's Republic of China,*
    56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) (final determ.) ................. 10, 11

*Silicon Carbide from the People's Republic of China,*
    59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (final determ.) ................. 10, 11

*Diamond Sawblades and Parts Thereof from the People's Republic of China,*
    71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) (final determ.) ................. 11

*Certain New Pneumatic Off-The-Road Tires from the People's Republic of China,*
    73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) (final results) .................. 4

*Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China,*
    79 Fed. Reg. 53,169 (Dep't of Commerce Sept. 8, 2014) (prelim. results) .................. 18

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,*
    79 Fed. Reg. 61,291 (Dep't of Commerce Oct. 10, 2014) (prelim. results) .................. 3

*1,1,1,2-Tetrafluroethane From the People's Republic of China,*
    79 Fed. Reg. 62,597 (Dep't of Commerce Oct. 20, 2014) (final results) .................. 18

*Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China,*
    79 Fed. Reg. 68,860 (Dep't of Commerce Nov. 19, 2014) (final results) .................. 18

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,*
    80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015) (final results) .................. 1, 4

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,*
    80 Fed. Reg. 26,230 (Dep't of Commerce May 7, 2015) (amended final results) .......... 2, 4

*Diamond Sawblades and Parts Thereof From the People's Republic of China,*
    80 Fed. Reg. 32,344 (Dep't of Commerce June 8, 2015) (final results) .................. 18

**<u>OTHER AUTHORITIES</u>**

13B Wright & Miller, Fed. Prac. & Proc. § 4478.3 (2d ed.) ....................................................14

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| _____ ) | | |
| CHINA MANUFACTURERS ALLIANCE, LLC | ) | |
| AND DOUBLE COIN HOLDINGS LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Consol. Court No. 15-00124 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ ) | | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to this Court's order of October 6, 2021 (ECF No. 258), defendant, the United

States, respectfully submits this response to the motion for judgment on the administrative record

filed by plaintiffs China Manufacturers Alliance, LLC (CMA) and Double Coin Holdings Ltd.

(collectively, Double Coin).  *See* Pl. Br., Dec. 6, 2021, ECF No. 260 (Double Coin Br.).

In its motion, Double Coin challenges the final determination issued by the U.S.

Department of Commerce (Commerce) in the fifth administrative review of the antidumping

duty order covering certain new pneumatic off-the-road tires (OTR Tires) from the People's

Republic of China (China).  As we explain below, Double Coin's challenge is without merit.

Accordingly, we respectfully request that the Court deny Double Coin's motion and enter

judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      Administrative Determination Under Review**

The administrative determination at issue is Commerce's determination in *Certain New*

*Pneumatic Off-the-Road Tires from the People's Republic of China,* 80 Fed. Reg. 20,197 (Dep't

of Commerce Apr. 15, 2015) (final results admin. review) and the accompanying Issues and Decision Memorandum (IDM) (P.R. 293), *as amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 80 Fed. Reg. 26,230 (Dep't of Commerce May 7, 2015) (amended final results) (collectively, *Final Results*).[1] The period of review is September 1, 2012, through August 31, 2013.

## II.   Statement Of The Issues

1.      Whether Double Coin's challenge to Commerce's determination that Double Coin failed to qualify for a separate rate is foreclosed by the United States Court of Appeals for the Federal Circuit's opinion in this case, which upheld Commerce's application of the China-wide rate to Double Coin.

*2.*      If the Court determines that Double Coin's challenge is not foreclosed by the Federal Circuit's opinion, whether Commerce's determination that Double Coin failed to qualify for a separate rate is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

## I.     Proceedings Before Commerce

This case concerns the fifth administrative review of the antidumping duty order on certain new pneumatic off-the-road tires from China covering the period of review September 1, 2012, through August 30, 2013. For this review, Commerce found that it was not practicable to fully investigate each of the nine companies for whom Commerce initiated an administrative review and, as such, it selected as mandatory respondents the two companies accounting for the

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

largest volume of exports during the period of review for which reviews were requested, Guizhou Tyre Co., Ltd and Double Coin. *See* Respondent Selection Memorandum (P.R. 27).

In a non-market economy (NME) antidumping duty review, Commerce applies a rebuttable presumption that all companies within the country are subject to government control and, therefore, should be assessed a single, country-wide antidumping duty rate. To overcome the presumption, an exporter must demonstrate that it operates free from *de jure* and *de facto* government control over its export activities. Commerce found that Double Coin is majority-owned by the Huayi Group (Huayi). *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 79 Fed. Reg. 61,291 (Dep't of Commerce Oct. 10, 2014) (prelim. results admin. review) (*Preliminary Results*), and accompanying preliminary decision memorandum at 10 (P.R. 259) (PDM). Huayi is wholly-owned by the Shanghai State-owned Assets Supervision and Administration Commission of the State Council (SASAC), a central governmental body that oversees important state assets. *Id*.

Commerce concluded that Double Coin did not satisfy the criteria demonstrating an absence of *de facto* government control over export activities because it found evidence demonstrating that, through its 100-percent SASAC-owned Huayi assets, the Chinese government exercises rights inherent in majority ownership as would be expected. *Id*. In particular, Commerce found that Huayi had control over the composition of Double Coin's board of directors, which in turn chose the company's management. *Id*. Further, Commerce found that Double Coin and Huayi had extensively intertwined management and board members. As a result, Commerce determined that Double Coin was ineligible for a separate rate, and, thus, was part of the China-wide entity. Commerce continued to find that Double Coin failed to qualify for a separate rate in the *Final Results*. *See* IDM at 18.

Commerce found that the only rate ever determined for the China-wide entity was 210.48 percent, which was determined in the less-than-fair-value antidumping duty investigation.  *See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,485, 40,489 (Dep't of Commerce July 15, 2008) (final results).  Although Commerce ordinarily would have assigned the same rate for the China-wide entity in the review, Double Coin, as a mandatory respondent, provided Commerce with all requested information necessary to calculate a margin for at least a part of the China-wide entity.  However, Commerce found that it lacked the information to determine what share of production and exports of subject merchandise Double Coin constituted as part of the China-wide, government-controlled entity. Because there could only be one margin for the China-wide entity, Commerce calculated a simple average of the previously assigned China-wide rate (210.48 percent) and Double Coin's calculated margin (0.14 percent), or 105.31 percent, as the China-wide entity rate for the Final Results.  *See Final Results*, 80 Fed. Reg. at 20,199.   Commerce's then issued amended final results to correct a ministerial error involving the calculation for another respondent, Guizhou Tyre Co., which did not affect Double Coin's rate.  *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 80 Fed. Reg. 26,230 (Dep't of Commerce May 7, 2015).

## II.   Proceedings Before The Court Of International Trade

After briefing and argument, this Court remanded Commerce's amended final results on February 6, 2017.  *See China Mfrs. Alliance LLC v. United States*, 205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) (*CMA I*).  In *CMA I*, among other things, the Court instructed Commerce to rescind the China-wide rate as applied to Double Coin and instead apply the 0.14 percent *de minimis* margin that had been calculated using Double Coin's data, finding that (1) Commerce's

selection of Double Coin as a mandatory respondent required Commerce to assign Double Coin an individual rate and (2) Double Coin's cooperation with Commerce's requests for information meant Commerce could not carry forward the adverse inferences built into the original 210.48 percent China-wide rate, which were based on the non-cooperation of different companies during the initial investigation.  *Id.* at 1334-42.  Having found, on these bases, that assigning the 0.14 percent *de minimis* margin to Double Coin was "the only possible result that, on the record of the fifth administrative review, could comply with all statutory requirements," this Court did not make any findings in *CMA I* regarding Double Coin's substantial evidence challenge to Commerce's conclusion that Double Coin failed to rebut the presumption of *de facto* Chinese government control.  *Id.* at 1344.

Commerce complied with the remand order in *CMA I*, under respectful protest, by assigning Double Coin the 0.14 percent *de minimis* margin on remand.  *See* Final Results of Redetermination Pursuant to Court Remand at 21, June 21, 2017, ECF No. 200 (*Remand Results*).  Less than a month later, in August 2017, the Court of Appeals for the Federal Circuit upheld Commerce's application of the China-wide rate to a mandatory respondent that failed to rebut the presumption of government control and was found ineligible for a separate rate, notwithstanding the respondent's argument (like Double Coin's in this case) that Commerce did not find that the respondent failed to cooperate with Commerce's administrative review.  *See Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304 (Fed. Cir. 2017) (*Diamond Sawblades*).  In light of *Diamond Sawblades*, we filed a motion in this case requesting that this Court remand the issue of Double Coin's dumping margin to Commerce for reconsideration of the *Remand Results* because *Diamond Sawblades* represented intervening precedent that affected

the validity of Commerce's under-protest remand redetermination.  *See* Def. Motion for Partial

Voluntary Remand, Aug. 28, 2018, ECF No. 218.

In January 2019, after consideration of the parties' briefing relating to both the remand

redetermination and the Government's motion for remand, this Court sustained-in-part and

remanded-in-part Commerce's remand redetermination and denied the Government's motion for

remand.  *See China Mfrs. Alliance, LLC v. United States*, 357 F. Supp. 3d 1364, 1379-89 (Ct.

Int'l Trade 2019) (*CMA II*).  Although this Court denied the Government's motion for a remand

with respect to Double Coin, in *CMA II* this Court remanded to Commerce for unrelated issues

relating to other exporters.  *See id.* at 1388-89.  After Commerce addressed those other issues in

a second remand, *see* Final Results of Redetermination Pursuant to Court Remand, Apr. 16,

2019, ECF No. 231 (*Second Remand Results*), this Court sustained the *Second Remand Results*

in September 2019.  *See China Mfrs. Alliance, LLC v. United States*, 2019 WL 416527 (Ct. Int'l

Trade September 3, 2019) (*CMA III*).

III.   **Proceedings On Appeal And Following Remand**

The Government appealed this Court's decision to overturn Commerce's application of

the China-wide antidumping duty rate to Double Coin to the Federal Circuit.  In June 2021, the

Federal Circuit reversed, concluding that, "where a respondent in a {non-market economy}

country cooperates with an investigation or review but fails to rebut the presumption of

government control, Commerce may permissibly apply the country-wide {non-market economy}

entity rate." *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1040 (Fed. Cir. 2021)

(*CMA IV*).  The Federal Circuit further ordered the case to be remanded to this Court with

instructions to proceed in a manner consistent with the Federal Circuit's opinion.

After the Federal Circuit mandate issued on August 2, 2021, the parties filed a joint status report with this Court. *See* Joint Status Report and Proposed Briefing Schedule, Sept. 17, 2021, ECF No. 255. In the joint status report, Double Coin argued that the Court should consider the issue of whether Double Coin qualified for a separate rate and permit further briefing on the issue. We argued that this Court should not reopen the issue of Double Coin's eligibility for a separate rate on remand because the Federal Circuit concluded that the application of the 105.31 percent China-wide entity rate to Double Coin was "reasonable on the facts of this case." *See id.* at 4-5 (citing *CMA IV*, 1 F.4th at 1040). Additionally, we argued that Double Coin waived the issue of whether it was part of the China-wide entity on appeal because "{t}he Federal Circuit applies the same standard of review as was applied by this Court, without deference, and thus could have reviewed Commerce's determination that Double Coin was part of the China-wide entity had CMA raised the issue on appeal." *Id.* at 5-8.

On October 6, 2021, this Court issued a briefing schedule for further briefing and declined to consider the Government's legal arguments regarding reopening the issue of Double Coin's eligibility for a separate rate at that time.

## SUMMARY OF THE ARGUMENT

The Court should decline to reopen the issue of Double Coin's eligibility for a separate rate because the Federal Circuit held that Commerce's application of the 105.31 percent China-wide rate to Double Coin was reasonable on the facts of this case, and Double Coin waived any challenge to Commerce's separate rate determination by failing to raise the issue before the Federal Circuit.

If the Court decides to address on the merits the issue of Commerce's denial of a separate rate for Double Coin, the Court should affirm Commerce's determination from the *Final Results*

7

because Commerce reasonably determined that the Chinese government's majority ownership of Double Coin, via SASAC and Huayi, means that Double Coin was not *de facto* independent from the Chinese government concerning the selection of management. Double Coin's arguments to the contrary fail because they do not undermine Commerce's finding that Huayi's majority ownership would allow it to appoint the members of Double Coin's board of directors, which appoints the general manager responsible for the day-to-day operations of the company. Additionally, Commerce's determination followed this Court's reasoning from prior cases that found that majority Chinese government ownership rendered a respondent ineligible for a separate rate under similar facts. Furthermore, Double Coin's argument that Double Coin's majority state ownership would not indicate control unless Double Coin's board of directors exercised control of management's decisions after the fact is legally and factually unsupported. Therefore, Commerce's determination that Double Coin failed to qualify for a separate rate should be affirmed.

## ARGUMENT

## I.   Standard Of Review

### A.   Review Of Commerce's Determinations

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility

of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

**B.    Legal Framework For Establishing An Absence Of Government Control In Proceedings Involving Non-Market Economy Countries**

In proceedings involving non-market economy countries, Commerce uses a rebuttable presumption that all companies within the country are subject to government control over their export activities and should be assigned a single antidumping duty rate. *See, e.g.,* *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117

9

F.3d 1401, 1405 (Fed. Cir. 1997)).  Under this presumption, an exporter receives the non-market economy countrywide rate unless it affirmatively demonstrates an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to exports.  *Id*.  The burden of rebutting the presumption of government control rests solely with the exporter.  *Sigma Corp.*, 117 F.3d at 1405-06 (affirming Commerce's authority to place burden of proof on respondents, as they have the best access to necessary information).

If the company fails to rebut the presumption of government control, it continues to receive the single, country-wide, dumping rate.  *See Diamond Sawblades*, 886 F.3d at 1311 (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388 (Fed. Cir. 2014)).  That is, the company applying for a separate rate bears the burden to demonstrate that its export activities are free from *de jure* and *de facto* government control.  *AMS Assocs.*, 719 F.3d at 1379-80; *Sigma Corp.*, 117 F.3d at 1405-06.

A company that receives a company-specific rate separate from the China-wide entity is referred to as having "separate rate status."  *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013).  To establish whether a company is sufficiently independent to be entitled to a separate rate, Commerce applies a test first established in a proceeding concerning sparklers from China, and further developed during a proceeding concerning silicon carbide from China.  *See Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) (final determ.); *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (final determ.).

Pursuant to this test, Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive

stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies. *See Sparklers*, 56 Fed. Reg. at 20,588; Policy Bulletin on the Topic of Separate Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (April 5, 2005) (Policy Bulletin 05.1), *available* at http://enforcement.trade.gov/policy/bull05-1.pdf.   Commerce's analysis of the *de jure* factors, and its conclusion that GTC and Aeolus rebutted the presumption of *de jure* government control, is not at issue in this case.

Separately, Commerce generally considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final determ.); *Silicon Carbide*, 59 Fed. Reg. at 22,585; *Sparklers*, 56 Fed. Reg. at 20,589; Policy Bulletin 05.1.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017) (*Yantai CMC Bearing*); *see also Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d

1342, 1345 (Ct. Int'l Trade 2013) (*Advanced Tech. II*); *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (affirmed pursuant to Fed. Cir. R. 36) (upholding a determination where Commerce did not make a *de facto* finding on two of the four criteria).  Further if an applicant fails to establish any one of the *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria.  *Yantai CMC Bearing*, 203 F. Supp. 3d at 1326.

## II.    This Court Should Not Reopen The Issue Of Double Coin's Eligibility For A Separate Rate

In its decision in *CMA IV*, the Federal Circuit stated: "Commerce's application of the 105.31% PRC-wide entity rate to Double Coin was not contrary to law and was reasonable on the facts of this case.  Accordingly, we reverse the final judgment of the Trade Court and remand the case with instructions to return the case to Commerce for it to proceed in a manner consistent with this opinion."  *CMA IV*, 1 F.4th at 1040.  The Federal Circuit's remand instruction made no mention of this Court reopening the question of whether Double Coin demonstrated eligibility for a separate rate by rebutting the presumption of state control on remand.  The Federal Circuit further concluded that the application of the 105.31 percent rate to Double Coin was "reasonable on the facts of this case."  *Id.*  Thus, the Court should not reopen this issue on remand.

Furthermore, Double Coin waived the issue of whether Double Coin was part of the China-wide entity on appeal.  The Federal Circuit applies the same standard of review as was applied by this Court, without deference, and thus could have reviewed Commerce's determination that Double Coin was part of the China-wide entity had Double Coin raised the issue on appeal.  *See*, *e.g.*, *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005).  In its decision, the Federal Circuit held that, "Double Coin does not appeal Commerce's factual

determination that Double Coin failed to demonstrate *de facto* independence from Chinese government control." *CMA IV*, 1 F.4th at 1032 n.5.

Instead, in its response to our appeal, Double Coin argued that Commerce lacked the statutory authority to apply a China-wide rate. *See id.* at 1036. Double Coin would have lacked standing to raise this argument if it was not part of the China-wide entity. Double Coin could have argued in the alternative before the Federal Circuit that it had established independence and thus was not part of the China-wide entity—and thus should not have had the China-wide rate applied to it—but chose not to do so. Thus, the issue of whether Double Coin was part of the China-wide entity was within the scope of the Federal Circuit's mandate and Double Coin waived this argument by not raising it before the Federal Circuit.

Double Coin's request to reopen the issue of *de facto* independence conflicts with the Federal Circuit's mandate and it waived the issue on appeal. "Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) (collecting cases); *see also Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001) (explaining that once a contested issue is addressed by the trial court, that issue is ripe for challenge on appeal and if a party fails to challenge the issue on appeal, the appellate court's mandate acts to preclude the party from raising that issue on remand). Additionally, "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal' may properly be deemed waived." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1382 (Fed. Cir. 2015) (quoting *Engel*, 166 F.3d at 1383); *see also United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) ("[t]here are two major limitations on the scope of a remand. First, any issue that could have been but was not

raised on appeal is waived and thus not remanded. . . . Second, any issue conclusively decided by this court on the first appeal is not remanded."); 13B Wright & Miller, Fed. Prac. & Proc. § 4478.3 (2d ed.) (district court may not "reconsider its own rulings made before appeal and not raised on appeal").

Double Coin is not permitted to reopen the issue of *de facto* independence on remand because the Federal Circuit's mandate did not preserve the issue for remand and Double Coin did not appeal the issue to the Federal Circuit. The question of whether Double Coin demonstrated *de facto* independence was within the scope of this Court's judgment that was appealed to the Federal Circuit because this Court's judgment was premised upon Double Coin being part of the China-wide entity. In *CMA I*, this Court remanded Commerce's application of the China-wide entity rate of 105.31 percent to Double Coin with instructions to apply a rate of 0.14 percent based upon Double Coin's individual data. *See CMA I*, 205 F. Supp. 3d at 1365. In doing so, the Court considered whether Commerce had the statutory authority to apply a China-wide entity rate to Double Coin as part of the China-wide entity without having first conducted an individual examination of the PRC-wide entity on the record of the fifth administrative review. *See CMA I*, 205 F. Supp. 3d at 1335-37. If the Court had ruled that Double Coin was not part of the China-wide entity, however, the Court would not have needed to reach the question of whether Commerce properly investigated the China-wide entity—instead, the Court could have ruled that Double Coin had established independence and therefore Commerce should have applied a rate based on Double Coin's own data without considering whether Commerce properly investigated the China-wide entity. Thus, this Court's decision in *CMA I* proceeded from the premise that Double Coin was part of the China-wide entity.

14

Similarly, in *CMA II*, this Court rejected our request for a voluntary remand for Commerce to reconsider the application of the 0.14 percent rate to Double Coin in light of the Federal Circuit's intervening decision in *Diamond Sawblades*. Although this Court ruled that it did not need to reach the question of whether CMA demonstrated *de facto* independence, the Court stated that this was because it decided that, "the only rate Commerce reasonably could assign the PRC-wide entity on the record of the fifth review would be the 0.14% rate Commerce assigned Double Coin in the Remand Redetermination." *CMA II*, 357 F. Supp. 3d at 1382. This Court held that, "in the fifth review, no Chinese exporter or producer of OTR tires other than Double Coin was in a position to be determined to be part of the PRC-wide entity, with the result that the record contained no information on *any part of the PRC-wide entity except for Double Coin*." *CMA II*, 357 F. Supp. 3d at 1386 (emphasis added). This Court further held that, "Commerce never requested any information from the government of the PRC or from *any part of the PRC-wide entity other than Double Coin*," and that, "if the {China}-wide entity can be presumed to include any exporters or producers of OTR tires *other than Double Coin*, they cannot be identified and do not appear in the record of the review." *Id*. at 1387 (emphasis added). Accordingly, this Court's decision was premised upon Double Coin being part of the China-wide entity, and the issue of whether Double Coin was part of the China-wide entity was within the scope of the Federal Circuit's decision.

This Court's decision in *CMA II* also was premised upon Double Coin being part of the China-wide entity because the Court distinguished *Diamond Sawblades* on the ground that, in this review, no portion of the PRC-wide entity failed to cooperate. *See CMA II*, 357 F. Supp. 3d at 1383 ("In *Diamond Sawblades*, 21 companies that were part of the {China}-wide entity failed to cooperate in the review, and therefore the PRC-wide entity as a whole could be considered to

have failed to cooperate.  Such is not the case here.  In concluding the fifth review, Commerce

stated that Double Coin was a fully cooperative respondent and that no other part of the {China-

wide} entity failed to cooperate.") (quotation omitted).  This Court then held that, "the only rate

Commerce reasonably could assign to the {China}-wide entity is one equivalent to the individual

margin it calculated for Double Coin."  *Id.* at 1384.  The fact that the Court held that Double

Coin's individual data could be the only basis for a China-wide rate in *CMA II* necessarily meant

that the Court's decision proceeded from the premise that Double Coin was part of the China-

wide entity.  This issue thus was within the scope of the Federal Circuit's decision and thus

reopening this issue on remand would conflict with the Federal Circuit's mandate.

Because the Federal Circuit upheld Commerce's application of the China-wide rate to

Double Coin and concluded that Double Coin did not appeal Commerce's finding that Double

Coin failed to demonstrate *de facto* independence from Chinese government control, the Court

should not reopen this issue on remand.

**III.    Commerce's Determination That Double Coin Failed To Qualify For A Separate
          Rate Is Supported By Substantial Evidence And In Accordance With Law**

Even if this Court finds it appropriate to reopen the issue of Double Coin's eligibility for

a separate rate, Commerce's determination that Double Coin failed to rebut the presumption of

Chinese government control is supported by substantial evidence and otherwise in accordance

with law.  In this proceeding, Commerce properly determined that Double Coin failed to rebut

the presumption of Chinese government control due to its majority ownership by a state-

controlled entity, and, as such, was not entitled to a separate, company-specific rate.  *See* IDM at

14-18.  Commerce appropriately considered and weighed the available evidence regarding

Double Coin's degree of independence in its export activities and its conclusion that Double

Coin failed to demonstrate *de facto* independence is supported by substantial evidence.

16

Double Coin incorrectly contends that Commerce's determination regarding its separate rate status is unsupported by substantial evidence. First, Double Coin erroneously contends that Commerce's finding of a lack of *de jure* control allegedly must "inform" Commerce's consideration of the *de facto* factors of control. *See* Double Coin Br. at 27-29. Second, Double Coin contends that Commerce's finding of *de facto* control through majority ownership was insufficient to establish control over Double Coin's export activities. *See* Double Coin Br. at 29-39. Lastly, Double Coin incorrectly argues that Commerce's decision is unsupported by substantial evidence because Commerce allegedly did not demonstrate that Double Coin's board of directors exercised control over Double Coin's export activities after the fact, rather than beforehand by selecting or having the power to replace management. *See* Double Coin Br. at 39-50. All of Double Coin's arguments fail.

### A.    Commerce Properly Determined That Double Coin Failed To Rebut The Presumption Of *De Facto* Chinese Government Control

Applying its *de facto* analysis, Commerce properly determined that Double Coin was subject to *de facto* control by the Chinese government and, accordingly, that Double Coin failed to qualify for a company-specific separate rate. Double Coin argues that Commerce failed to consider certain record evidence in making its determination and to make separate findings regarding each of the four *de facto* independence factors. Double Coin Br. at 12-20. Commerce, however, considered the totality of the record and determined that the evidence cited by Double Coin was insufficient to establish that the company operates free of *de facto* government control. *See* IDM at 18.

As discussed above, Commerce generally considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the

respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See* Policy Bulletin 05.1. In evaluating these factors, Commerce has concluded that where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter, the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally. *See Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) (*Advanced Tech. I*); *Advanced Tech. II*, 938 F. Supp. 2d at 1353.

Pertinent here, Commerce has found that respondents that are under the control of SASAC, which the Chinese government established to administer state owned enterprises (SOEs), are not entitled to separate rates. *See, e.g., Diamond Sawblades and Parts Thereof From the People's Republic of China*, 80 Fed. Reg. 32,344 (Dep't of Commerce June 8, 2015) (final results), and accompanying IDM at Comment 1; *1,1,1,2-Tetrafluroethane From the People's Republic of China*, 79 Fed. Reg. 62,597 (Dep't of Commerce Oct. 20, 2014) (final results) and accompanying IDM at cmt. 1; *Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China*, 79 Fed. Reg. 53,169 (Dep't of Commerce Sept. 8, 2014) (prelim. results) and accompanying Preliminary Decision Memorandum at 5-9; unchanged in *Carbon and Certain Alloy Steel Wire Rod From the People's Republic of China*, 79 Fed. Reg. 68,860 (Dep't of Commerce Nov. 19, 2014) (final results). Commerce's conclusion is based on SASAC's control over, for example, the selection of management, a key factor in determining whether a company has sufficient independence in its export activities to merit a separate rate. Consistent with

18

normal business practices, Commerce reasonably has determined that any majority shareholder, including a government, would have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company. *See* IDM at 14.

Record evidence in this proceeding further supports Commerce's conclusion that Double Coin was not entitled to a separate rate. There is no dispute that SASAC owns 100 percent of the shares in Huayi. *See* Double Coin Preliminary Analysis Memo at 10-14 (C.R. 244; P.R. 264) (citing Double Coin's Verification Report at Section III.B.4 (Oct. 6, 2014) (C.R. 243; P.R. 263) and Double Coin's 2nd Sections A, C, and D Supplemental Questionnaire at Exhibit S2-5 (July 31, 2014) (C.R. 137; P.R. 192)). Huayi is the majority shareholder of Double Coin with 65.66 percent of the ownership shares. The remainder of Double Coin's ownership is held by a diverse range of investors on the stock market, no one of which holds more than a one percent share. *See* IDM at 16; Double Coin Preliminary Analysis Memo at 11 (C.R. 244; P.R. 264). As the majority shareholder, and the sole shareholder with more than one percent of ownership of Double Coin, Huayi has nearly complete control over shareholder decisions, including decisions which may affect the management and operations of the company.

In *Advanced Technology II*, this Court sustained Commerce's determination that the respondent was not entitled to a separate rate under similar facts in an antidumping duty proceeding involving diamond sawblades from China. *See Advanced Tech. II*, 938 F. Supp. 2d at 1345. The Federal Circuit, in turn, affirmed this Court's decision. *See Advanced Tech. & Materials Co. v. United States*, 581 F. App'x 900 (affirmed pursuant to Fed. Cir. R. 36). In that proceeding, SASAC owned 100 percent of the shares of the Central Iron & Steel Research Institute (CISRI). CISRI was the majority shareholder of the respondent and was active in the

selection of its management.  In sustaining Commerce's remand determination, the Court rejected the respondent's artificial distinction between actual instances of government control versus the potential to exercise control, finding that "{t}he point is that because AT&M {the respondent} had not shown autonomy in choosing its own management, Commerce found that AT&M had failed to rebut the presumption of control." *Advanced Tech. II*, 938 F. Supp. 2d at 1348.

Huayi's majority ownership of Double Coin is analogous to CISRI's majority ownership of the respondent in *Advanced Technology II*. This Court should similarly sustain Commerce's determination that Double Coin failed to qualify for a separate rate because it has not demonstrated the autonomy to choose its own management free from control by the Chinese government.

Additionally, contrary to Double Coin's argument that Commerce was required to weigh each of the four *de facto* factors individually, Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. In particular, this Court has held that if a respondent fails the third factor of the *de facto* independence analysis, autonomy in the selection of management, that failure is sufficient to conclude that th respondent lacked independence from state control. *See Yantai CMC Bearing,* 203 F. Supp. 3d at 1326 ("Yantai CMC failed to meet the third factor of the test. Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis.") *Advanced Tech. II*, 938 F. Supp. 2d at 1345 (upholding a determination where Commerce did not make a *de facto* finding on two of the four criteria).  The cases Double Coin cites where this Court remanded for additional analysis of the four factors do not detract from Commerce's discretion to determine that a respondent failed to demonstrate *de*

*facto* independence if it fails to meet any one of the four *de facto* criteria. Double Coin's argument thus fails.

### B. Double Coin's Argument That The *De Jure* Factors Should Be Treated As Dispositive Of Commerce's *De Facto* Analysis Is Incorrect

Double Coin erroneously contends that Commerce's finding (which Double Coin does not dispute) that a majority state-owned entity owned a majority of Double Coin is not sufficient to support Commerce's finding of government control of Double Coin. *See* Double Coin Br. at 20-29. In support of this contention, Double Coin argues that Commerce's finding of a lack of *de jure* control must "inform" Commerce's consideration of the *de facto* factors of control, and that Commerce should have given greater weight to Double Coin's alleged showings of independence, *e.g.*, Double Coin's listing on the Chinese stock exchange, corporate bylaws, minority shareholders, existence of a minority of allegedly independent directors, and separate boards of directors. *See id.* at 28-38.

Double Coin argues that Commerce "effectively concluded the record regarding *de jure* control was irrelevant." Double Coin Br. at 28. Commerce did not, however, find that the *de jure* criteria were "irrelevant," but rather that the factors were not dispositive with regard to control of export activities. IDM at 14-15. Double Coin points to no statute or regulation compelling Commerce to make the *de jure* control factors dispositive of its *de facto* control analysis.

Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies. *See* Policy Bulletin 05.1. In this proceeding, Commerce

determined the Chinese laws and regulations at issue (*i.e.*, the Interim Regulations, and the Company Law) were not dispositive with regard to control of export activities. *See* IDM at 14-15.

Commerce found that the Chinese laws and regulations at issue provided a framework for various corporate entities to form and operate at some distance from the central government. Although these laws and regulations indicate the existence of some degree of government control, Commerce found that the overall legal environment is permissive of individual firms maintaining independent operations with respect to export activities. *Id.* Based on its experience evaluating the separate rate criteria, Commerce determined that the *de jure* factors are not overridingly indicative of the absence of control of export activities in the typical case, but rather they demonstrate an ability on the part of the exporter to control its own commercial decision making. In large part, the laws and regulations that Commerce has examined over the years, such as China's Interim Regulations and the China Company Law, indicate that a certain level of control has devolved in that the commercial decision-making can lie with the various corporate entities operating under these laws and regulations. As a result, Commerce focused its analysis of the record evidence to ensure that there is an absence of *de facto* aspects of government control over export activities. *Id.*

Specifically, Commerce found that China's laws and regulations cited by Double Coin could not affirmatively demonstrate *de facto* independence from government control. *Id.* Commerce's determination was supported by the Court's findings in litigation involving diamond sawblades from China, which dismissed many of the same arguments that Double Coin has made regarding the *de jure* criteria. *Id.* (citing *Advanced Tech. I*, 885 F. Supp. 2d at 1353).

For example, Double Coin claims that under China's Company Law, Huayi cannot exercise control over Double Coin.  Double Coin Br. at 29-31.  This Court rejected a similar argument in *Advanced Technology I*, finding that China's Company Law was "inadequate" to rebut the presumption of *de jure* control because "it lacks . . . common business sense." *Advanced Tech. I*, 885 F. Supp. 2d at 1353.  The Court found that a certain provision of the law relied upon to demonstrate an absence of state control, which also was cited by Double Coin, "does not appear … may reasonably be construed to 'limit' the power of the state in the companies in which the state invests."  *Id.* at 1354 (describing Article 20 of China's Company Law as "preserv{ing} state shareholding power by allocating state institutions, with appropriate governmental deputization, to create wholly state-owned companies in which the state's shareholding power is undiluted.").

Further, in *Advanced Technology I*, this Court found the structure of China's Company Law provides controlling shareholders direct and effectual control because "{s}hareholders have the ability to hire and fire each board member and decide their pay pursuant to Article 38, and each board member is thereby beholden.  That amounts to delegation, as opposed to separation . . . since the general manager, in point of fact, is selected by the same board of directors 'in charge of overall business planning and the selection of upper management' that is 'responsible to the shareholders' and can readily be replaced at their whim."  *Id.*  This Court also addressed Articles 22-27 of China's Code of Governance for Listed Companies, finding that these articles "reveal little to an inquiry into 'governmental control' in the running of a company including its export operations."  *Id.*  In this instance, Commerce similarly determined that the Chinese laws and regulations revealed "little" about the extent of government control over Double Coin's export activities, and as such, properly determined that it had limited bearing on

Commerce's separate rate analysis.  Double Coin's challenge based upon the *de jure* factors thus is unsupported.

### C.    Double Coin's Challenges To Commerce's *De Facto* Analysis Are Meritless

Double Coin admits that "a majority shareholder has significant influence in the constitution of the board, and even in the selection of Double Coin's management."  Double Coin Br. at 36.  Despite this admission, Double Coin contends that Commerce erred in its *de facto* analysis of government control based on its allegations that: (1) Double Coin's Articles of Association state that its managers control the company's day-to-day operations; (2) Double Coin's minority shareholders have "specific rights;" (3) Double Coin's board of directors may have independent directors; and (4) there are no instances in which Huayi "actually exercised" control over the day-to-day operations of Double Coin.  *Id*. at 31-39.  Double Coin's arguments are without merit.

First, Double Coin contends that certain information in its Articles of Association and other company documents on the record demonstrate an absence of *de facto* government control because such documents state that managers control the company's day-to-day operations.  *Id*. at 33.  Commerce evaluated the evidence and reasonably found that even if operational management authority has been granted to certain individuals by the Articles of Association, these managers ultimately answer to Double Coin's board of directors.  *See* IDM at 15-16.  Thus, and as explained above, ultimate control of operations rests with the shareholders, the majority of which is government-owned Huayi, through the board of directors.  *Id*.

Further, in *Advanced Technology I*, this Court rejected a similar argument, finding that managers should be presumed "to be beholden to the board that controls their pay, in particular to the chairman of the board as the *de facto* company head under the PRC model," until proven

otherwise. *Advanced Tech. I*, 885 F. Supp. 2d at 1359.  The Court further held that "{i}f board members are properly presumed subject to governmental control, directly or indirectly, then true independence and autonomy remain in doubt until proven otherwise.  If they are not so presumed, then the presumption of state control is without purpose or application."  *Id.* Similarly, in this proceeding, Commerce reasonably found that, as the controlling shareholder, Huayi is the entity controlling Double Coin's board and management.  *See also Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record.").

Second, Double Coin argues that Commerce ignored that its minority shareholders have certain *bona fide* rights pursuant to the company's Articles of Association that "temper the control" that the state-owned Huayi entity can exert over Double Coin.  Double Coin Br. at 33-36.  Contrary to Double Coin's contention, Commerce addressed this issue and found that the protections afforded to Double Coin's minority shareholders were not sufficient to demonstrate that it was entitled to separate rate status.

Specifically, as Commerce explained in the *Final Results*, the standard for determining such a status is that a non-market economy exporter is presumed to be under government control until such a presumption is sufficiently rebutted.  *See* IDM at 16.  As such, the absence of evidence of control or other demonstrable action on behalf of a minority shareholder does not rebut this presumption of state control absent affirmative proof that the exporter is not subject to state control.  Nor does the existence of certain minority shareholder rights, such as the ability to bring suit against a board member or manager who acts against the interests of the company, or the right of minority shareholders to call a shareholder meeting, prove the absence of government control.  *Id.*  This Court has rejected the argument that a minority shareholder's

"protected rights," including voting rights, is sufficient to demonstrate an absence of government control, finding that, for example, "the power to veto {a board member} nomination does not equilibrate the power of control *over* nomination." *Advanced Tech. I*, 885 F. Supp. 2d at 1358 (emphasis in original).

Similarly, as Double Coin's majority shareholder and the only shareholder with more than one percent ownership, Huayi has near complete control over any shareholder decisions, including decisions which may affect the management and operations of the company. *See* Double Coin Preliminary Analysis Memo at 12 (citing Articles 85 and 133 of Double Coin's Articles of Association) (C.R. 244; P.R. 264). Huayi's choice of management then has control over the day-to-day operations of the company. In the case of an exporter in a non-market economy country, such an arrangement does not rebut the presumption of state control, but rather supports it.

In particular, Article 146 of Double Coin's Articles of Association dictates that its general manager is appointed by the board of directors. *Id.* The general manager, pursuant to Article 114 of the Articles of Association, then is in charge of the company's day-to-day operations and hiring decisions. *Id.* In other words, rather than limit Huayi's control, as Double Coin contends, Double Coin's Articles of Association support Commerce's determination that the majority-owner and sole owner with any significant share-ownership of the company has effective control over shareholder decisions and maintains operational control over the company through the general manager. Through Huayi, a wholly-owned entity of SASAC, the Chinese government has the potential for operational control over the company, and as such, Commerce properly concluded that Double Coin should not be entitled to a separate rate.

Third, Double Coin argues that Commerce ignored the importance of independent members of Double Coin's board of directors. Double Coin Br. at 37. Commerce, however, found that despite Double Coin's claims that any shareholder can nominate a director for a vacant position, no minority shareholder has ever nominated a director and no Huayi nominee has ever been rejected. *See* IDM at 15. In fact, Double Coin's Articles of Association make clear that a minority shareholder's rights are limited. Double Coin Preliminary Analysis Memo at 13 (citing Article 85 of Double Coin's Articles of Association) (C.R. 244; P.R. 264). In other words, as the majority shareholder, Huayi has the ability to unilaterally adopt resolutions of significant importance to the operations of the company regardless of the presence of an independent director on the board of directors. *Id.*

The record demonstrated that Huayi and Double Coin have intertwined management and board members, including, for example, Mr. Liu Xunfeng, who was the Chairman of the boards of directors of both Double Coin and Huayi during the period of review. *See* Double Coin Supplemental Section A Response at 7-8 (June 16, 2014) (C.R. 102; P.R. 149); Double Coin Preliminary Analysis at 13 (C.R. 244; P.R. 264); Double Coin Verification Report (Oct.6, 2014) (C.R. 243; P.R. 263). Further, Commerce found that certain senior managers of Double Coin had prior roles with Huayi. *Id.* at 3; Double Coin Section A Response at 10 (Jan. 22, 2014) (C.R. 14; P.R. 48). Thus, regardless of the possibility of an independent director, the record supports Commerce's determination that the state-owned Huayi had near-complete control over Double Coin's shareholder decisions.

Fourth, Double Coin argues that Commerce erred in finding that Double Coin was not entitled to a separate rate because it could not cite a single example in which Huayi "actually" exercised its legal right to control or influence Double Coin's day-to-day operations. Double

Coin Br. at 38-39.  In making this argument, Double Coin misconstrues the standard for rebutting the presumption of control.  As the party seeking to obtain a separate, company specific rate in a non-market economy proceeding, Double Coin must affirmatively demonstrate the absence of *de facto*, as well as *de jure*, state control.  In other words, the burden to rebut the presumption of government control is on the party seeking separate rate status, not on Commerce to find the "actual" exercise of control over Double Coin's day-to-day operations.

Moreover, and as described above, when Commerce did inquire into the issue during its verification proceedings, Double Coin was unable to provide an example of where a minority shareholder nominated a potential director or a Huayi Group nominee was rejected.  *See* IDM at 15; Double Coin Preliminary Analysis Memo at 12-13 (C.R. 244; P.R. 264).  To the contrary, the record demonstrated that Huayi had the ability to appoint all members of Double Coin's board of directors, which would then appoint the general manager.  *Id.*  Double Coin's general manager, in turn, is responsible for the day-to-day operations of the company.  Thus, Double Coin's argument that it demonstrated *de facto* independence from state control is unfounded.

### D.    Double Coin's Contention That It Showed *De Facto* Independence Due To A Lack Of Board Control Of Its Export Activities Is Unfounded

In the alternative, Double Coin argues that, even assuming that the Chinese government could select the board, which in turn selected management, this does not equate to Chinese government control over Double Coin's export activities.  *See* Double Coin Br. at 39-50.  Double Coin argues that this is because the shareholder control over the selection of Double Coin's board was allegedly too attenuated to constitute control over Double Coin's export activities. Double Coin asserts that these export activities, specifically the prices charged for exports, were set by its U.S.-based affiliate, CMA, without direct involvement from the parent company, and so the ability of the shareholder to control the composition of Double Coin's board does not

28

equate to direct control over Double Coin's export activities.  In essence, Double Coin argues that it should be treated as independent because Commerce did not find evidence that Double Coin's board of directors exerted control over management's decisions *after the fact* rather than beforehand by appointing management or having the power to replace management.  Double Coin's argument is contrary to prior decisions of this Court and is factually unsupported.

Double Coin lists various aspects of its export activities and argues that Commerce lacked substantial evidence for its finding that Double Coin failed to rebut the presumption of state control on the ground that Commerce did not find that the Chinese government actually exercised its control by interfering with management's decisions.  *See* Double Coin Br. at 39-43. Double Coin thus argues that Commerce's determination that Double Coin lacked independence is invalid unless Commerce demonstrates that the Chinese government actually exerted control over its individual export decisions, as opposed to Double Coin failing to rebut the presumption that the Chinese government could control its decisions if it chose to do so.  This argument is inconsistent with the presumption of state control applied to non-market economy producers.

Double Coin makes several claims that Commerce failed to consider certain information in its evaluation of the *de facto* criteria for government control, but it simply disagrees with Commerce's conclusion.  *See* Double Coin Br. 43-46.  Double Coin's disagreement, however, does not render Commerce's decision to be unsupported by substantial evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. at 620 (stating that the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"); *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1381 (Fed. Cir. 2001) ("Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence and is

29

otherwise in accordance with the law."); *Usinor Sacilor v. United States*, 215 F.3d 1350 (Fed. Cir. 1999) ("Our review of the record indicates that the {Court of International Trade} evaluated and weighed the evidence in order to make its own {factual} determination . . . . That was error. It was not proper for the court to conclude that evidence that it considered 'persuasive' eclipsed contrary evidence that Commerce thought persuasive."); *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1350 (Ct. Int'l Trade 2014) ("Because Commerce possesses both expertise and relevant first-hand knowledge . . . the court will not reweigh the evidence before the agency."). All of the export decisions Double Coin references where Double Coin's management allegedly made the decisions without participation from the Double Coin's board do not detract from Commerce's conclusion that the Chinese government had the power to make all of those decisions if it wished through the selection of the board and therefore management. Because Commerce reasonably evaluated and interpreted the record before it, its determination should be sustained.

Contrary to Double Coin's argument that Commerce must demonstrate affirmative exercise of state control over export pricing to find a lack of *de facto* independence over export activities, this Court has found that a determination of whether export prices are set by the exporter's government or the "market" is not determinative for purposes of a separate rate analysis. *Advanced Tech. I*, 885 F. Supp. 2d at 1360. Specifically, the Court stated that "the price of an arm's length transaction to a buyer in the market is always a 'market' transaction by definition, and regardless of any 'setting' of or involvement in price by the seller's government. For that matter, the actual setting of price is only one of the four *de facto* factors described in the Policy Bulletin {05.1}, whereas governmental manipulation of the cost of inputs . . . or rationalization of industry or output are among numerous other scenarios of concern that can

affect seller pricing." *Id.* (internal citations omitted). This Court found that the ability to control board composition, and with it selection of management who would control export activities, was sufficient evidence to support the presumption of state control in *Advanced Technology I*, and the same is true here. Accordingly, Double Coin's argument is indistinguishable from the producer's argument in *Advanced Technology* and its argument should be rejected for the same reasons as in that case.

Further, Double Coin contends that the PRC government could not have controlled its export activities because Double Coin's U.S. affiliate, CMA, is responsible for setting "export pricing." Double Coin Br. at 47. As explained above, however, the ability to set export prices is one of the four criteria that Commerce examines in its *de facto* control analysis. *See* Policy Bulletin 05.1. Commerce reasonably found that CMA's U.S. operations, which addressed one factor of Commerce's analysis, did not overcome the other considerations on the record, including Huayi's ability to make decisions regarding the selection of its management and its power to unilaterally adopt resolutions of significant importance to Double Coin's operations. *See* IDM at 16-17.

Lastly, Double Coin argues that the factual record of this case is distinguishable from *Advanced Technology* because Double Coin allegedly pointed to additional evidence that its export activities were allegedly insulated from Chinese government control by the operation of various layers of management and coordination with Double Coin's U.S. affiliate, CMA. *See* Double Coin Br. at 48-50. Double Coin's argument relies upon the premise that Double Coin establishes *de facto* independence if it shows that "the Double Coin board of directors exercised no influence over the setting of export prices." Double Coin Br. at 49-50. Contrary to Double Coin's argument, however, Commerce properly found that the other *de facto* factors weighed

31

against a finding of independence, and that Double Coin's board of directors exercised influence over the setting of export prices by appointing the management who set them or having the power to replace the management if the management did not comply with the board's directives. *See* IDM at 14-17. Double Coin's argument thus fails for the same reasons as in *Advanced Technology*.

<u>**CONCLUSION**</u>

For the above reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the administrative record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director


/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director


OF COUNSEL:                       /s/ John J. Todor
PAUL KEITH                      JOHN. J. TODOR
Attorney                           Senior Trial Counsel
Office of the Chief Counsel     U.S. Department of Justice
   For Trade Enforcement and Compliance   Civil Division
U.S. Department of Commerce   Commercial Litigation Branch
Washington, D.C. 20230      P.O. Box 480
                            Ben Franklin Station
                            Washington, D.C. 20044
                            Tel: (202) 616-2382
                            Fax: (202) 307-0972
                            Email: john.todor@usdoj.gov


February 4, 2022                Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraph 2(B)(2) of the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in paragraph 2(B)(1)(b) of the Chambers Procedures for a filing under Rule 56.2(h). Specifically, excluding those exempted portions of the brief as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 9,641 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word 2016) used to prepare this brief.

<u>/s/ John J. Todor</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

_____
                                                                    )
CHINA MANUFACTURERS ALLIANCE, LLC    )
AND DOUBLE COIN HOLDINGS LTD.,              )
                                                                    )
                              Plaintiffs,                         )
                                                                    )          Consol. Court No. 15-00124
                              v.                                  )
                                                                    )
UNITED STATES,                                            )
                                                                    )
                              Defendant.                      )
_____)

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is denied; and, it is further

ORDERED that judgment is entered for the United States.

Dated:_____          _____
              New York, New York                                    SENIOR JUDGE